UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10133-RCL |
| | ) | |
| DERONE BREWINGTON | ) | |

DEFENDANT'S PRELIMINARY MEMORANDUM
IN SUPPORT OF MOTION TO SUPPRESS

Defendant Derone Brewington respectfully submits this memorandum in support of his motion to suppress the fruits of his illegal stop and subsequent arrest, both on February 28, 2004.

Since the stop and arrest of Brewington were not supported by a warrant, the government has the burden of showing that the challenged police actions were lawful. See, e.g., United States v. Cruz Jimenez, 894 F.2d 1, 6 (1st Cir. 1990). Defendant reserves the right to amend or supplement this memorandum in response to the government's reply and to the extent that additional discovery and investigation make necessary.

PRELIMINARY SUMMARY OF FACTS[1]

On February 28, 2004, at approximately 6:00 p.m., Boston Police officers observed a black male "standing near the bus stop" in the area of Dorchester Avenue and Talbot Street in

---

[1]This preliminary summary includes some police contentions taken from police reports and prior grand jury testimony in Suffolk County. Defendant reserves the right to amend this statement, and to correct police statements, as the evidence from an evidentiary hearing dictates.

Dorchester.  Boston Incident Report, Feb. 28, 2004.  The area is
well-traveled, being the terminal station for the Red Line as
well as a busy bus hub serving Dorchester and the outlying
community.  Police assert that they observed the man walk up the
block in the direction of Dracut Street and Dorchester Avenue.
He met a "white female," according to the incident report, and
the couple walked a short distance up Dracut Street.  Police
Officer David O'Sullivan testified that he drove past the two
persons, and "I observed at that time, a white female walking
away from a black male.  As she was walking away, she put her
hand in the right-hand pocket."  Transcript of Grand Jury
Testimony of David O'Sullivan, March 11, 2004 at 20.

     Officer O'Sullivan continued up the street and parked his
car.  The man was walking up the street in his direction.  The
officer walked up to the unknown man:

>     I put my hand to his chest and his heart was racing at
>     a high rate of speed.  And I said, `Is there something
>     I should know about, Mr. Brewington, your heart is' --
>     I didn't know his name at the time, actually.  I asked
>     him.  I said, `Is there something I should know about,
>     your heart is racing?'

Transcript of Testimony, March 11, 2004 at 24.  Officer
O'Sullivan frisked the man, removing a small pocket knife from
his pocket.  The officer alleges that the man subsequently broke
away, wiggling free from a jacket that the officer was holding,
and fled.

-2-

Police examined the jacket left behind.  Inside was a Massachusetts identification card in the name Derone Brewington, a set of keys, and a cell phone.  Police requested that a canine be brought to the scene, but the dog lost the scent.  Police returned to the station.  They accessed the computerized criminal record system and learned that the man had a Boston address, 36 Wrentham Street.

In the interim, police stopped the "blond female," later identified as Darlene Court, who allegedly possessed a quantity of cocaine.

At about 9:00 p.m., seven or more officers went to the Wrentham Street address, a wood frame home, and surrounded the property.  They did not have an arrest warrant for Brewington, nor a search warrant for the premises.  Using keys found in defendant's jacket, they opened the exterior door and entered a small vestibule.  Facing an interior locked door, they tested the key in the lock.  Finding that it fit, officers knocked at the door.  When Brewington's girlfriend, Ebonie Minter, opened the door, the officers rushed in and arrested Brewington in the front living room.  He was taken to the station and booked.

Police fanned out through the apartment, and entered the bedroom.  They looked in a closet.  They allege that they secured a consent to search from Ms. Minter, and found firearms in a

-3-

small safe.  Later in the evening, they obtained a search warrant
for the premises, relying upon the fruits of the earlier entry.

Two weeks after the entry, on March 11, 2004, Ms. Minter
appeared before a Suffolk County grand jury and testified as
follows:

> Q: [W]hen you opened the door to the apartment, what
> happened next?
>
> A [Ms. Minter]: They had just all rushed in with their
> guns on and flashlights and they were running around
> looking for him, and then they asked for someone to
> turn on the light, so me and my friend helped them turn
> on the light and then they arrested him.... When the
> lights were on, I seen they had had him under arrest in
> the living room.... He was on the floor.

Transcript of Grand Jury Testimony of Ebonie Minter, March 11,
2004 at 8-9.  She similarly testified in the federal grand jury
that he was arrested in the living room:

> Q [Mr. Berman]: And did he do anything when they came in?
>
> A [Minter]: No.  He was just standing there waiting to be
> arrested.

Transcript of Grand Jury Testimony of Ebonie Minter, March 31,
2004, at 10.

<u>ARGUMENT</u>

I.  <u>THERE WAS NO REASONABLE SUSPICION TO SUPPORT THE STOP</u>

Police observed an unknown man at the busy Ashmont T
station.  The man walked a block where he met a white female.  A
police officer, driving past the two, reported:  "I observed at
that time, a white female walking away from a black male.  As she

-4-

was walking away, she put her hand in the right-hand pocket."
Transcript of Testimony of David O'Sullivan, March 11, 2004 at
20.

A Terry stop requires specific articulable facts to support
a police officer's reasonable suspicion "that criminal activity
may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). The Terry
court set forth a two-prong inquiry, asking first "whether the
officer's action was justified at its inception," and, second,
"whether it was reasonably related in scope to the circumstances
which justified the interference in the first place." Terry, 392
U.S. at 20.

It is unremarkable that a black man might stand near a bus
stop at a busy Boston transit hub. It is equally unremarkable
that the same man might walk about, or meet an unknown white
female. Same for the female, who was seen by Officer O'Sullivan
putting her hand in her own pocket. The officer's response was
to grab Brewington and put his hand to Brewington's chest,
wanting to see whether Brewington's heart "was racing." This
description -- the officer's own -- conveys the flavor of this
urban street stop.[2] What on earth, one might ask, was the

---

[2] This case, as in so many of the cases selected for federal
prosecution, arises from police action in an urban neighborhood.
One recalls the concern expressed by Judge Lynch in her dissent
from the denial of en banc review in United States v. Woodrum,
208 F.3d 8, 10 (1st Cir. 2000), addressing the "extension of
police discretion" in urban neighborhoods and "its societal
consequences": "When one sector of the community feels the brunt

purpose of the officer putting his hand to the young man's chest except, perhaps, to intimidate him?[3]  Certainly, no investigative purpose was served.  The injunction of <u>Florida v. Royer</u> – that "the investigative methods employed should be the least intrusive means reasonably available" – was exceeded.  <u>Florida v. Royer</u>, 460 U.S. 491, 502 (1983) ("We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the <u>Terry</u> line of cases."  <u>Id.</u> at 504.)  <u>See also</u> <u>Atwater v. City of Lago</u>, 532 U.S. 318, 347 (2001) (under <u>Terry</u>, whether a search or seizure is "extraordinary," and therefore harmful to a defendant's privacy interests, "turns, above all else, on the manner in which the search or seizure is executed.")

The stop was not founded on articulable facts supporting a reasonable suspicion of criminal activity.  Rather, it was unwarranted and its fruits must be suppressed.

---

of discretionary police action more than others, that sector may be less likely to accept that the purpose of the law is to protect them."  This same concern animated Judge Woodlock's opinion in <u>United States v. Omar Sharif McKoy</u>, 2004 U.S. Dist. LEXIS 24945, 2004 WL 2851950  (D. Mass. Dec. 9, 2004), discussed <u>infra</u>.

[3] Under the circumstances, it would be remarkable if his heart was not racing.  "Nervousness is a natural reaction to police presence."  <u>United States v. Omar Sharif McKoy</u>, 2004 U.S. Dist. LEXIS 24945 (D. Mass. Dec. 9, 2004) (Woodlock, J.).  All the more, one might think, if an officer puts his hand to a person's chest.

II.  <u>THERE WERE NO CONSTITUTIONAL GROUNDS TO CONDUCT A FRISK</u>

Reasonable suspicion and the manner of the stop aside, there is the separate issue whether the frisk was permissible.  In a recently released opinion, Judge Woodlock noted that a <u>Terry</u> stop does not permit an "automatic frisk" of the suspect:

> This is not to say that officers are entitled to frisk anyone they briefly detain. To have an adequate foundation for such limited searches, the officer "must have constitutionally adequate, reasonable grounds for doing so." <u>Sibron v. New York</u>, 392 U.S. 40, 64, 20 L.Ed.2d 917, 88 S.Ct. 1889 (1968). "[The officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." <u>Id</u>.

<u>United States v. Omar Sharif McKoy</u>, 2004 U.S. Dist. LEXIS 24945, 2004 WL 2851950 (D. Mass. Dec. 9, 2004).  The court expressed concern lest <u>Terry</u> devolve into "an automatic frisk rule in practice" where "the Fourth Amendment rights of citizens ... will be eviscerated." <u>Id</u>. at 10.

Applied here, <u>Terry</u> required that the police have reason to believe that Brewington was armed <u>and</u> dangerous. <u>Id</u>. at 27 [emphasis added].  Police had no such information.  <u>Compare</u> <u>United States v. Osbourne</u>, 326 F.3d 274, 278 (1st Cir. 2003) ("This was not a case involving an unknown suspect; [the detective] had specific information that Osbourne was 'always' armed with a semi-automatic weapon and was a member of a violent street gang.")

In the absence of a factually based, reasonable belief that

defendant was armed and dangerous, evidence derived from the frisk must be suppressed.  It is immaterial whether defendant ran from the grasp of an officer (even if the officer had identified himself).  In Reid v. Georgia, 448 U.S. 438 (1980), petitioner was stopped by DEA agents at the Atlanta Airport after he was observed carrying a shoulder bag in the company of a second male who left the terminal with the petitioner.  Outside the terminal, DEA agents approached the petitioner and questioned him about his port of embarkation.  The agent asked if the petitioner would agree to go back into the terminal and if the petitioner would consent to a search of his person and his shoulder bag.  The agent testified that the petitioner agreed to the search but as they entered the terminal, the petitioner ran.  During his flight and before he was caught by the agents, the petitioner threw the shoulder bag down.  The agents opened the shoulder bag and discovered cocaine inside it.  The Reid court ruled that there was no valid Terry stop and that the petitioner and his luggage had been unlawfully seized by the DEA agents.  See also Florida v. Bostick, 111 S.Ct. 2382 (1991) (holding that a seizure occurs when circumstances show that a reasonable person would believe he or she was not free to leave).

Similarly, the police here illegally frisked defendant and illegally seized his jacket.  The frisk and its fruit must be suppressed.

-8-

III.  THE ENTRY INTO THE VESTIBULE OF THE TWO-FAMILY HOUSE
      WAS UNLAWFUL

     After returning to the station, officers learned of a local
address from Brewington's probation sheet.  Without seeking an
arrest warrant, they went to the address, 36 Wrentham Street, and
surrounded it.  Using defendant's key, they let themselves into
the small vestibule of the house.  They knocked at the interior
door, and when it opened, they rushed into the apartment, grabbed
the defendant and pushed him to the floor.

     Thirty Six Wrentham Street is a residential wood-framed
house, tan with brown trim.  Two photos of the property are
attached to the Affidavit of Ebonie Minter, see Attachment A.
From the outside, it appears to be a single family home.  The
only hints that the building has more than one occupant are two
buzzers to the right of the front door, along with two mailboxes.
It has a single front door, kept locked, with a small glass pane
covered by a curtain.  The curtain shields from view a small
vestibule which measures approximately four foot by six foot.
Upon entry, there is a locked door on the first floor, and, to
the right, a staircase to the second floor.  See Affidavit of
Ebonie Minter, at ¶ 3.  It was into this small vestibule that
police entered uninvited – more bluntly, trespassed – on
February 28, 2004.

     The small vestibule is shared by the two apartments in the
building.  The first floor apartment was rented by defendant's

-9-

girlfriend, Ebonie Minter. Id. Defendant stayed at the
apartment, according to Ms. Minter, "[t]he majority of the week
and on the weekends." Transcript of Testimony of Ebonie Minter,
March 31, 2004 at 6. The second apartment, upstairs, was
occupied by a woman (Theresa) and her two young children. Both
tenants kept the property clean, including taking responsibility
for keeping the entry way swept and clean. They kept items of
property in the entry area, including cleaning implements and
some child toys. The tenants were on good terms. The upstairs
tenant occasionally allowed her daughters to go downstairs to the
Minter apartment, feeling safe because the outer door was always
kept locked. Affidavit of Courtney Roberts, ¶ 8, appended hereto
as Attachment B. The house is small and intimate, with the
tenants sharing an expectation of privacy that the property,
including the small inside vestibule, would be secure against
intruders and protected against unauthorized entry. See
Affidavit of Ebonie Minter, ¶ 7.

A.

In McDonald v. United States, 335 U.S. 451 (1948), two
Justices (Jackson and Frankfurter) concurring in a 5-person
majority, stated that a tenant has a constitutionally protected
privacy interest within the locked common areas of his rooming
house. At issue was whether police officers violated the
defendant's right to be secure from unreasonable search and

seizure when they entered the locked common area of his rooming house without a search warrant. The officers arrested the defendant and searched his room after observing, from their position within the hallway, the defendant engaged in illegal activity within his room. The Court ruled for the defendant, stating, "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." Id. at 455. As the police claimed no emergency in this case, the Court concluded that faithful adherence to constitutional principles would not tolerate the absence of a search warrant.

The First Circuit has not acknowledged McDonald in its cases addressing privacy in common areas of residences. Moreover, the court has not addressed whether an occupant of a 2-family house has an expectation of privacy in a common area. It has addressed claims to privacy in certain unlocked areas of apartment buildings and complexes, specifically unlocked basements and garages. In United States v. Cruz Pagan, 537 F.2d 554, 559 (1st Cir. 1976), the court ruled that there was no privacy right in an underground parking garage and basement of a multi-unit apartment house. The apartment in question was part of a large complex (the defendant lived in apartment 311 of the El Girasol Condominium) and the court referred to the "well travelled common area" of the complex. Id. at 558. In United States v. Hawkins, 139 F.3d 29, 32-33 (1st Cir. 1998), the court denied an

-11-

expectation of privacy in the "unenclosed areas of the basement" of an apartment building in which defendant occupied unit 5.  The basement had "open storage areas, enclosed within a framing covered with chicken wire, the interiors of which were visible from outside."  Id. at 31.  The court expressed the view that "it is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building."  Id. at 32.  This dicta, of course, utterly ignored McDonald, but, in any event, appears limited to garages and basements in large buildings.  See, e.g., United States v. Thornley, 707 F.2d 622, 625 (1st Cir. 1983) [finding no privacy expectation in an unlocked basement storage area of a residence with eight persons, the court explained that the factors weighing against an expectation of privacy were that the door to the storage area was not kept locked and access to the basement was not restricted as to any of the eight tenants].  In contrast, the Sixth Circuit takes a different view, one more consonant with McDonald.  In United States v. Carriger, 541 F.2d 545 (6th Cir. 1976), the court explained that, for Fourth Amendment purposes, "a tenant of an apartment building expects other tenants and invited guests to enter in the common area of the building but he does not expect trespassers."  541 F.2d 545.  The court held that there was an inherent privacy interest violated when a trespasser enters the building's common areas and "each tenant of a

building, while he has no right to exclude from the common
hallways those who enter lawfully, does have a personal and
constitutionally protected interest in the integrity and security
of the entire building against unlawful breaking and entry." Id.
at 550. When a police officer enters a locked building, without
authority or invitation, the evidence gained as result of his
presence in the common areas of the building must be suppressed.
The court explained that even though a key was used to enter the
building:

> Whether the officer entered forcibly through a
> landlady's window or by guile through a normally locked
> entrance door, there can be no difference in the
> tenant's subjective expectation of privacy, and no
> difference in the degree of privacy that the Fourth
> Amendment protects.

Id. at 551; United States v. Heath, 259 F.3d 522, 533 (6th Cir.
2001).

In this case, we analyze the claim to privacy in a small
vestibule of a private house, not in "a well travelled common
area of an apartment house or condominium," as in Cruz Pagan, 537
F.2d at 558. Consistent with Cruz Pagan and Thornley, we look to
the degree of control a tenant retains over personal space within
a common area. Id. We do so in the context of First Circuit
cases which have shown sensitivity to privacy claims where access
is limited to a few persons. In United States v. Marshall, 348
F.3d 281, 284 (1st Cir. 2003), the court, in assessing whether
authority existed for the search of two rented rooms in a small

-13-

house, looked to see if one of the occupants had consented to the search. The fact that the property was shared with a few others was not dispositive. It is clear from Marshall, and plainly stated in other cases, that a person may have a constitutionally protected right to privacy even when his/her access is "shared" with others. In United States v. Mancini, 8 F.3d 104 (1st Cir. 1993), the court affirmed suppression of an appointment calendar belonging to the mayor of North Providence. The calendar was found by authorities in a records archive accessible to a limited number of other persons. The fact that the premises were not under defendant's exclusive control did not defeat the claim to privacy.[4] See also Commonwealth v. Hall, 366 Mass. 790, 795 n.5, 323 N.E.2d 319, 323 n.5 (1975) ("We draw support for our conclusion [of a right to privacy in a hallway within a 3-story building] from those cases in which a small number of tenants share a hallway but the outer door is kept locked, and it is held that this limitation of access itself is enough to create an expectation of privacy. [cites omitted]").

---

[4] Mancini makes plain that shared access may be entirely consistent with a claim to privacy. For example, the court noted that "[i]t is undisputed that, under certain circumstances, a corporate officer or employee may assert a reasonable expectation of privacy in his/her corporate offices even if shared with others, and may have standing with respect to searches of corporate premises and records. [cite omitted]." Mancini, 8 F.3d at 109 [emphasis added].

-14-

B.

A two-family home is far more intimate than an apartment complex, with fewer occupants and a greater sense of seclusion. Access is shared with one other family; under Mancini, 8 F.3d at 108, such "shared access" is entirely consistent with a reasonable expectation of privacy.  Residents of two-family homes expect intimacy and quiet, unlike tenants of larger buildings, who surrender that quiet for the greater anonymity of the bigger building.  "In a typical apartment building the need of each tenant for privacy competes with the fact that other tenants and their guests and business invitees, the landlord's caretaking employees, and still others, must also use such areas as hallways, stairs, lobbies, and cellars."  Commonwealth v. Hall, 366 Mass. at 794.  These differences are reflected in our language.  In common usage, we distinguish between an apartment house and a two-family (indeed, even triple-deckers), never referring to the latter as an "apartment house."

Several circuits, including the Fifth, Sixth and Ninth, and the District of Columbia district court have held that occupants in small houses have an increased expectation of privacy.

In Fixel v. Wainwright, 492 F.2d 480, 483 (5th Cir. 1974), the court ruled that defendant's dwelling, a four-unit apartment building, was distinct from a large apartment complex or motel and that he enjoyed a legitimate interest of privacy in the

backyard of the dwelling.  The court reasoned that
"[c]ontemporary concepts of living such as multi-unit dwellings
must not dilute Fixel's right to privacy any more than is
absolutely required."  Id. at 484.

In United States v. King, 227 F.3d 732, 746 (6th Cir. 2000),
addressing whether the common areas of a two-family dwelling
("duplex") should be treated differently for purposes of Fourth
Amendment protection than an apartment building, the court ruled
that a defendant enjoyed a reasonable expectation of privacy in
the basement area of the dwelling.  The court stated:

> ... [A] tenant in a small two-family dwelling such as a
> duplex would have a reasonable expectation of privacy
> in an area shared only by the duplex's tenants and the
> landlord. Stated differently, the nature of the living
> arrangements of a duplex, as opposed to a multi-unit
> apartment building, affords the tenant of the duplex a
> greater expectation of privacy in areas the tenant of
> the multi-unit apartment building would not enjoy,
> because in the case of a duplex, access to such areas
> is limited to the duplex's tenants and landlord.

Id. at 750.

In United States v. Fluker, 543 F.2d 709 (9th Cir. 1976),
addressing a three unit building, the court held that the
defendant had a reasonable expectation of privacy in the corridor
separating the door of his apartment from the outer doorway of
the building. The court noted that the defendant lived with only
two other tenants and that access to the entryway was limited as
a matter of right to the two basement tenants.  Furthermore, the
outer door was always locked, with only the building's three

-16-

tenants having keys.  The few tenants exercised "considerably
more control over access to that portion of the building than
would be true in a multi-unit complex, and hence could reasonably
be said to have a greater reasonable expectation of privacy than
would be true of occupants of large apartment buildings."  Id. at
716.

In United States v. Drummond, 98 F.Supp.2d 44 (D.D.C. 2000),
the court addressed a "small, residential, two-story dwelling
containing only two apartments--the defendants' first-floor
apartment and an apartment upstairs."  Id. at 46.  Police entered
the outer door without announcement, and found the first-floor
apartment's inner door partially open. The officers then
announced themselves, but immediately entered the apartment
without giving the occupants a chance to allow or deny entry.
The court concluded that the apartment occupants "had a
legitimate expectation of privacy in the entryway behind the
outer door."  98 F.Supp.2d at 49.  Again, the court focused on
the size of the apartment and the degree of control reserved by
the defendant, reasoning:

> In this case, the area in question is not common to
> anyone but these two defendants. There was no shared
> space between these defendants and any other member of
> the general public, as there was in each of the cases
> cited by the government. Defendants here would have
> "reasonably believed that [this area was] not open to
> the world at large." United States v. Lyons, 706 F.2d
> 321, 325-26 (C.A.D.C. 1983).  The difference between
> this building and the buildings involved in the cases
> cited by the government highlights the critical

distinction in the legitimacy of defendants' privacy
expectation here.  In this respect, the government's
argument that apartment hallways are never areas in
which one can have a legitimate expectation of privacy
fails to note the important principle that the Fourth
Amendment protects people, not places.  See Katz v.
United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511
(1967).

The Drummond court also held that the officers violated the knock

and announce rule at the outer door.  See 98 F.Supp.2d at 53.  In

rejecting the government's argument that knocking at the outer

door placed an undue burden on law enforcement, the court said:

> This opinion does not support the general proposition
> that police are required to knock at the outer door to
> any apartment complex.  It recognizes that greater
> police diligence may be required where the police can
> reasonably be expected to know that there is a very
> small number of units within a residential building,
> where they are unclear how many other residents are
> living in the building, and where they are unclear
> whether the public has access to the area in the
> building behind the entrance door.

Id. at 51.  See also United States v. Case, 435 F.2d 766 (7th

Cir. 1970) [locked hallway used by a very confined group, and,

most of the time, limited to the proprietors of the stores in the

commercial building]; United States v. Blank, 251 F.Supp. 166 (N.

D. Ohio 1966)

Two circuit courts, in divided panel decisions, have

rejected claims to privacy, but not without vigorous dissenting

opinions, including one by the respected Judge Jon Newman of the

Second Circuit.  In United States v. Holland, 755 F.2d 253 (2d

Cir. 1985), addressing a two-family home, the two-judge majority

reversed the district court's order granting the defendant's motion to suppress evidence seized incident to the defendant's warrantless arrest.  The court ruled that defendant did not enjoy a reasonable expectation of privacy in the vestibule of the two-story dwelling where the defendant resided in the second floor apartment.  In dissent, Judge Newman disagreed with the majority's conclusion based upon the unique nature of the limited size of the dwelling.  Id. at 259.  Judge Newman reasoned:

> I have no doubt that a tenant in a multi-apartment
> building must accept the risk that someone else will
> admit a police officer into the common areas of the
> building and, if the defendant is present in those
> areas, he may be arrested there upon probable cause.
> But following Katz (temporally and substantively), I
> believe a tenant has a legitimate expectation of
> privacy in a hallway when he is using it to admit
> someone to his home; at least, this should be so in a
> small two-family house like Holland's.

Id.

Similarly, in United States v. McCaster, 193 F.3d 930, 931-32 (8th Cir. 1999), addressing a duplex, the court ruled that there was no expectation of privacy in a hall closet located within a common area of the duplex in which defendant resided. In partial dissent, Judge Heaney stated that, "in [his] view, a tenant in a duplex has a reasonable expectation of privacy in common areas shared only by the duplex's tenants and the landlord." Id. at 934 (Heaney, J. concurring in part and dissenting in part).

Both the front and back doors of the duplex had locks,
and only the tenants and the landlady had access to the
duplex. Further, the closet was shared only by the
tenants and the landlady. Thus, because the right to
access to the duplex and use of the closet was limited
to these individuals, McCaster could reasonably have
expected greater privacy than if he resided in a
multiple-unit building.

The nature of the living arrangement in a duplex, as
opposed to a multi-unit building, leads me to conclude
that a tenant in a duplex has a reasonable expectation
of privacy in common areas shared only by the duplex's
tenants and the landlady.

Id. at 935.

Cases in several states recognize a right to privacy in
small buildings. In the previously-quoted Commonwealth v. Hall,
388 Mass. 790, the court held private a common hallway in a
three-story house. In People v. Killebrew, 76 Mich. App. 215,
218 256 N.W.2d 581, 583 (Mich. Ct. App. 1977), addressing a two-
apartment building, the Michigan Court of Appeals held that the
defendant's motion to suppress was properly granted because:

Generally, a hallway shared by tenants in a private
multi-unit dwelling is not a public place. It is a
private space intended for the use of the occupants and
their guests, and an area in which the occupants have a
reasonable expectation of privacy. In the case at bar
there were only two apartments sharing a common
hallway, entry to which was limited by right to the
occupants. These occupants certainly could expect that
a high degree of privacy would be enjoyed in that area.

Id. at 218. The court noted that "The warrantless search and
seizure was not justified by the plain view exception as the
police officers were not rightfully in the hallway when they
spotted the evidence." Id. See Connecticut v. Reddick, 207

-20-

Conn. 323, 541 A.2d 1209, 1214 (Conn. 1988) [defendant's
subjective expectation of privacy in the common basement of a
two-family house was reasonable]; State v. Di Bartolo, 276 So. 2d
291 (La. 1973)(police did not have a right to be in the hallway
of apartment building, which was not truly public in nature, or
in the building, which was kept locked with access only to
tenants and guests.)

C.

As is reflected in the summarized cases, a person enjoys,
and expects, greater privacy in a smaller residence.  In larger
buildings, tenant traffic is greater and tenants are accustomed
to the entry of trades persons, delivery persons, and visitors.
In larger buildings, it is entirely ordinary to see persons
passing in the hallway, whether waiting for an elevator, or
delivering a pizza.  In a smaller building, the sound of a person
entering the building or walking in the hallway, even during
daytime hours, can be unsettling.  One expects quiet, not the
commotion that is life in the apartment complex.  The entry of
persons, uninvited, is decidedly more intrusive and more
disturbing.  See generally Sean M. Lewis, The Fourth Amendment in
the Hallway: Do Tenants Have a Constitutionally Protected Privacy
Interest in the Locked Common Areas of Their Apartment
Buildings?, 101 Mich. L. Rev. 273 (2002).

Here, police arrived at the outer door just before 9 pm, well after nightfall.  They entered the small residential building uninvited and unannounced.  In doing so, they intruded into an area where defendant and his girlfriend enjoyed a reasonable expectation against warrantless government intrusion. The violation of that constitutional assurance, the intrusion into that privacy, mandates suppression of the fruits of the illegal entry.

IV.  THE WARRANTLESS IN-HOUSE ARREST VIOLATE PAYTON v. NEW YORK

After entering the vestibule, police then approached the door to the apartment, again without benefit of a warrant.  As the door opened, they poured into the apartment, putting defendant to the floor and cuffing him.  At the time, defendant was standing in the living room to the left of the front door of the apartment.  As related in the state grand jury testimony of Ebonie Minter, given within two weeks of the arrest:

> Q: [W]hen you opened the door to the apartment, what happened next?
>
> A [Ms. Minter]: They had just all rushed in with their guns on and flashlights and they were running around looking for him, and then they asked for someone to turn on the light, so me and my friend helped them turn on the light and then they arrested him.... When the lights were on, I seen they had had him under arrest in the living room.... He was on the floor.

Transcript of Grand Jury Testimony of Ebonie Minter, March 11, 2004 at 8-9.

As stated in <u>United States v. United States District Court</u>, 407 U.S. 297, 313 (1972), "[the] physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  In the words of Justice Jackson:

> The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

<u>Johnson v. United States</u>, 333 U.S. 10, 14 (1948).

"[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into the home." <u>Kirk v. Louisiana</u>, 536 U.S. 635, 638 (2002).  This reaffirms the principle of <u>Payton v. New York</u>, 445 U.S. 573, 590 (1980), prohibiting a warrantless entry into a suspect's dwelling for a routine felony arrest in the absence of valid consent or exigent circumstances.  <u>Payton</u> rested on the special protection individuals enjoy in their homes under the Fourth Amendment.  <u>Id</u>. at 589.[5]  As stated in <u>Buenrostro v. Collazo</u>, 973 F.2d 39 (1st Cir. 1992):

> <u>Payton</u> sends the clearest signal for our purposes. There, the Supreme Court held that a non-consensual, non-exigent, warrantless entry into a home to effectuate an arrest transgressed the Fourth Amendment, notwithstanding that probable cause sufficient to

---

[5] This special protection is also extended to an overnight guest in the host's home.  <u>See</u> <u>Minn. v. Olson</u>, 495 U.S. 91, 96-98 (1990).

justify the same arrest in a more public arena may have
existed. <u>Payton</u>, 445 U.S. at 590; see also <u>Minnesota v.
Olson</u>, 495 U.S. 91, 95, 109 L. Ed. 2d 85 , 110 S. Ct.
1684 (1990) (describing <u>Payton</u> as holding "that a
suspect should not be arrested in his house without an
arrest warrant"); <u>New York v. Harris</u>, 495 U.S. 14, 17-
18, 109 L. Ed. 2d 13 , 110 S. Ct. 1640 (1990) (<u>Payton</u>
"drew a line" prohibiting police from entering a
person's home without a warrant); <u>United States v.
Beltran</u>, 917 F.2d 641, 642 (1st Cir. 1990) (apart from
exigent circumstances or a consensual entrance, the
Constitution requires the police to obtain a warrant
"before entering a person's home to make an arrest").
Absent some legally cognizable justification, then,
appellants violated a clearly established
constitutional right when they unceremoniously hauled
the plaintiff from hearth and home.

<u>Id</u>. at 43.

    Warrantless arrests in suspects' dwellings are presumptively

unreasonable. <u>See</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984)

("presumption of unreasonableness . . . attaches to all

warrantless home entries").  The arrest of Brewington, and its

fruits, should be suppressed.

V.  HIS COURT SHOULD SUPPRESS THE FRUITS OF THE ILLEGAL
    DETENTION AND ARREST

    This Court should suppress the fruits of the unlawful

detention, frisk and arrest of defendant.  All physical evidence

seized by the police should be suppressed as direct fruit of the

unlawful conduct.  Any statements made by defendant are

inadmissible since they occurred during confinement following the

unlawful arrest.  <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975) (a

confession "obtained by exploitation of an illegal arrest" may

not be used against a criminal defendant.)   Evidence discovered

-24-

as a result of these violations, including evidence obtained
pursuant to a search warrant later executed which had been issued
on the basis of an affidavit containing the fruits of the earlier
violations, must be suppressed.

                              DERONE BREWINGTON
                              By his attorney,

                              /s/ Charles P. McGinty

                              Charles P. McGinty
                                 B.B.O. #333480
                              Federal Defender Office
                              408 Atlantic Avenue
                              Boston, MA  02110
                              Tel: 617-223-8061

Date:  February 18, 2005