UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 04-cr-10133-RCL |
| ) | |
| DERONE BREWINGTON ) | |

**GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS**

**I.   Introduction**

Defendant DERONE BREWINGTON has moved this Honorable Court to suppress various (and unspecified) items of physical evidence found immediately after police first stopped the defendant on suspicion of narcotics distribution.  Defendant has further moved this Court to suppress additional (and unspecified) items of evidence recovered after he was ultimately apprehended in an apartment to which he fled after he assaulted the police officer who initially stopped him, along with statement made by the defendant after his arrest.  Defendant's motion should be denied.

Contrary to the claims made in Defendant's Motion to Suppress and in his accompanying Memorandum of Law (collectively, "Defendant's Motion"), Boston Police Officer David O'Sullivan properly stopped and frisked the defendant and after he and other officers observed the defendant engage it what appeared to be a narcotics transaction.  After he was stopped, the defendant assaulted Officer O'Sullivan.  The officer shortly thereafter confirmed that the defendant had just sold narcotics to another person.  Less than one hour after the initial stop of the defendant, the officers properly arrested him inside his girlfriend's apartment at 36 Wrentham Street in Dorchester.  They subsequently searched that apartment after receiving consent from the defendant's girlfriend, and interviewed the defendant after the defendant waived his Miranda rights.  Because the police action throughout this case was proper, there is

no grounds to suppress any of the evidence in this case.

For all these reasons and the reasons discussed below, Defendant's Motion should be denied.

## II.     Factual Background:

The United States expects that the following facts will be established at the upcoming hearing on this matter:

On February 28, 2004, officers assigned to the Boston Police Drug Control Unit engaged in an unmarked patrol in the vicinity of Dorchester Avenue and Talbot Avenue, an area known to them as having a high incidence of drug trafficking. During the course of their observations, the officers saw the defendant pacing back and forth near a bus station, appearing to look into the windows of each passing car. The officers observed that the defendant remained at the bus stop even after the bus that services the bus stop arrived and left. A short time after the bus left, Police Officer Felipe Colon observed the defendant talking on his cellphone, and saw the defendant walk a short distance to the corner of Dorchester Avenue and Dracut Avenue where he met a white female later identified as Darlene Court. At approximately 6:20 in the evening, Officer Colon observed the defendant and Darlene Court engage in a very short conversation and exchange items that he could not see. Officer Colon then observed the defendant and Darlene Court rapidly walk off in different directions. During the course of these observations, Officer Colon was in constant radio communication with the other members of his unit, informing them of his observations.

At the same time that Officer Colon made these observations, and as a result of Officer Colon's radio communications, another Boston Police Officer, David O'Sullivan, drove his

unmarked police car near to the site of the Darlene Court/Derone Brewington exchange. Officer O'Sullivan observed these two individuals talking, then briefly lost sight of them as he maneuvered his vehicle. When he regained sight of them, he observed Darlene Court walking away from the defendant and placing something into her pants pocket.

After Colon and O'Sullivan communicated their observations to each other and to other members of the team, Officer O'Sullivan followed the defendant and stopped him further up Dracut Street. Officer O'Sullivan, who at this point was alone, identified himself as a Boston Police Officer, and asked the defendant if he just talked to a female down the street. The defendant admitted that he had. Officer O'Sullivan observed that during this conversation the defendant appeared to be nervous. Officer O'Sullivan then touched the defendant's chest and noticed that the defendant's heart was racing, further increasing Officer O'Sullivan concern. Officer O'Sullivan, who feared for his safety because he was alone dealing with a person under suspicion of drug distribution, asked the defendant whether he was armed. The defendant said that he was not. However, after a pat frisk of the defendant, the officer recovered a knife from the defendant's back pocket. The defendant then offered to provide Officer O'Sullivan with an identification. As the defendant reached towards his pocket, ostensibly to provide his identification, he hit Officer O'Sullivan with his forearm, and attempted to flee. A struggle ensued. After a brief tussle, Officer O'Sullivan grabbed the defendant's jacket, but the defendant wiggled out of his jacket and fled in the direction of Wrentham Street, which was about one block away.

At the same time that Officer O'Sullivan stopped the defendant, Officer Colon and others stopped Darlene Court. They recovered 1/4 ounce of crack cocaine from Darlene Court, who

stated that she had just purchased the drugs from Derone Brewington.

After the defendant fled from the police, the officers called a K-9 unit. The police dog followed the defendant's scent to the vicinity of 36 Wrentham Street, but then apparently lost the scent. The officers also recovered from the defendant's jacket a wallet with a driver's license identifying the defendant as Derone Brewington with a Brockton address, and a set of keys. At 6:50 pm, approximately 30 minutes after Brewington fled from the police, the officers ran Brewington's criminal history, and discovered that he was on probation, with a last known address of 36 Wrentham Street in Dorchester. The officers immediately returned to 36 Wrentham Street.

Upon arrival at 36 Wrentham Street, the officers observed a two family house with a single common entrance leading to a small vestibule, which was entirely visible through the main door's window. The officers opened this common door, which they found unlocked. The officers could see that the downstairs apartment had all its lights off, so they proceeded to the upstairs apartment, and knocked on the door. A girl and a woman at the upstairs apartment opened the door. The officers showed the woman a picture of the defendant, and asked if he lived in the building. The woman nodded and then pointed downstairs and mouthed that he was home. She then indicated to the officers that she did not want the defendant to know that she had spoken to the officers.

The officers then proceeded to the first floor apartment at 36 Wrentham Street, knocked on the door, and identified themselves as police officers. As they were knocking on the door, the officers heard sounds from within the apartment, and observed that the lights went on. The officers then heard a woman inside the apartment state that she would open the door. As the

door opened, the officers observed the defendant running towards the back of the apartment, in the direction of a closet. The officers stopped the defendant, and opened the closet. Inside the closet they found a bullet proof vest and two safes, along with clothes and other objects.

The officers then removed the defendant from the apartment. While he was being removed from the apartment, the defendant repeatedly yelled, "There is nothing here, there is nothing here."

After the defendant left the apartment, Sergeant Detective Al Terestre, spoke with Ebonie Minter. Ms. Minter stated that she rented the apartment in her own name, but that the defendant occasionally stayed there with her. She gave oral and written consent for the officers to search the apartment in general and one of the two safes in the closet in particular. Ms. Minter stated that she kept documents inside the safe, and provided a key to the safe. Inside that safe, the officers found the guns and ammunition that led to the charges contained in the second count of the Superceding Indictment in the instant matter. The officers also discovered that one of the keys on the keychain they recovered from the jacket that the defendant abandoned on Dracut Avenue also operated that safe. Ms. Minter also stated that she did not have access to the second safe, and believed that it belonged to one of the defendant's friends. The officers subsequently obtained a search warrant for Ms. Minter's apartment, and for both safes. Inside the second safe the officers found a quantity of cocaine. This cocaine does not form the basis of any charge in the Superceding Indictment.

Later that evening, at the police station, the defendant was read his Miranda rights and agreed to waive them. He then provided a statement to the police. During the course of that statement he first appeared to admit that he sold drugs to Darlene Court, then denied it and

claimed that he had been trying to obtain prostitution services from her. He also stated that the guns and ammunition found in the apartment were his alone and did not belong to Ebonie Minter or any other person. Defendant denied any knowledge of the drugs found in the second safe.

### III.    Argument:

####    A.    The Stop and Frisk of Defendant was a Proper Terry Stop

Police Officer David O'Sullivan had a reasonable suspicion that criminal activity was afoot when he stopped the defendant. This reasonable suspicion came from his knowledge of the dangerous drug activities that occurred in the neighborhood, his own observations of the defendant's behavior, and the information that had been radioed to him by other police officers who had observed the defendant for several minutes and who had witnessed a hand to hand exchange between the defendant and Darlene Court. This information also led to the officer's justified belief that the defendant could have been armed and dangerous, allowing him to pat frisk of the defendant.

Investigatory stops of defendants are governed by the Supreme Court's ruling in Terry v. Ohio, 392 U.S. 1 (1968). In Terry, 392 U.S. at 22, the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to effect an arrest." In determining whether a particular investigatory seizure or search violates the Fourth Amendment's protection against unreasonable searches or seizures, the inquiry is the now familiar two-prong test announced in Terry -- "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; see also United States v. Sharpe,

6

470 U.S. 675, 682 (1985); United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990); United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987).

The Supreme Court in Terry recognized: "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" Terry, 392 U.S. at 21, quoting, Camara v Municipal Court, 387 U.S. 523, 534-535, 536-537 (1967). To assess the need to search, the Court established the "articulable suspicion" standard against which officers' conduct must be measured: "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21.

The articulable suspicion standard is not a stringent one. "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." United States v. Sokolow, 490 U.S. 1, 7 (1989), quoting, INS v. Delgado, 466 U.S. 210, 217 (1984) (emphasis added). As stated by the United States Supreme Court:

> That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," Illinois v. Gates, 462 U.S. 213, 238 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause, see United States v. Montoya de Hernandez, 473 U.S. 531, 541, 544 (1985).

Sokolow, 490 U.S. at 7; see also United States v. Jackson, 918 F.2d 236, 239 (1st Cir. 1990); Alabama v. White, 496 U.S. 325, 330 (1990) ("Reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

The second prong of the Terry standard, the assessment of the reasonableness of safety

7

measures taken during an investigatory stop, is as follows:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. . . The officer need not be absolutely certain that the individual is armed: <u>the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger</u>.

<u>Terry</u>, 392 U.S. at 24 (<u>emphasis</u> <u>added</u>); <u>see</u> <u>also</u> <u>Trullo</u>, 809 F.2d at 113. As stated by the Supreme Court at that time: the second prong is "concerned with more than the governmental interest in investigating crime – there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that . . . could be used against him." <u>Terry</u>, 392 U.S. at 23. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." <u>Id</u>.

Although articulable suspicion is also the measure of reasonableness under the second prong of <u>Terry</u>, it is not necessary that the specific facts observed in any rigorous sense constitute proof that the officer or others are in danger. "The standard necessary to establish reasonable suspicion 'is considerably less than proof . . . by a preponderance of the evidence.'" <u>United States v. Kikumura</u>, 918 F.2d 1084 (3rd Cir. 1990), <u>quoting</u>, <u>Sokolow</u>, 490 U.S. at 7.

The First Circuit has considered several <u>Terry</u> stops in which officers observed conduct strikingly similar to that which led to the stop in the instant case. In each instance, the First Circuit has found the stops constitutionally permissible. For example, in <u>United States v. Trullo</u>, 809 F.2d 108 (1st Cir. 1987), the court considered whether a <u>Terry</u> stop was justified by officers'

observations of an individual engage in a brief conversation with the driver of a parked vehicle, enter the vehicle for a very brief drive, and then leave the vehicle. In analyzing the propriety of the officer's stop and frisk in that case, the court stated: "We wish to make clear at the outset that a determination of whether the stop was justified at its inception depends on the totality of the circumstances confronting the officer." Trullo, 809 F.2d at 111. The court ultimately found the stop justified based on two factors: 1) the incident occurred in a high crime neighborhood in which narcotics transactions frequently take place; and 2) in the officers' experience such brief conversations between individuals are indicative of an illegal transaction. The Court noted that the "circumstances under which the officers acted are to be viewed through the eyes of a reasonable and a cautious police officer on the scene, guided by his experience and training," and found that the officer's judgment that an illegal transaction had taken place is "a judgement to which we give appropriate deference." Id. at 112, internal citations and quotations omitted.

Like Brewington, the Trullo defendant argued that the stop was not justified because his actions could also be interpreted as manifestations of wholly innocent conduct. The court rejected that claim:

> We could, no doubt, hypothesize some innocent explanation of appellant's conduct, for it must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation. It is precisely for that reason that the applicable standard in determining the propriety of a Terry stop is whether a defendant's acts give rise to an articulable, reasonable suspicion of criminal activity and not whether they can be construed as innocent through speculation.

Id. at 112 internal citations and quotations omitted.

In addition to finding the stop justified, the Trullo court also found the frisk of Trullo justified. Quoting the Second Circuit the court noted that, "'We have recognized that to substantial dealers in narcotics, firearms are as much 'tools of trade' as are most commonly

9

recognized articles of drug paraphernalia.'" Id. at 113, quoting United States v. Oates, 560 F.2d 45, 62 (2nd Cir. 1977). Thus, the officers' had an articulable basis to fear for their safety, and a legal basis to frisk the defendant.

The First Circuit reached a similar conclusion in United States v. Stanley, 915 F.2d 54 (1st Cir. 1990). In Stanley, the court held that officers' observation of a man alone in a vehicle, in a high crime neighborhood, crouching towards the passenger seat console with his head down constituted an articulable suspicion that he was involved in narcotics trafficking. The court again rejected the argument that the fact that there were innocent explanations for the defendant's conduct undermined the justification for a Terry stop. "Appellant's argument that '[t]oo many alternative explanations, all of them innocent, exist which could explain [the defendant's behavior],' is misguided.... Under Terry the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation." Id. at 57.

The First Circuit has held similarly in at least two others cases. In United States v. Gilliard, 847 F.2d 21 (1st Cir. 1988) the First Circuit held that officers' observation of an individual in high crime neighborhood engage in brief conversation and exchange objects with another person provided articulable suspicion that a narcotics transaction had taken place, and provided sufficient basis for a Terry stop. The Court also held that a pat frisk was justified because the defendant was suspected of involvement in drug activity and appeared nervous, giving rise to a legitimate concern for the officers' personal safety. Similarly, in United States v. Cook, 277 F.3d 82 (1st Cir. 2002), the Court also upheld a Terry stop based on observations of a furtive exchange in a high crime neighborhood. The Court noted, "When determining the

legitimacy of an investigative stop, a court must undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior." Id. at 85.

The stop at issue in this case falls squarely within this precedent.  As with the defendants in the cases cited above, the officers observed Brewington in an area known for drug activity, and observed him engage in a brief conversation with another individual.  They observed the defendant exchange items with this other individual, and observed that after the transaction the defendant rapidly walked off in different directions from the other individual.  This is more than enough to justify the subsequent stop of the defendant.  The defendant's nervous behavior during the stop, combined with the knowledge that guns and drugs are commonly found together, provided Officer O'Sullivan with a "warranted ... belief that his safety or that of others was in danger."[1]  Terry, 392 U.S. at 24.

    B.   The Entry into the Vestibule of the Two Family House was Proper

Defendant argues that the entry into the vestibule of the two family house was improper. As is argued in more detail below, regardless of whether the defendant had a privacy interest in the vestibule of 36 Wrentham Street, the officers were entitled to enter the premises because of the exigent circumstances involved in the case.  However, even if exigent circumstances did not

---

[1] Even if the Court were to find that the initial stop or subsequent frisk of the defendant in this matter violated the defendant's rights, this would only provide a basis for suppressing the knife found on the defendant, not any of the evidence subsequently found.  Because the defendant assaulted Officer O'Sullivan before any other evidence was found, Officer O'Sullivan had an independent basis to arrest the defendant which occurred entirely after the pat frisk.  In fact, defendant abandoned his jacket during the course of the subsequent struggle (which occurred because of defendant's assault on the officer, and not because of the initial stop or frisk of the defendant).  All of the evidence found thereafter came either from evidence developed as a result of what was found in the defendant's jacket, or evidence developed as a result of the stop of Darlene Court.

entitle the officers to enter the apartment in which the defendant was arrested, they were entirely within their rights to enter the vestibule.

Contrary to defendant's claims, the front door to the vestibule was unlocked when the officer's arrived. Defendant attaches two affidavits to his motion, both of which assert that it was the general practice of the residents of the building to keep the vestibule door locked. Even assuming that these affidavits are true, they do nothing to contradict the officer's expected testimony that the vestibule door was open that night. It should be noted that the defendant returned to the house that night after fleeing from the police without his keys. Thus, it is not at all surprising that however he (presumably hurriedly) gained entry into the vestibule that night, he very likely failed to lock the door behind him, regardless of what the normal practice of the residents may have been. Moreover, the entire vestibule area is visible through the glass panes on the door, making it unlikely that the defendant, or anyone else, can claim a privacy interest in the vestibule area.

Indeed, defendant's argument that the officers' entry into the vestibule was improper is not supported by the case law in this circuit. As the defendant noted in his brief, the First Circuit has stated quite clearly, "it is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998). The defendants attempt to dismiss this ruling by noting its apparent contradiction with a concurrence in a Supreme Court Case decided a half century earlier is without merit. The more recent holdings of other districts that find otherwise are simply not relevant in this circuit.

However, even assuming for the moment that in some circumstances a resident of a

building may have a right to privacy in the vestibule of a building, the facts of this case do not provide such an instance. First, the officers entered the vestibule area for one reason – to knock on the individual apartment doors of each resident. They did not search the vestibule, nor did they find any evidence there. In fact, the door they first knocked on was not the door of the apartment in which the defendant was found, but rather the neighbor's door. The neighbor confirmed that the defendant was present in the downstairs apartment. The defendant cannot have had a reasonable expectation of privacy that individuals would not enter the vestibule to contact his neighbor, or, indeed, to knock on his apartment door. The cases cited by defendant involve searches of common areas of buildings, not information learned or observations made from within the common areas by officers who were transversing the common areas in order to knock and seek entrance to the apartments therein.

      C.      <u>The Arrest Inside the Apartment was Proper Because of Exigent Circumstances</u>

The defendant was arrested in 36 Wrentham Street less than one hour after he fled from Officer O'Sullivan. During this hour, the police officers learned several facts that provided probable cause to believe that the defendant had committed one or more crimes, had fled into 36 Wrentham Street, that he constituted a risk of flight, and that there existed a risk that evidence would be destroyed if the defendant was not immediately apprehended. Specifically, in addition to what the police knew when Officer O'Sullivan first stopped the defendant, by the time the officers arrived at 36 Wrentham Street they also knew 1) that the defendant had been armed with a knife at the time that he had his initial contact with Officer O'Sullivan; 2) that the defendant lied about having been armed to officer O'Sullivan; 3) that the defendant had assaulted an officer and fled; 4) that crack cocaine had been recovered from Darlene Court, the individual with

whom the officers had seen the defendant exchanging items on Dracut Avenue; 5) that Darlene Court had told the officers that she purchased the crack cocaine from the defendant; 6) that the officer had observed the defendant running in the direction of 36 Wrentham Street; 7) that a police dog had followed the defendant's scent to the vicinity of 36 Wrentham Street; 8) that the defendant was on probation with a last known address of 36 Wrentham Street; and 9) that drugs are easily concealed or destroyed.

Shortly after arriving at 36 Wrentham Street, the officers learned two additional facts: 1) that even though it was nighttime the lights were out in the downstairs apartment at 36 Wrentham Street but the noises emanating from the apartment suggested that it was occupied; and 2) that according to the upstairs neighbor, the defendant stayed in the downstairs apartment and was home at the time the police arrived. Finally, when the door of the apartment was opened, the officers observed the defendant running towards a door at the back of the apartment, apparently attempting to flee, hide, or obtain some item from within the apartment. As a consequence, the officers' entry into the apartment to arrest the defendant was justified by exigent circumstances.

The Supreme Court long ago recognized that exigent circumstances create an exception to the general requirement that officers obtain a warrant to arrest a suspect in his home. See United States v. Santana, 427 U.S. 38, 43 (1976). In order to find that exigent circumstances justify an arrest or search in a private place absent a warrant, a court must find that the police had (1) probable cause to make the arrest and (2) exigent circumstances justifying an exception to the warrant requirement, allowing the officers to enter without first obtaining a warrant. See United States v. Moore, 790 F.2d 13, 15 (1st Cir. 1986); United States v. Wilson, 36 F.3d 205 (1st Cir.

1994); and United States v. Scott, 520 F.2d 697 (9th Cir. 1975). Given the overwhelming evidence that the defendant had committed at least two crimes (drug distribution and assaulting a police officer) prior to his flight to 36 Wrentham Street, there can be no doubt that the police had satisfied the first prong of this test. They had also clearly satisfied the second prong – the existence of exigent circumstances – both because they were in hot pursuit of the defendant, who they had probable cause to believe was inside the apartment and because they feared that evidence could be lost or destroyed if they did not immediately secure the premises.

### Hot Pursuit

The Supreme Court has long held that a suspect may not defeat an arrest merely by fleeing into a private place. In other words, police may pursue a fleeing felon into his home so long as they are in "hot pursuit" of that felon. In the Supreme Court's words, "a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place." United States v. Santana, 427 U.S. 38, 43 (1976). See also Warden v. Harden, 387 U.S. 294 (1967).

In order to find that the officers were in "hot pursuit" of a suspect, a court need not find that there existed an uninterrupted chase from the scene of the crime to the private house. Instead, the pursuit must be active, and over a short period of time. For example, in United States v. Scott, 520 F.2d 697 (9th Cir. 1975), the Ninth Circuit found that hot pursuit justified an arrest inside a private apartment absent a warrant where four gunmen robbed a bank at 2:05 pm. At 2:45pm, officers discovered that a car matching the description of the getaway car had been located in the parking lot of a two-story apartment building. The officers then spent the next hour searching each apartment in the building. The entered the final apartment at 3:45pm (over

1.5 hours after the initial robbery) and arrested the four robbers inside. The Court held that despite the 1.5 hour elapsed time the arrests were justified because the police were in hot pursuit of the defendant.

The Sixth Circuit found that hot pursuit justified an arrest inside a house two hours after the initial crime in United States v. Mitchell, 457 F2d 513 (6th Cir. 1972). Mitchell also involved a bank robbery. In that case, a witness recorded the license plate of the getaway car used by the robber. The police used this information to ascertain that the getaway car was registered to the defendant. Within two hours of the robbery, the police learned that the car was then parked at the defendant's residence, and entered the residence without a warrant to arrest the defendant inside. The police also found evidence linking the defendant to the bank robbery inside his house. In upholding the arrest of the defendant and the search of his house based on exigent circumstances, the court stated:

> When the record is considered as a whole, it would appear that a rational line of reasonably trustworthy information led from the robbery to the defendant's home and pointed to the defendant as the probable culprit. The facts known to the officers at the time of arrest were sufficient to cause a reasonable and prudent man to believe it probable that the defendant had committed the offense. .... The exigencies of the situation made that course (i.e. the entry and arrest without a warrant) imperative.

Id. at 514, internal citations and quotations omitted.

Though the First Circuit has not considered these issues in the context of a criminal suppression motion, it has considered the subject in the related context of a civil suit seeking damages from police officers who entered an apartment based on the mistaken belief that a fleeing felon would be found inside. In Archibald v. Mosel, 677 F2d 5 (1st Cir. 1982), the court held that the forcible entry and search of an apartment by police officers who were pursing a robber was constitutional. In the Archibald case, the officers had been informed by a victim of

16

an alleged robbery that about ten to fifteen minutes earlier a man had robbed the witness of $105 and his jacket. The victim then reported that he chased the man into an apartment approximately one half-block away. The informant specified the apartment into which he claimed the robber had retreated, and the police forcibly entered the apartment. As it turned out, the only occupant of the apartment was a child. The First Circuit, citing both <u>Scott</u> and <u>Mitchell</u>, held that because the police had probable cause and exigent circumstances to enter the apartment, they had not violated the constitutional rights of the occupants, even though it turned out that the officers' information was wrong.

<u>Destruction of Evidence</u>

In the instant matter, officers were entitled to enter the defendant's apartment not only because they were in hot pursuit of the defendant, but also because they had a reasonable suspicion that evidence could be destroyed in the apartment. Several courts have recognized that the potential for destruction of evidence is particularly great in the context of narcotics crimes. For this reason, courts have held that officers may enter private spaces without a warrant if they have probable cause to believe that narcotics may be found therein and that the occupants are aware of the presence of the officers.

> We have previously observed that the destruction of narcotics is 'characteristic behavior' of those engaged in drug trafficking.... As far as the officers knew at the time, Thomas and perhaps others involved in the drug trafficking operation might still be hiding in the house, barricading themselves against an arrest. Furthermore, any individuals who remained inside might still be destroying evidence. If so, a sweep through the house was the officers' only opportunity to recover remnants of attempts at drug destruction, which would likely be lost during the intervening time required to obtain and execute a search warrant.

<u>United States v. Blount</u>, 123 F.3d 831 (5th Cir. 1997). The Eleventh Circuit came to the same conclusion in <u>United States v. Mikell</u>, 102 F.3d 470,475 (11th Cir. 1996) ("This court has held

that the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be quickly destroyed."). See also, United States v. Jones, 204 F.3d 541 (4th Cir. 2000) (finding exigent circumstances to enter a house, arrest a defendant, and conduct a protective sweep that uncovered drugs after officers observed the suspect exchange an unknown substance for money and then rapidly leave when the police presence became known).

In the instant matter, there can be no doubt that exigent circumstances permitted the officers entry into the apartment in which the defendant was arrested. Even before arriving at 36 Wrentham Street, the officers in the instant case had probable cause to believe that a crime had been committed, that the defendant was inside his apartment, and that he constituted a risk of flight (indeed he had already fled from the police once that day). Moreover, they had reasonable cause to believe that narcotics might be found in the apartment, and could be destroyed if the apartment was not immediately frozen. Nevertheless, when the officers arrived at 36 Wrentham Street, within 45 minutes of the initial incident, they did not attempt simply to barge in on defendant's apartment, though they legally could have. Instead, they continued their investigation, which provided further evidence that the defendant was in the downstairs apartment. Even then the officers did not simply barge into the defendant's apartment. Instead, they knocked on the door and waited until it was opened. The officers only entered the defendant's apartment after 1) they had actually seen the defendant inside; and 2) they observed the defendant running away from them. Though neither one of these two factors were necessary to provide the probable cause and exigent circumstances necessary to enter the apartment without a warrant (that existed before the officers arrived at the premises), they provided

additional probable cause and additional exigency, further justifying the entrance into the apartment.

Once the officers were legally inside the apartment, they had the right to conduct a protective sweep of the apartment, including looking into any space large enough to hold a person, including the closet towards which the defendant had fled.  See, e.g., Maryland v. Buie, 494 U.S. at 334 (permitting search of places "immediately adjoining the place of arrest from which an attack could be immediately launched.").  For this reason, the body armor found within the apartment was properly discovered and should be admissible at trial admissible.

Similarly, there was no constitutional violation in any of the other evidence discovered subsequent to the defendant's arrest.  After the officers arrested defendant, they obtained written and oral consent to search the premises in general and one of the safes in particular from Ebonie Minter, the defendant's girlfriend and the person in whose name the apartment was leased.[2]  Indeed, Ms. Minter even provided them with a key to that safe.  The evidence found as a result of this consent search was obtained properly and is therefore admissible against the defendant. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218 (1973) and United States v. Romain, 393 F. 3d 63 (1st Cir. 2004).  So too was the evidence obtained as a result of the defendant's post-arrest statement.

In short, since there was no constitutional violations in obtaining any of the evidence found against the defendant, there is no poisonous tree from which the evidence could be

---

[2]Even if the officer's entry into the apartment were deemed improper, the items found as a result of the consent search would not constitute "fruits" of this improper action.  An intervening cause – the consent of Ebonie Minter – allowed the officers to search the apartment, a location they would have sought to search even if the defendant had not been arrested there, since they already strongly suspected that he had fled to the location immediately he had fled from Officer O'Sullivan.

considered the fruits. Moreover, since the arrest was proper, there is no grounds to suppress the statements made by defendant following the arrest.

## IV. Conclusion

For these reasons, the United States asks this Court to deny Defendant's Motion to suppress the evidence and statement in this case. The United State request the opportunity to supplement this memorandum after any evidentiary hearing in this matter.

                               Respectfully submitted,

                               MICHAEL J. SULLIVAN
                               United States Attorney

By:    /s/ Seth P. Berman
        SETH P. BERMAN
        Assistant U.S. Attorney