UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| v. ) | Case No. 04-cr-10133-RCL |
| DERONE BREWINGTON ) | |

**GOVERNMENT'S SUPPLEMENT TO ITS OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS**

Defendant seeks to suppress all the physical evidence in this case and the defendant's post-arrest Mirandized statements based on two claims: first, that the officers did not have grounds to stop and frisk the defendant prior to his struggle with and flight from Officer O'Sullivan; and second that the officers violated the defendant's rights by entering the apartment in which he was arrested. As explained below, and as argued in the previously filed Government's Opposition to the Defendant's Motion to Suppress, which is incorporated herein by reference, defendant's motion is without merit and should be denied.

**I.   Initial Stop and Frisk of the Defendant**

The initial stop and frisk of the defendant was based on the observations of two experienced police officers, Sergeant (then Officer) Felipe Colon and Officer David O'Sullivan. Sergeant Colon had been in the drug control unit for seven years prior to the events that led to the defendants arrest, during which time he had been involved in well over 500 arrests and had seen thousands of drug transactions. Colon Tr. at 5. He knew the area in which the defendant was first observed to be a high crime area where drug sales commonly occur. Colon Tr. at 9. Officer O'Sullivan had been in the drug control unit for ten years, and had participated in over 1000 drug surveillances and arrests. O'Sullivan Tr. at 4-5.

Sergeant Colon observed the defendant for a significant period of time prior to his observation of the drug transaction that led to the defendant's being stopped. Sergeant Colon

variously estimated this time period that he observed the defendant as between 8 and 30 minutes. Colon Tr. at 16 and 34.  During this time period, he observed the defendant pacing back and forth, looking around and into motor vehicles.  Colon Tr. at 8.  He saw the defendant approach a bus as it pulled up to the bus stop near where he was standing, but then refrain from getting on the bus.  Colon Tr. at 9.  Then, Sergeant Colon observed the defendant talk on his mobile phone for a brief moment, and walk away from the area.  Colon Tr. at 10.  Shortly thereafter, Sergeant Colon observed the defendant meet a white female, later identified as Darlene Court.  Colon Tr. at 10.  During this entire time period, Sergeant Colon was within 30 to 50 feet of the defendant, and had a clear view of him.  Colon Tr. at 11.  Sergeant Colon then observed the defendant and Ms. Court walk to the front of 9 Dracut Street, where they turned around, stood close together, and made an exchange of unknown objects.  Colon Tr. at 11.  Sergeant Colon testified that he was able to see their hands meet in a manner that he described as not a greeting, but consistent with something being passed from one to the other.  Colon Tr. at 11 and 47-48.  He then observed Ms. Court place her right hand, the hand she had used to exchange objects, into her right pocket.  Colon Tr. at 12 and 47.  Based on these observations, Sergeant Colon determined that a drug deal had taken place.  Colon Tr. at 12 and 48.  Sergeant Colon shared his observations with Officer O'Sullivan, gave officer O'Sullivan a description of the suspects, and told him that the deal had been done.  Colon Tr. at 12 and 55-56.  O'Sullivan Tr. at 7-9.

Officer O'Sullivan himself observed the defendant and Darlene Court immediately after the exchange had occurred.  He observed the two suspects beginning to separate, and observed Ms. Court place a clench fist into her pocket.  O'Sullivan Tr. at 8-9.  He testified that based on his observations and experience, drug dealers are often armed and dangerous.  For this reason, he

was afraid for his safety when he first approached the defendant. O'Sullivan Tr. at 17-18.

These observations clearly created an articulable suspicion that criminal activity was afoot, as required by Terry v. Ohio, 392 U.S. 1 (1968) before a stop can be initiated. Moreover, the defendants actions, combined with the fact that they occurred in a high crime neighborhood, also justified a safety frisk of the defendant. See, United States v. Cook, 277 F.3d 82 (1st Cir. 2002) (finding a Terry and frisk justified based on observations of a furtive exchange in a high crime neighborhood); United States v. Gilliard, 847 F.2d 21 (1st Cir. 1988) (same); United States v. Trullo, 809 F.2d 108 (1st Cir. 1987) (same). As the First Circuit has ruled, a Court should grant "deference" to the judgements of experienced law enforcement officers about the meaning of suspicious behavior. Trullo, 809 F.2d at 112 and Cook, 277 F.3d 82 at 85.

**II.     The Entry Into 36 Wrentham Street Was Justified By Exigent Circumstances**

The officers' decision to enter 36 Wrentham Street was informed by everything they knew at the moment that the defendant was stopped and frisked, as well as several key pieces of information they subsequently discovered. First, before they entered 36 Wrentham Street, the officers had learned that Darlene Court had been arrested with approximately 42 grams of crack cocaine on her person, and that she had acknowledged that she had just purchased these drugs for $1600 from the defendant. Colon Tr. at 14-16. The officers also knew that the defendant had a knife on him at the time he was first stopped, that he had lied about having that knife, and that he had assaulted a police officer and fled. O'Sullivan Tr. at 11-13. Based on these facts there can be no question that officers had probable cause to arrest the defendant.

Defendant contends that despite the fact that the officers had probable cause to arrest him, they did not have a right to enter 36 Wrentham Street. Thus, he argues, the arrest and the

events that followed inside that location were somehow improper. This assertion is wrong. The officer's entry into 36 Wrentham Street was allowed because of exigent circumstances. During the period between the crime and the defendant's arrest, a period of approximately one hour, the officers were in hot pursuit of the defendant.[1] Immediately after the defendant fled, Officer O'Sullivan recovered an identification card with the defendant's name and a Brockton address, as well as a set of keys from the jacket that the defendant abandoned after he assaulted Officer O'Sullivan.[2] O'Sullivan Tr. at 15. They also knew that the defendant had fled in the direction of Wrentham Avenue, and that a canine unit had traced the defendant's scent to a site adjacent to 36 Wrentham Street. O'Sullivan Tr. at 19, Colon Tr. at 18, Terestre Tr. at 10. At 6:50 pm, 52 minutes after the incident, they learned that the defendant's last known address was 36 Wrentham Street. Terestre Tr. at 11-12, O'Sullivan Tr. at 20-22. Upon learning this the officers immediately went to 36 Wrentham Street, arriving within five or ten minutes. Terestre Tr. at 13, Colon Tr. at 18, and O'Sullivan Tr. at 23. Indeed, even the defendant's girlfriend testified that the police arrived at the apartment "just a few minutes" after the defendant ran into the apartment and stated that he was running from the police. Minter Tr. at 23-25.

Based on all this information, the officers' entry into 36 Wrentham Street was proper,

---

[1] The short time frame between the incident and the arrest is established by the recorded radio report of the defendant's flight from Officer O'Sullivan, which occurred at 5:58 pm, and the time that the defendant's criminal history was printed, 6:50 p.m., 52 minutes later.

[2] During the hearing, the defense attorney implied through cross-examination that it was improper (or evidence of something improper) that Det. Sgt. Terestre first stated over the radio that he intended to seek an arrest warrant for the defendant, but the officers nevertheless arrested the defendant without a warrant. Terestre Tr. at 43-45. In truth, the intention to seek a warrant was based on the fact that the police thought that the defendant lived in Brockton and would not be found that night. Immediately after making this statement, however, the officers learned the location to which the defendant had fled, and continued their pursuit of him. Terestre Tr. at 62. This lead to his warrantless, but proper, arrest.

even assuming the officers used the defendant's key to enter the building.³  See United States v. Santana, 427 U.S.38, 43 (1976) ("A suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place."); United States v. Moore, 790 F.2d 13, 15 (1st Cir. 1986) (same); United States v. Wilson, 36 F.3d 205 (1st Cir. 1994) (same).  See also United States v. Scott, 520 F.2d 697 (9th Cir. 1975) (finding that 1.5 hour time period between crime and flight in public place justified a warrantless, hot pursuit arrest in defendant's home); United States v. Mitchell, 457 F2d 513 (6th Cir. 1972) (finding that 2 hour time period between crime and flight in public place justified a warrantless, hot pursuit arrest in defendant's home).

The officers' entry into 36 Wrentham Street was further justified by the fact that the defendant was suspected of dealing in narcotics, as narcotics are easily destroyed.  See, e.g., United States v. Blount, 123 F.3d 831 (5th Cir. 1997) (officers may enter a private space without a warrant when they have probable cause to believe that narcotics are inside and the occupants know of the police presence);  United States v. Mikell, 102 F.3d 470,475 (11th Cir. 1996) ("the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be quickly destroyed."); United States v. Jones, 204 F.3d 541 (4th Cir. 2000) (finding exigent circumstances to enter a house, arrest a defendant, and conduct a protective sweep that uncovered drugs after officers observed a suspect exchange an object for money and rapidly leave when he became aware of the police).

**III.    The Entry into the Vestibule of 36 Wrentham Street was Proper**

---

³ As noted below, the government does not concede that the key was used, nor that the vestibule constituted a private location that the officers were prohibited from entering.

Defendant maintains that the entry into the vestibule of the two family house was improper. As noted above, the Court need not determine whether the door was locked, as exigent circumstances allowed the officers to enter the private areas of the defendant's house. Moreover, even assuming for the sake of argument that the officers did not have the authority to enter the first floor apartment before they entered the vestibule, the vestibule is a common area of the two unit building that is 36 Wrentham Street. The defendant does not have a reasonable expectation of privacy in the common areas of a multi-unit dwelling. United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("it is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building"). Finally, even if under some circumstances a person may have a privacy interest in the common area of a dwelling, no evidence was found inside the common area of the dwelling except evidence obtained after people opened the doors to their apartments in response to police knocking. There is simply no case law to support the view that evidence obtained as a result of police knocking on doors that were opened by the occupants is suppressible as a fruit of the poisons tree.

In addition to their being no legal basis for the defendant's suppression claim regarding the entry into the vestibule, there is also no factual basis for the claim. Not a single witness at the hearing stated that the vestibule door was locked when the officers arrived at 36 Wrentham Street immediately prior to the arrest. Indeed, Sergeant Colon testified that he did not believe that the door was locked when the officers arrived at 36 Wrentham Street. He testified that he did not use the keys to enter the door, and he does not remember Sergeant Detective Terestre using the keys either. Colon Tr. at 62-64. Sergeant Detective Terestre testified that he did not have any memory of whether the door was locked, and did not remember using the keys to open

the door. Terestre Tr. at 49-52. Even the defendant's girlfriend and sole witness at the hearing conceded that she did not remember locking the door that day, and is not sure it was locked. Minter Tr. at 24. The Court could thus reach the factual conclusion that the door was not locked on that day.

### IV.  The Evidence Found Subsequent to the Officer's Entry Into 36 Wrentham Street is Admissible

It is the government understanding that the sole basis for defendant's motion is that the entry into the first floor apartment at 36 Wrentham Street was improper. As a consequence, this motion does not further address any of the physical or testimonial evidence discovered after the officers properly entered that apartment.[4] If the defendant's supplemental motion, which is being filed simultaneously with this supplemental opposition, raises any such issue, the government will seek to further supplement this opposition.

### IV.  Conclusion

For these reasons, the United States asks this Court to deny Defendant's Motion to suppress the evidence and statement in this case.

                                          Respectfully submitted,

                                          MICHAEL J. SULLIVAN
                                          United States Attorney

                             By:    /s/ Seth P. Berman
                                       SETH P. BERMAN
                                       Assistant U.S. Attorney

---

[4] The items found after entry into the apartment include, but are not limited to, the things the officers saw and heard inside the apartment, the items found as a result of the consent search and the subsequent warrant based search of the apartment, and the statements the defendant and others made to the officers.