UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. 04-10133-RCL |
| | ) | |
| DERONE BREWINGTON | ) | |

DEFENDANT'S POST-HEARING MEMORANDUM

1. <u>PROPOSED FINDINGS OF FACT</u>

    1. On February 28, 2004 at about 5:50 p.m, BPD Officer Felipe Colon, while investigating an unrelated matter, Tr.1.8,[1] observed an unknown black male at the intersection of Dorchester Avenue and Talbot Street in Dorchester. Tr.1.38. The intersection adjoins the Ashmont T station, which is the Red Line's terminal station, as well as a busy bus hub. Tr.1.35, Exhibit D (map). The man appeared to be "waiting for someone." Tr.1.9.

    2. The man was not waiting long. Within 5 minutes of this sighting, at approximately 5:55 p.m., Brewington was observed by Officer O'Sullivan on Dracut Street. Tr.2.17. According to the computerized printout of Boston Police radio transmissions, Off. O'Sullivan reported at 5:58 p.m. that Mr. Brewington had fled from him. Tr.1.34; Ex. F.

    3. Colon watched the man walk up Dorchester Avenue to Dracut Street where he met an unknown white female. Tr.1.10. The two "turned onto Dracut Street," Tr.1.11, a "little residential street." Tr.2.27. Colon, riding in a Caravan van, held back from the intersection to avoid being conspicuous ("At that point, I gave him some time." Tr.1.11; 1.42-44). After waiting

---

[1] Transcripts of hearings in this matter are referenced as follows: May 24 ("Tr.1._"); May 27 (Tr.2._), June 8 (Tr.3._), and __ ("Tr.4._).

"[a]nywhere from 15 to 30, 40 seconds," Tr.1.44,  Colon pulled his van forward into the small Dracut intersection. Tr.1.43, 46.  As he peered up the street, he said that he saw the pair in front of 9 Dracut, Tr.1.44, the first building from the corner. Ex. A, Tr.1.43.  He estimated that 9 Dracut was "more 30 [feet from the corner] [b]ut maybe 50." Tr.1.46.  Colon testified without suppporting detail that the pair were "in tight" together.  Tr.1.44.  He could not see anything in their hands; he could only "remember Ms. Court's right hand, but I don't remember exactly what hand they used."  Tr.1.46-7.  He could not say which person was standing where. Tr.1.48-9.  When Colon testified with more particularity that "Ms. Court was observed going with her right hand going toward her right pocket," he had slipped into the passive voice.  Tr.1.12.  Neither officer claimed to have seen Brewington put anything in his pocket. Tr.2.39.

    4.  Colon's claim to have pulled forward in time to see the pair "in tight" together was impeached by Off. O'Sullivan's testimony.  Colon had testified that "as I was at the corner and they were meeting, Officer O'Sullivan turned onto Dracut Street." Tr.1.12.  But O'Sullivan, turning onto Dracut, did not see Colon's van, Tr.2.28-30, which Colon described as "pull[ed] up into the intersection" of the small street. Tr.1.43, 46.  O'Sullivan conceded that it "would [] be important to know where [Colon] was," Tr.2.30, and that he knew Colon's van. Tr.2.29.  But he did not see Colon at the corner.

    5.  O'Sullivan also testified that he was in radio contact with Colon, on an unrecorded frequency, and heard Colon say words to the effect that the deal was done.  But moments later Colon's voice can be heard on a recorded channel trying to summon O'Sullivan on the radio. Tr.1.51-54, 55-6.  O'Sullivan, for his part, claimed that, "[a]s I drove on Dracut, I saw – observed a white female turn away from Mr. Brewington with a right hand clinched and go into her

pocket." Tr.2.6.  He did not, however, transmit this observation back to Colon.  Tr.1.52.  Nor did O'Sullivan testify in the grand jury during his March 2004 testimony that he saw Ms. Court's hand "clinched" or closed, Tr.2.31-34, or that Colon told him that the deal was done. Tr.2.31.

      6.  Colon did not immediately approach Ms. Court.  Instead, he "repositioned" his van, Tr.1.13, and then went into the Peabody Tavern to see where Ms. Court went.  Learning that she had gone into the Ladies Room, Colon first testified that he "went to the restroom, knocked on the door, didn't get a response, opened the door, knocked on the second door and ordered Ms. Court out of the bathroom," Tr.1.14, and that she came out "with some hesitation, but she did [come out]." Tr1.14.  Asked on cross if he had barged into her stall, Tr1.58, he disavowed the conduct.  However, confronted with Ms. Court's grand jury testimony, Colon admitted that he had "barge[]" into the bathroom and had opened her stall door.  Tr.1.59.  He could not recall if the stall was locked: "I believe it wasn't locked. I was able to open it." Id.  He said "when I first encountered [Ms. Court], it looked like she was coming from the seated position;" he was standing "[v]ery close" to her, but didn't "recall" if her pants were down.  Tr1.60.  He ordered her to "give it to me." Tr.1.60.  He said that 14 grams was recovered from her pocket.  A bag of 28 grams was recovered from her breast area.  Tr.3.36.

      7.  Ms. Court at the scene identified the man (not Brewington) she bought the drugs from.  The police did not record the man's name and kept no record of the stop.  Tr.3.38-41.

      8.  In the meantime, Brewington was walking up Dracut Street.  Only as O'Sullivan approached Brewington did he decide to stop him.  Tr.2.34-5.  He asked Brewington: "[d]id you meet with a girl down the street?"  He put his hand on Brewington's chest to test his heart rate:

> Q: Is it your testimony that he simply stood there and permitted you to test his heart rate as you waited to see whether it was beating quickly; is that what happened?
>
> O'Sullivan: Yes, sir.
>
> Q: During that time, did he lift his arms up to hit you?
>
> O'Sullivan: No, sir.
>
> Q: Did he do anything with his arms to try to defend himself from you while you did that?
>
> O'Sullivan: No, sir.

Tr.2.37. O'Sullivan said that he detected that Brewington's heart was "beating at a rapid pace," Tr.2.11, and decided to frisk him. Tr.2.18. He removed his right hand from Brewington's chest and, with the same hand, reached around to his rear pocket which held a closed pocketknife. Sullivan's other hand held a flash light. Sullivan acknowledged that, as he reached around Brewington, he left himself unguarded. Tr.2.37-8. Brewington said he had identification, and, as he reached for it, he fled O'Sullivan's grasp. O'Sullivan grabbed his jacket, but he "pulled out of his jacket." Tr.2.13. When O'Sullivan transmitted the radio report, he did not say that the man assaulted him, only that the man had run out of his jacket. Tr.2.40.

9. A canine was called to the scene and it lost the scent at the rear of an apartment complex at 59-69 Msgr. Lydon Way. Tr.3.44.

10. O'Sullivan and Terrestre both returned to the station. Tr.3.47-8. Both radioed they would be seeking a warrant for Brewington ("We have him I.D.'d, we'll be getting warrants for him." Tr.3.45; 2.2). Terrestre obtained a Board of Probation report on Brewington, with an address of 36 Wrentham Street. Having a local address, Sgt. Terrestre resolved to go there "without benefit of warrant to make entry at 36 Wrentham Street." Tr.3.45.

11. Neither O'Sullivan nor Terrestre attempted to learn if 36 Wrentham Street was a one- or two family. Tr.3.51-2. Neither conducted surveillance of the property to find who lived there. Terrestre did not disclose how many officers arrived at the property ("I can only guess, there was my squad, there was some uniformed presence, and there was some anti-crime units which are additional units." Tr.3.48.). Police surrounded the building. Tr.3.49.

12. 36 Wrentham is a well-maintained, 2 ½ story residential property with a porch. Ex. C. There is a single entrance at the front, with an exterior screen door and an exterior locked wooden door with a small glass window covered by a curtain. Terrestre could not recall if an interior light was on in the entry area. Tr.3.51. Sgt Terrestre "believed" the screen door was closed, but did not recall which officer opened it. Tr.3.51. Although Terrestre had the keys taken from Brewington, Tr.2.45, he did not remember if he used them. According to Ebony Minter, the exterior door "automatically locked" and was locked at the time. Tr.4.10, 15. Terrestre testified: "My testimony is we went through there [the exterior door]," without knocking, but could not remember how. Tr.3.49, 63. O'Sullivan, for his part, admitted that in his grand jury testimony he had said that 'the keys opened that outside hallway door," but insisted he was not on the porch with Terreste, Tr.2.45, a claim which contradicted his own grand jury testimony. Tr.2.46. Terrestre, in turn, contradicted O'Sullivan, testifying that he had a "specific memory of Mr. O'Sullivan being on the porch...." Tr.3.52. It is apparent that police, using Brewington's key, had let themselves into the locked building and were not prepared to admit it.

14. The police announced themselves at the inside door. Terrestre testified: "I don't think I said anything other than open the door, Boston Police." Tr.3.54. A male voice

(Brewington's) shouted out, she's going to open door. Tr.1.22; 4.17. Ebony Minter opened the door. According to Terrestre, Brewington was "behind her in the living room." Tr.3.15. "He was just standing there at the moment I made eye contact with him." Id. Approximately seven officers immediately entered the apartment and arrested Brewington. Tr.4.17. At the time, Brewington was in the living room, Tr.4.17, or, as Terrestre described it, "in the front foyer leading out from the living room towards the front door." Tr.3.64. Terreste spoke with Minter in the bedroom, "apart from where Mr. Brewington was." Tr.3.65. Terreste, as he spoke with Minter, could hear Brewington's voice, "pretty close to the front door..., [r]ight around the front door." Tr.3.65. Ebony Minter corroborated Terrestre, saying that Brewington was arrested where he stood, in the living room adjoining the front door. Tr.4.18-20.

2. ARGUMENT

    1. No "Specific Articulable Facts" Supported a Terry Stop

Brewington was observed "waiting for someone." Within five minutes, he walked to Dracut Street, and met a white woman. There was no testimony that Dracut Street, with its attractive, well-kept houses (see exhibit B), was a high-crime area (indeed, there was no supporting testimony that the Ashmont T area, where suburbanites await busses to Milton and points beyond, was high-crime. Tr.1.9). Officer Colon, stopping his van shy of the corner of Dracut, saw only that the pair had parted and that Ms. Court was entering the Peabody Tavern. On a hunch that drugs were involved, Colon forced his way into Ms. Court's bathroom stall while she was quite indisposed, and then sought to spare this Court the unpleasant details by denying them under oath. At the scene, Ms. Court identified someone else as the person who gave her drugs, a fact buried in a police tape.

No one saw Brewington put anything in his pocket. As O'Sullivan approached him on foot, O'Sullivan still had not decided to stop him, a fact indicative of the absence of reasonable suspicion.

 2. There Were No Grounds Supporting a Frisk of Brewington

As with Ms. Court, the police encounter was forceful. O'Sullivan pressed his hand to Brewington's chest, not to frisk him but to test his heart rate (a decidedly Alpha-Dog move). Brewington did not resist. O'Sullivan's aggressive move combined with the casual manner of the ensuing frisk (Brewington's hands were free throughout) betrayed that O'Sullivan held no fear of Brewington. The officer's softly-intoned testimony that "I was, you know, basically being very cautious," Tr.2.18, was well-delivered but not, in the context, very persuasive. In any event, officers are not entitled to frisk anyone they briefly detain. United States v. Omar Sharif McKoy, 2004 U.S. Dist. LEXIS 24945 (D. Mass. 2004).

 3. The Officers Were Not Free to Forego Obtaining a Warrant

With Brewington's driver's license in hand, officers resolved to obtain a warrant for him. This was appropriate, particularly where (1) Ms. Court's identified another person as the drug seller, and (2) Brewington was not seen putting his hands in his pocket. But the officers decided to proceed "without benefit of warrant to make entry at 36 Wrentham Street," Tr.3.45, obviating judicial scrutiny and making abundantly clear that they intended to "make entry" to get him. They arrived at a property they knew nothing about and, with numerous officers, encircled the house. They used Brewington's key to breach the exterior door (the government did not get its "expected testimony" that the vestibule door was open, see Government Opposition at 12, as

none of the officers could remember how they got in; one also recalls Colon's memory failure when asked if he had forced a different door, the one on Ms. Court's bathroom stall, although most persons would remember if they yanked open a stall door to find a person of another gender seated inside.). Poised several deep at the door, they entered the apartment without invitation, arresting Brewington in the living room or, as Sgt. Terreste put it, "in the front foyer leading out from the living room towards the front door." Tr.3.64.

4. No Exigent Circumstances Existed

To justify the uninvited entry into the apartment, Off. Colon said that Brewington ran to the rear of the apartment, but at a most peculiar time: only after police had announced their presence, only after a "male voice" (Brewington's) said that Ebony Minter would open the door, and then only after Brewington made eye contact with the officers. As noted above, Sgt Terrestre said Brewington was arrested in the foyer by the front door, so the flight allegation makes little sense (apart from lingering questions about Colon's credibility following his versions of the arrest of Ms. Court). Further, even if Brewington retreated into his apartment, as was his right, police could not enter. The house was surrounded. There was no risk he could escape.

Nor was this "hot pursuit." "This is simply not a case where there was compelling need for official action and no time to secure a warrant," United States v. Adams, 621 F.2d 41, 45 (1st Cir. 1980), citing Michigan v. Tyler, 436 U.S. 499, 509 (1978), evidenced by the officers initial resolution to seek a warrant. See also Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) (under circumstances where policemen traced suspect to his home, "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime"). Nor is this case akin to cases cited by the government where police chased

unknown suspects, e.g., United States v. Scott, 570 F.2d 697 (9th Cir. 1975)(bank robbery by four males with sawed off shotguns), or where a suspect stepped back through a doorway to frustrate a police arrest. United States v. Santana, 427 U.S. 38 (1976).

    At bottom, police entered without invitation a house for which could not have secured a search warrant to arrest a person for whom they held no arrest warrant, ignoring the rule of Payton v. New York, that warrantless felony arrests in the home are prohibited by the Fourth Amendment.

    DERONE BREWINGTON
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
  B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue
Boston, MA  02110
Tel: 617-223-8061

Date: September 23, 2005