UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 04-10133-RCL

UNITED STATES OF AMERICA

v.

DERONE BREWINGTON

**REPORT AND RECOMMENDATION RE:
DEFENDANT'S MOTION TO SUPPRESS
(DOCKET ENTRY # 20)**

**December 22, 2005**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to suppress (Docket Entry # 20) filed on February 18, 2005.  At the conclusion of the evidentiary hearing on June 17, 2005, defendant Derone Brewington ("the defendant") requested an opportunity to file a post hearing brief to supplement the brief filed prior to the hearing. Accordingly, this court allowed both parties the opportunity to file post hearing briefs 14 days after receipt of the final transcript.  After allowing the defendant an additional extension of time after the filing of the final transcript, the defendant and the government filed post hearing briefs on September 23, 2005.  The motion to suppress (Docket Entry # 20) is therefore presently ripe for review.

The three count Superceding Indictment charges that on or about February 28, 2004, the defendant:  (1) knowingly and

intentionally possessed with an intent to distribute five or more grams of cocaine base, also known as "crack," in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (Count One); (2) knowingly possessed, as a previously convicted felon, two firearms and various rounds of ammunition in violation of 18 U.S.C. § 922(g)(1) (Count Two); and (3) knowingly possessed, as a previously convicted felon, body armor in violation of 18 U.S.C. § 931 (Count Three). As reflected in the Information filed on February 18, 2005, the government intends to rely on one or more prior drug convictions rendered in state court as a basis for a sentence enhancement with respect to Count One.

The defendant moves to suppress all of the evidence seized as a result of a purportedly illegal stop and arrest of the defendant that took place on February 28, 2004, in the vicinity of Dorchester Avenue in Dorchester, Massachusetts. (Docket Entry # 20). Having heard four days of testimony, this court finds the following facts.

<u>FACTUAL BACKGROUND</u>

I.  <u>Initial Stop and Frisk</u>

On February 28, 2004, Officer Filipe Colon ("Officer Colon"),[1] a 13 year veteran of the Boston Police Department ("BPD"), was assigned to the drug control division based in

---

[1]  Officer Colon currently holds the rank of sergeant.

Dorchester where he had worked for seven years.  An experienced member of the BPD, Officer Colon has been involved in "[w]ell over 500 [drug] arrests" and observed "thousands" of drug transactions.  (Docket Entry # 36, p. 5).[2]  Together with three other members of the drug control unit, Officer Colon was conducting an unrelated investigation in plain clothes in an unmarked vehicle.  The members of Officer Colon's team or unit that day consisted of Officer David M. O'Sullivan ("Officer O'Sullivan"), Detective Detective Albert Terestre ("Detective Terestre") and Officer Daniel Adams ("Officer Adams").

In the late afternoon on February 28 near dusk, Officer Colon was driving the unmarked vehicle in the area of Dorchester Avenue and Talbot Avenue when he noticed the defendant in an area where firefighters park their vehicles.  The defendant attracted the attention not only of Officer Colon but also of Detective Terestre.  Before Officer Colon voiced his concerns about the defendant's behavior over channel 12,[3] Officer Terestre had driven his unmarked vehicle past the area and noticed the defendant's "odd" behavior of "looking around for somebody or something."  (Docket Entry # 33, p. 7).

Further up the street and approximately "one block away" is the locus of the Ashmont T stop and bus terminal where

---

[2]  Citations to the record are provided only for direct quotes.

[3]  See footnote number six <u>infra</u>.

individuals often come and go using the T or a bus.  (Docket
Entry # 36, p. 36).  At the station, people frequently utilize
their cellular telephones.

The area where Officer Colon observed the defendant is,
based upon his experience, an area of high crime.  Officer Colon
had seen "a number of drug sales" in that area and it was an area
where "drug buyers would meet their drug dealers."  (Docket Entry
# 36, p. 9).  What first drew Officer Colon's attention to the
defendant, however, was not only his presence in a high crime
area but also his unusual conduct of pacing back and forth and
looking around as if "he was waiting for someone."  (Docket Entry
# 36, p. 9).

Officer Colon proceeded to observe the defendant and monitor
his activities for 20 to 30 minutes from a number of positions in
his unmarked vehicle before witnessing the transaction detailed
below.  It was still light out and, occupying a distance from the
defendant ranging from 30 to 50 feet, Officer Colon had a "clear
view" of the defendant throughout this time period.  (Docket
Entry # 36, p. 11).  Officer Colon also maintained a constant
communication on channel 12, an unrecorded radio channel, with a
number of other BPD officers, including Officer O'Sullivan.

During this time period, Officer Colon initially witnessed
the defendant pace back and forth and look into motor vehicles as
they drove by.  After approximately ten minutes, a bus pulled up

4

to the bus stop and the defendant started walking towards the bus as if to board.  He then refrained from boarding, however, and walked back to the area where Officer Colon first observed him.

Officer Colon next observed the defendant have a "brief conversation" on his cellular telephone.  (Docket Entry # 36, p. 10).  After using the cellular telephone, Officer Colon saw the defendant walk away from Talbot Avenue and up Dorchester Avenue where he met a white female, later identified as Darlene Court ("Court"), at the intersection of Dorchester Avenue and Dracut Street.  The two then walked up Dracut to the front of 9 Dracut Street, according to Officer Colon's observations.  The Peabody Tavern is at this intersection on the corner of Dorchester Avenue and Dracut Street.  As the two walked up Dracut Street, Officer Colon allowed the defendant "some room" of about 15 seconds to avoid being conspicuous.  (Docket Entry # 36, p. 42).  Having given the two only "seconds" of time (Docket Entry # 36, p. 43), Officer Colon then had a clear view up Dracut Street from inside his vehicle, which was located approximately 30 feet from the defendant and Court at the corner of Dorchester Avenue and Dracut Street.

Officer Colon then saw the defendant and Court, now located in front of 9 Dracut Street, make "an exchange of unknown objects."  (Docket Entry # 36, p. 11).  Focusing upon both the defendant and Court, Officer Colon witnessed the defendant look

5

around before getting "in tight" with Court at which point they
made an "exchange of unknown objects."  (Docket Entry # 36, p.
11).  Officer Colon saw "their hands meet with one another" in an
exchange that "was not a greeting" but, rather, was "consistent
with something being passed off."  (Docket Entry # 36, p. 11).
Although the pair was close, Officer Colon could see both their
hands.  Court used her right hand which, after the exchange, was
observed "going towards her right pocket."  (Docket Entry # 36,
pp. 12 & 47).

Officer Colon then observed the two separate.  Court walked
in Officer Colon's direction while the defendant walked in the
opposite direction.  Officer Colon witnessed what he believed was
an illegal transaction and transmitted the information to Officer
O'Sullivan "that the deal was done," which Officer O'Sullivan
understood as a "[d]rug transaction just completed."  (Docket
Entry # 36, pp. 47-48; Docket Entry # 37, p. 8).  Officer Colon
shared his observations over the unrecorded radio channel with
Officer O'Sullivan.  The two established that Officer O'Sullivan
would follow the defendant and Officer Colon would follow Court.

As Officer O'Sullivan then drove his unmarked vehicle on
Dracut Street, he witnessed the end of the transaction and, more
specifically, saw Court turn away from the defendant.  Officer
O'Sullivan saw that Court's right hand was "clinched" or "closed"
and that she then put her right hand "into her pocket."  (Docket

Entry # 37, pp. 8 & 33).  Officer O'Sullivan drove up Dracut

Street and pulled over as the defendant walked up the street on

the opposite side toward Officer O'Sullivan.  Exiting his

vehicle, he approached the defendant and, based upon his

experience and the knowledge provided him by Officer Colon, he

decided to stop the defendant.  As he approached the defendant,

Officer O'Sullivan identified himself as a Boston police officer

and asked the defendant if he had met "'with a girl down the

street?'" (Docket Entry # 37, p. 11).  The defendant was looking

around "for a way to run." (Docket Entry # 37, p. 18).

Based upon his experience,[4] Officer O'Sullivan, who was

alone in a high crime area with an individual who had just

engaged in what appeared to be a covert drug transaction,

reasonably feared that the defendant was armed and dangerous.

Moreover, based upon Officer O'Sullivan's experience, he knew

that drug dealers often have weapons and that he was alone "in

plain clothes." (Docket Entry # 37, p. 18).  Officer O'Sullivan

then felt the defendant's chest for his heart, which "was racing"

or "beating at a rapid pace," and observed the defendant back

---

[4]  Officer O'Sullivan, an 18 year member of the BPD, has
been involved with making "well over a thousand" drug arrests and
seen "well over a thousand" drug surveillances. (Docket Entry #
37, pp. 4-5).  He has been with the drug control unit for
approximately ten years.  Detective Terestre, a member of the BPD
since 1987, has, like Officer O'Sullivan, participated in "well
over a thousand" drug arrests and drug surveillances. (Docket
Entry # 33, p. 5).  He has been assigned to the drug control unit
since 1999.

away from him thereby further leading Officer O'Sullivan to believe that the defendant had something on his person.[5] (Docket Entry # 37, p. 18). Officer O'Sullivan next asked the defendant, "'Is there something on you I should be concerned about?'" (Docket Entry # 37, p. 11). The defendant answered "'No'" and Officer O'Sullivan then proceeded to do a quick pat down search of the defendant's outer clothing. Officer O'Sullivan reached around the defendant with his right hand, keeping his left hand free of the defendant, felt a bulge in the defendant's back pocket and removed a closed pocket knife.

Officer O'Sullivan then asked the defendant again, "'Is there anything else I should be concerned about?'" (Docket Entry # 37, pp. 12-13). The defendant answered that he had identification in the sleeve of his jacket. The defendant then leaned back and, unprovoked, hit Officer O'Sullivan in the chest with a forearm. "A struggle ensued" and, as Officer O'Sullivan was holding the defendant's jacket, the defendant managed to pull himself free of the jacket and flee up Dracut Street.[6] Officer

---

[5] There was an automobile in back of the defendant but Officer O'Sullivan did not push the defendant "back onto the windshield" of the automobile. (Docket Entry # 37, p. 36).

[6] Officer Colon lost radio contact with Officer O'Sullivan on channel 12 at or around this time period because he was "in a struggle." (Docket Entry # 36, p. 55). Channel 12 is specific to drug officers and "can only be transmitted within a mile radius." (Docket Entry # 36, p. 68). It allows for a transmission to occur without scanners intercepting the transmission. When an officer is in trouble, standard procedure is for him to go to the main channel, i.e., channel six.

O'Sullivan pursued the defendant into a yard which ran towards Wrentham Street at which point he lost sight of the defendant. Wrentham Street runs in a direction parallel to Dracut Street. (Docket Entry # 37, p. 13).

Officer O'Sullivan then broadcast a description of the defendant on channel six, the recorded channel, at 5:58 p.m. describing that the defendant had run out of his jacket.[7]  Inside the jacket, Officer O'Sullivan recovered a Massachusetts driver's license in the name Derone Brewington with a Brockton address of 18 Walnut Street, Apartment One.  There was also a set of keys. At or around this time, Detective Terestre, having been directed by Officer Adams to proceed up Dracut Street, located Officer O'Sullivan who advised him about the confrontation with the defendant.  Detective Terestre and/or Officer O'Sullivan then requested "several other units" and a canine unit to assist in a search of the area for defendant.

Meanwhile, after Officer Colon witnessed the exchange between the defendant and Court, he exited his unmarked vehicle and made eye contact with Court who quickly went inside the Peabody Tavern.  (Docket Entry # 36, p. 13).  Officer Colon then directed Officer Adams, who had pulled his unmarked vehicle up to the corner, to go inside the tavern after Court.  Officer Adams complied but mistook the bartender for Court and began talking to

---

[7]  Officer O'Sullivan did not describe the assault.

9

her.  After Officer Colon entered the tavern and rectified the mistake, the bartender indicated to both officers that Court had gone inside the restroom.

Officer Colon knocked on the restroom door and, hearing no response, entered the restroom and ordered Court, who was inside a bathroom stall at the time, out of the restroom.  With "some hesitation" and after Officer Colon opened the unlocked restroom stall, Court exited the restroom with Officer Colon who "handed her off to [O]fficer Adams" while he went back inside the restroom to determine if Court had flushed "anything down the toilet."  (Docket Entry # 36, p. 14).  The two officers collectively recovered approximately 42 grams of crack cocaine from Court who also told the officers that she had paid $1,600 for the drugs.[8]  Officer Colon informed the members of his team, including Detective Terestre and Officer O'Sullivan, about the recovery of the drugs from Court.[9]

During the course of the aforementioned search for the defendant in the surrounding area, a number of BPD units reported individuals who might fit the defendant's description but, after looking at a number of those individuals, Officer O'Sullivan

---

[8]  Officer Colon noted that Court "never protested to the fact that [the transaction] didn't occur" when Officer Colon "told her [he had] observed the transaction."  (Docket Entry # 36, p. 15).  Court later provided Officer Colon with a black scale.

[9]  Court is presently a cooperating witness.

concluded that they were not the defendant.  The canine unit also arrived at the scene.  The canine picked up the defendant's scent and tracked it to an area near 36 Wrentham Street in the rear of an apartment complex on Monsignor Lydon Way.[10]  Wrentham Street runs parallel to and is the next street over from Dracut Street. Monsignor Lydon Way also runs parallel to Dracut Street.

After the canine lost the scent, Officer O'Sullivan and Detective Terestre returned to a police station located approximately one and a half miles away.[11]  By that time, Court had been placed under arrest.  Using the identification taken from the defendant's jacket, Detective Terestre ran a Board of Probation check ("criminal history check") at 6:50 p.m., slightly less than one hour from the time Officer O'Sullivan had broadcast the defendant's description over channel six.  Upon conducting the check, Detective Terestre learned that although the license stated that the defendant lived in Brockton, the criminal history check revealed that the defendant had given a different

_____

[10]  Detective Terestre testified that the canine lost the scent "in the back yard between Monsignor Lydon and Wrentham Street."  (Docket Entry # 33, p. 42).  The complete name of the street is "Patrick J. Lydon Way."  (Ex. D).

[11]  On cross examination, Detective Terestre testified that he "went to the station after the search for [defendant] had concluded with negative results."  (Docket Entry # 33, p. 47). In making the finding that the officers were in hot pursuit, this court has considered this testimony.

address.[12]  The criminal history check revealed not only the

different address of 36 Wrentham Street but also the defendant's

repeated arrests for possession of drugs with an intent to

distribute and for possessing a firearm without a permit.  Armed

with that information, Detective Terestre decided not to seek a

search warrant but, instead, to return to 36 Wrentham Street, the

area where the canine had lost the scent.  Officers O'Sullivan,

Adams and Colon, Detective Terestre and "a couple marked units"

and/or anti-crime units proceeded to 36 Wrentham Street.[13]

(Docket Entry # 37, p. 23).


II.  Entry into 36 Wrentham Street Building

     Officer Colon was the first to arrive at 36 Wrentham Street.

The time was around 7:00 p.m. or approximately one hour after he

had witnessed the drug transaction between the defendant and

Court and Officer O'Sullivan had broadcast the defendant's

---

     [12]  Before learning that the defendant had provided different
addresses, Detective Terestre had broadcast over the recorded
channel that, "We have him I.D.'d, we'll be getting warrants for
him."  (Docket Entry # 33, p. 45).  This was, however, at a time
when Detective Terestre and Officer O'Sullivan only knew of the
single, Brockton address on the Massachusetts driver's license.

     [13]  The group initially assembled a couple houses away from
36 Wrentham to receive assignments about where to go during the
approach to the building.  As to the number of police officers,
Detective Terestre testified that, "[T]here was my squad, there
was some uniformed presence, and there was some anti-crime units
which are additional units."  (Docket Entry # 33, p. 48).
Officer O'Sullivan testified that Detective Terestre, Officer
Colon, Officer Adams and "a couple marked units" were at the
scene.  (Docket Entry # 37, p. 23).

description over channel six.  In fact, the officers arrived only "a few minutes" after the defendant entered the downstairs apartment at 36 Wrentham and directed Ebonie Minter ("Minter"), his girlfriend, to turn off all the lights.

With Officer O'Sullivan taking a position on one side of the building, Officer Colon and Detective Terestre[14] went up the stairs leading to the front porch.  The other officers took positions outside "to surround the building."  (Docket Entry # 33, p. 49; accord Docket Entry # 36, p. 66).

Once Officer Colon and Detective Terestre came up the front porch stairs, they opened the unlocked but closed front screen door.  Two separate mailboxes and two buzzers on the exterior of the building near the front door indicated a two family or two apartment unit building.  A sensor light turns on when anyone comes onto the front porch.  Behind the screen door is a wooden front door with a two foot by two foot glass window pane with a metal grate covered by a curtain.

Officer Colon does not believe that this outer or exterior front door was locked when the officers arrived.  Referring to the keys taken from the defendant's jacket, Officer Colon testified that neither he nor Detective Terestre took the keys

---

[14] On cross examination, Detective Terestre stated that he believed it was Officer O'Sullivan who was on the front porch with him.  Officer O'Sullivan, however, testified that he occupied a position on the side of the building.  Officer Colon testified that both he and Detective Terestre went to the front door.

and used them to open the exterior front door.  In fact, Officer
Colon testified that he did not have the keys at the time, he did
not use the keys to open the exterior front door and he does not
recall Detective Terestre using the keys.

Detective Terestre testified that he did not remember
whether the exterior front door was open.  He does not remember
if he used the keys to open the exterior front door and he does
not remember if any of the other officers had the keys with them.
No one came to the exterior door, however, to let the officers
inside.  Officer O'Sullivan testified that he believed it was
Detective Terestre who had the set of keys but, notably, Officer
O'Sullivan was "not sure" if Detective Terestre used the keys to
open the exterior front door.  (Docket Entry # 37, p. 45).

Minter lived in the first floor apartment at the time.[15]
When the exterior front door closes, it automatically locks,
according to Minter.  Minter and the upstairs tenant have a
practice of keeping this outer door locked "for security
purposes."  (Docket Entry # 32, p. 10).  Unless the exterior
front door is open, a person needs a key to gain entry into the
interior hallway.

Minter does not, however, have a specific memory of whether
she closed the exterior front door after she let in the last

---

[15]  Minter moved into the unit the previous September.  The
defendant stayed at the apartment almost every night and kept
clothing there.

14

person to arrive at the apartment before the police, the
defendant's cousin.  Prior thereto, Minter had gone to the
exterior front door and let the defendant inside.  The defendant
appeared nervous, paced back and forth and, once inside the first
floor apartment, told Minter to turn off all the lights and the
television.  Knowing that the police might be coming soon,
Minter, the defendant and a female friend visiting Minter at the
time stayed in the darkened apartment until the defendant's 14 or
15 year old cousin arrived.  The cousin entered the building
because Minter "opened the door for him." (Docket Entry # 32, p.
15).  After Minter opened the door for the defendant's cousin,
she quickly returned to the darkened apartment.  Minter remembers
closing the interior door into her apartment, which does not lock
automatically, when she let the defendant's cousin into the
apartment.

On balance, therefore, this court finds that the exterior
front door was not locked when the two officers went up the front
porch stairs.  Officer Colon and Detective Terestre did not use
the keys taken from the defendant's jacket to enter the first
floor vestibule or hallway.  Instead, they entered the hallway by
opening the unlocked screen door and going through the unlocked
exterior front door without using the keys.

Upon opening the unlocked exterior front door, Officer Colon
and Detective Terestre entered the first floor hallway or

vestibule.  The door to the first floor apartment was approximately four feet in front of them and to the right was a set of stairs that led up to the apartment on the second floor. Detective Terestre knocked on the first floor door to Minter's apartment and announced himself as "Boston Police."  (Docket Entry # 33, p. 53).  Hearing no response, the two officers went up the stairs to the right and knocked on the door to the second floor apartment which is occupied by a woman and her children. The woman answered the door and the officers asked her a series of questions regarding whether she had observed anyone run into or enter the first floor apartment.  They then showed her the defendant's identification at which time she indicated with a pointing gesture that the defendantwas downstairs.

Officer Colon and Detective Terestre then went downstairs to the interior door of the first floor apartment.  Detective Terestre knocked again on the door to the first floor apartment and again announced "Boston Police."  (Docket Entry # 33, pp. 15 & 54).  By that time, they had received information from one of the several officers outside that a light had gone on inside the first floor apartment.  Shortly thereafter, a male voice shouted from inside the apartment, "[S]he's going to open the door." (Docket Entry # 36, p. 22; accord Docket Entry # 32, p. 17). Officer Colon could not "say for sure" if that male voice belonged to the defendant (Docket Entry # 36, p. 65) thereby

16

leading to a reasonable belief that there might be more than one adult male inside the premises.  Minter then came to the door and opened it for Detective Terestre and Officer Colon.  Detective Terestre and Officer Colon saw the defendant in back of Minter in the living room.[16]  Detective Terestre, without his gun drawn, made eye contact with the defendant who immediately proceeded to run towards the back of the apartment.  Without any guns drawn, the two officers[17] then crossed the threshold and Detective Terestre stopped the defendant and placed him under arrest in the bedroom near a closet.[18]  By the time Detective Terestre had

---

[16]  Minter's friend and the defendant's cousin were also inside the apartment at the time the officers entered.

[17]  Contrary to Minter's testimony, there were not seven officers rushing in with guns as she opened the door.  Minter's testimony was the most biased of the witnesses who testified and her demeanor far less convincing than the demeanors of Officers Colon and O'Sullivan and Detective Terestre.  See In Re Morad, 323 B.R. 818, 826 (1st Cir. 2005) (noting that trier of fact "'has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements'"); United States v. McGinnis, 346 F.Supp.2d 210, 211 (D.Me. 2004) (finding the "attitude and demeanor on the witness stand" of the defendant's girlfriend "not credible because she is dedicated to helping the the defendantwith whom she has a close personal relationship"), aff'd 429 F.3d 1 (1st Cir. 2005).

[18]  Minter testified at trial that the defendant was located in the living room.  This testimony was effectively impeached. (Docket Entry # 32, pp. 26-27).  Also contrary to her testimony, the apartment was not in "utter darkness" with the exception of the hallway light because by that time one of the officers outside indicated that "a light had gone on inside that first floor apartment" (Docket Entry # 33, p. 14) and, when the two

placed the defendant under arrest "several officers" had also entered the apartment.  (Docket Entry # 36, p. 23).

The layout of the first floor apartment consists of the living room to the left of the front door entrance and the bedroom also to the left in back of the living room.  A kitchen and a bathroom are to the right.  A rear exit door in the back leads out into a back hallway where there is a wooden door with a lock on the right side that "leads out to the screen door into the [side] porch."[19]  (Docket Entry # 32, p. 13).

Once Detective Terestre placed the defendantunder arrest with handcuffs he saw a small digital scale in plain view.  At that time, Officer O'Sullivan, Detective Terestre and Officer Colon or "several officers" conducted a protective sweep of the apartment.  (Docket Entry # 33, p. 16).  The brief and cursory sweep extended to the kitchen, "back closet" and "back door." (Docket Entry # 36, p. 24).  Officer Colon or another officer observed "a vest, a protective vest" in the closet.[20]  (Docket Entry # 36, p. 24; accord Docket Entry # 33, p. 17).  The

_____

officers crossed the threshold, they could see the defendantwho turned and ran towards the back.

[19]  There is also a second set of stairs leading up to the second floor apartment.

[20]  Count Three charges the defendantwith knowingly possessing a "Protective Armor International ballistic vest" having previously been convicted "of a crime of violence punishable by imprisonment for a term exceeding one year." (Docket Entry # 18).

officers did not open the safes in the closet at the time of the
protective sweep.  The officers did not locate "additional people
other than the people that were in the living room" as a result
of the sweep.  (Docket Entry # 33, p. 17).

After placing the defendant under arrest, one or more
officers escorted the defendant from the area where he was placed
under arrest near the closet and out of the apartment.[21]  As they
did so, the defendant shouted to Minter that "there's nothing in
the house."  (Docket Entry # 36, p. 27; Docket Entry # 32, pp.
27-28).  Minter understood the defendant's statement "to mean
that he had gotten rid of [the] guns."  (Docket Entry # 32, p.
28).  Minter therefore felt comfortable letting the police search
the apartment because she believed that nothing would be found.

During this time, Detective Terestre was in the process of
obtaining Minter's consent to search the apartment.  He spoke
with Minter in the bedroom and asked her in a non-threatening
manner "if she was willing to consent to a search of the
apartment."  (Docket Entry # 33, p. 16).  Minter assured
Detective Terestre that there were no drugs or firearms in the
apartment.  After the two discussed consenting to a search,
Detective Terestre briefly went outside to his vehicle, retrieved

---

[21]  The defendant was eventually taken to the police station
where he signed a form waiving his Miranda rights at around 11:00
p.m. that evening.  Defense counsel submits that the statements
made by the the defendant during confinement are inadmissible as
illegal fruit of an unlawful arrest.  (Docket Entry # 33, p. 26;
Docket Entry # 21, p. 24).

a consent form and returned to the first floor apartment.  He
then spoke again with Minter in the bedroom and "went through the
steps" with regard to the consent form "reading verbatim" from
the form.  (Docket Entry # 33, pp. 59-60).

After Detective Terestre obtained Minter's consent to search
the apartment for drugs and firearms and Minter signed the
consent form, several officers, including Detective Terestre and
Officer Colon, searched the premises for evidence relating to
drugs and firearms.  Upon entering the closet, they found two
"small grade century safes."  (Docket Entry # 33, p. 19).  They
again observed the "bulletproof vest" or "protective vest" in the
closet.  (Docket Entry # 33, p. 17; Docket Entry # 36, p. 24).
When Detective Terestre removed both of the safes from the
closet, Minter volunteered the information that she had a key to
one of the safes and voluntarily provided the key to Detective
Terestre.  Detective Terestre then opened one of the small safes
with the key provided by Minter and saw two firearms.  Officer
Colon additionally observed "some ammunition."  (Docket Entry #
36, p. 25).  Detective Terestre then immediately instructed
Minter that "the apartment would be frozen" and that he would be
seeking a search warrant.  Due to uncovering this additional
evidence, Detective Terestre explained to Minter that he believed
it more prudent to secure a search warrant.

Officer Adams and "probably Officer Colon" and Officer

O'Sullivan remained with Minter in the apartment while Detective Terestre obtained a search warrant.  (Docket Entry # 33, p. 21).  Detective Terestre left the apartment and prepared an affidavit to support the search warrant.[22]  At around 11:45 p.m., Detective Terestre returned to the first floor apartment and executed the search warrant.  Officer Colon also took part in that search.  During this search, the officers found two photographs.  Each photograph showed three men.  In each photograph one of the men is pointing a firearm at the photographer.  Inside the first safe, the officers secured the two firearms, consisting of a .45 caliber Glock semi-automatic pistol and a .9 millimeter Beretta [sic] semi-automatic pistol, both with obliterated serial numbers, and various rounds of ammunition.[23]  Detective Terestre first saw the firearms when he opened this safe during the consent search.

DISCUSSION

The defendant's arguments devolve into three discrete

---

[22]  Defense counsel questioned Detective Terestre at length about the information he gathered for the affidavit (Docket Entry # 33, pp. 32-43), testimony which this court has considered albeit not specifically summarized.

[23]  Count Two charges the defendantwith knowingly possessing "a .45 caliber Glock semi-automatic pistol with an obliterated serial number" and "a 9 mm Baretta [sic] semi-automatic pistol with an obliterated serial number" having previously been convicted "of a crime punishable by imprisonment for a term exceeding one year."  (Docket Entry # 18).

subsets.   The first involves the constitutionality of the
investigatory stop by Officer O'Sullivan.   The second concerns
the entry into the vestibule area.   The remaining segment covers
the interior apartment, to wit, the entry over the threshold into
the first floor apartment, the protective sweep, the arrest of
defendant, the effect of the consent provided by Minter and the
application of the exclusionary rule.


I.   The Investigatory Stop and Frisk

     The defendant asserts there was no reasonable suspicion to
support Officer O'Sullivan's stop and no reason to believe the
defendant was armed and dangerous to support the pat down search.
The government disagrees.

     The Fourth Amendment prescribes law enforcement officers
from making intrusive encounters that fall short of a full scale
arrest.   United States v. Gilliard, 847 F.2d 21, 24 (1st Cir.
1988).   The Supreme Court in Terry v. Ohio, 392 U.S. 1, 30
(1968), established the baseline rule allowing an officer to
conduct a "brief investigatory stop if he has a reasonable,
articulable suspicion that criminal activity is afoot."   United
States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004), cert. denied,
__U.S.__, 125 S.Ct. 2924 (2005).   With respect to an
investigatory stop, the relevant question is whether the actions
of the police "'were reasonable under the circumstances.'"

22

United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).  In making

this inquiry, the court employs "a wide lens and survey[s] the

totality of the circumstances."  United States v. Romain, 393

F.3d at 71.

Assessing the constitutionality of a Terry stop implicates a

dual inquiry of "whether the officer's action was justified at

its inception, and whether it was reasonably related in scope to

the circumstances which justified the interference."  Terry v.

Ohio, 392 U.S. at 20; accord United States v. Romain, 393 F.3d at

71 (court considers "'whether the officer's actions were

justified at their inception, and if so, whether the officer's

subsequent actions were fairly responsive to the emerging

tableau'"); United States v. Maguire, 359 F.3d 71, 76 (1st Cir.

2004) ("we first determine whether the officers' actions were

justified at their inception, and if so whether the actions

undertaken by the officers following the stop were reasonably

responsive to the circumstances justifying the stop in the first

place as augmented by information gleaned by the officers during

the stop") (internal brackets, citations and quotation marks

omitted); United States v. Young, 105 F.3d at 6 (same).

The reasonable suspicion test amounts to an intermediate

standard requiring "more than a naked hunch that a particular

person may be engaged in some illicit activity" but less than

probable cause "or evidence of a direct connection linking the

suspect to the suspected crime." United States v. Chhien, 266
F.3d 1, 6 (1st Cir. 2001); accord United States v. Cook, 277 F.3d
82, 85 (1st Cir. 2002) (standard requires "more than unfounded
speculation but less than probable cause"). Employing a
contextual analysis and affording a degree of deference to the
expertise of law enforcement officers, United States v. Cook, 277
F.3d at 85, "a stop is justified at its inception if the officer
can 'point to specific and articulable facts which, taken
together with rational inferences from those facts, reasonably
warrant [the] intrusion.'" United States v. Romain, 393 F.3d at
71 (quoting Terry, 392 U.S. at 21, and citing United States v.
Young, 105 F.3d at 7).

The propriety of the initial stop depends, in turn, upon
"what the officer knows (or has reason to believe) and how events
unfold." United States v. Romain, 393 F.3d at 71. The
touchstone is the reasonableness of the conduct in light of all
the attendant circumstances. United States v. Osbourne, 326 F.3d
274, 277 (1st Cir.), cert. denied, 540 U.S. 903 (2003).
Reasonableness entails a balancing of "'the need to search (or
seize) against the invasion which the search (or seizure)
entails.'" Terry v. Ohio, 392 U.S. at 21; accord United States
v. Chhien, 266 F.3d at 6 ("court must balance 'the nature and
quality of the intrusion on personal security against the
importance of the governmental interests alleged to justify the

intrusion'"); <u>United States v. Young</u>, 105 F.3d at 7 ("[w]eighing 'the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and in the police officer's safety'").

Here, Officer O'Sullivan had the necessary reasonable suspicion to briefly detain the defendant.  By the time Officer O'Sullivan stopped defendant, Officer Colon had observed the defendant for a 20 to 30 minute time period engaging in conduct that appeared suspicious.  Officer Colon then witnessed the defendant and Court engage in, what his experience taught him, was "not a greeting."  Rather, the defendant and Court "got in tight" and made an exchange of unknown objects.  Facing each other, Officer Colon could see both their hands in an exchange of unknown objects.  As observed by Officers Colon and/or O'Sullivan, Court's clinched right hand then went into her pocket.  After this quick interaction, Court and the defendant separated and walked away from each other.  Maintaining communication for the majority of the time via the unrecorded channel, Officer Colon radioed Officer O'Sullivan and told him that, "[T]he deal was done."  Although Officer Colon did not see the color or shape of the actual objects exchanged, what he observed supports the inference that he had just witnessed a narcotics transaction.  <u>See</u> <u>generally</u> <u>United States v. Gilliard</u>, 847 F.2d at 24 (noting that officers testified "merely to having

seen what 'appeared' to be currency" and that such testimony
"supports the inference that an exchange actually occurred").

Armed with imputed knowledge from Officer Colon, see
generally United States v. Cook, 277 F.3d at 86, Officer
O'Sullivan possessed the necessary specific and articulable facts
to warrant a reasonable suspicion that criminal activity had just
taken place and, at a minimum, justified stopping the
defendantand conducting a brief interrogation. See, e.g., United
States v. Gilliard, 847 F.2d at 25 (upholding stop based on
similar articulable facts); United States v. Trullo, 809 F.2d
108, 111-112 (1st Cir. 1987) (same). The governmental interest
in investigating a likely drug crime outweighs the
correspondingly minimal intrusion of detaining the defendantfor
the brief time period that ensued.

The scope of the search was also reasonable under the
attendant circumstances. See generally United States v. Young,
105 F.3d at 6 ("[t]o satisfy the second prong, we examine the
totality of the circumstances"). Not only were the questions
reasonable but the pat down of the defendant's exterior clothing
and, upon feeling a bulge, removing a closed knife, was also
reasonable.

The propriety of the pat down search turns upon whether the
officer has reasonable grounds to believe that the detained
individual is armed and dangerous. Assessed under "the totality

of the circumstances," a pat down frisk for weapons after a <u>Terry</u> stop is "permissible where 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" <u>United States v. McKoy</u>, 428 F.3d 39, (1st Cir. 2005). As succinctly stated by the First Circuit in <u>Romain</u>, "in determining whether a pat-down search is an appropriate step following a valid <u>Terry</u> stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" <u>United States v. Romain</u>, 393 F.3d at 71; <u>accord</u> <u>Terry v. Ohio</u>, 392 U.S. at 27 ("permit[ting] a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual").

Under the circumstances, a reasonable officer would be warranted in suspecting that the defendant was armed and that the officer's safety was in danger. Officer O'Sullivan was alone in plain clothes with the defendant in a high crime area. In addition, given the facts known at the time, a reasonable police officer, guided by his experience, <u>see</u> <u>United States v. Trullo</u>, 809 F.2d at 112, would conclude that the defendant had more than likely engaged in a recent drug transaction and had either the drugs or the proceeds from the transaction in his possession. Dangerous weapons such as firearms are often "'tools of the trade'" of drug dealers. <u>United States v. Gilliard</u>, 847 F.2d at

27

25 ("officers here suspected Gilliard of having participated in a narcotics sale and knew that firearms are 'tools of the trade'"). It was therefore likely that the defendant was armed.

In addition, the defendant was looking around for a way to run, according to Officer O'Sullivan. In order to further gauge the situation, Officer O'Sullivan placed his hand on the defendant's chest and felt a rapid heartbeat. The defendant thus appeared nervous and/or alarmed. See United States v. Cook, 277 F.3d at 87 n. 1 (noting inter alia that "Cook appeared to be alarmed after he saw" the officers as a basis in part to justify the frisk); United States v. Gilliard, 847 F.2d at 25 (noting that "Gilliard acted peculiarly and nervously"). Asking the defendant if he had "anything to worry about" confirms that the purpose of the pat down search was to search for dangerous weapons. Cf. United States v. Lott, 870 F.2d 778, 782-3 (1st Cir. 1989) (validity of search diminished inasmuch as "Officer Haglund conceded on cross-examination the search was for contraband, not just weapons"). In other words, Officer O'Sullivan conducted the pat down search to neutralize the reasonable and real threat of physical harm, a threat that outweighs the intrusion. See United States v. Barboza, 412 F.3d 15, 16 (1st Cir. 2005) (noting that the purpose of a protective search is "to neutralize the threat of physical harm to police officers and others").

In short, similar to the circumstances justifying the pat down searches in <u>Trullo</u> and <u>Guilliard</u>, Officer O'Sullivan's pat down search of the defendant's outer clothing was justified by a reasonable suspicion of fearing for his safety and the presence of weapons that might be used to assault him.  <u>See</u> <u>United States v. Gilliard</u>, 847 F.2d at 25; <u>United States v. Trullo</u>, 809 F.2d at 113-114.  Once Officer O'Sullivan felt the presence of what might be a weapon in the defendant's back pocket, he was justified in reaching into that pocket and retrieving the knife.  <u>See</u> <u>United States v. Trullo</u>, 809 F.2d at 114 ("[o]nce the 'pat down' confirmed that the article in appellant's pocket had the characteristics of a weapon, the officer was justified in reaching into the pocket and seizing it").

II.  <u>Entry into Vestibule</u>

The government and the defendant dispute whether the defendant had a reasonable expectation of privacy in the vestibule area of the two apartment, two family or two unit building.

Although the relevant inquiry is easily stated it is less easily applied.  A person has an expectation of privacy protected under the Fourth Amendment if he has a legitimate subjective expectation of privacy in that area and if society is prepared to

recognize that expectation as objectively reasonable.[24]  See Katz
v. United States, 389 U.S. 347, 361 (1967) (Harlan, J.,
concurring); accord United States v. Cardona-Sandoval, 6 F.3d 15,
20 (1st Cir. 1993) ("individual's Fourth Amendment right to be
free from unreasonable searches is implicated when he or she (1)
has 'manifested a subjective expectation of privacy' in the place
searched, which (2) 'society accepts as objectively
reasonable'").

Undeniably, the defendant would lack a reasonable
expectation of privacy if the two unit building at 36 Wrentham
Street was a large multi-unit apartment complex.  The First
Circuit, United States v. Garner, 338 F.3d 78, 80 (1st Cir.
2003); United States v. Hawkins, 139 F.3d 29, 32-33 (1st Cir.
1998); United States v. Cruz Pagan, 537 F.2d 554, 557-558 (1st
Cir. 1976), as well as the majority of other circuits addressing
the issue conclude that a tenant lacks a reasonable expectation
of privacy in the common area of a multi-unit apartment building.
United States v. Miravalles, 280 F.3d 1328, 1329 & 1331-1333
(11th Cir. 2002) (no reasonable expectation of privacy in common
areas of "large, multi-unit apartment building" where electronic
lock on building was not working on the day the officers entered
the building); United States v. Clark, 67 F.3d 1154, 1162 (5th

---

[24]  As a welcome overnight visitor or guest with keys, the
defendantundoubtedly has an actual expectation of privacy.  See
United States v. Fields, 113 F.3d 313, 320 (2nd Cir. 1997).

Cir. 1995) (tenant in apartment complex lacked reasonable expectation of privacy in unlocked common stairway and walkway);[25] <u>United States v. Nohara</u>, 3 F.3d 1239, 1239-1241 (9th Cir. 1993) (no reasonable expectation of privacy in hallway outside apartment in high rise apartment building); <u>United States v. Acosta</u>, 965 F.2d 1248, 1252 (3rd Cir. 1992) (tenant's zone of privacy under Fourth Amendment did not extend to unlocked, common hallway in three story, multi-unit apartment building); <u>United States v. Concepcion</u>, 942 F.2d 1170, 1172 (7th Cir. 1991) (no reasonable expectation of privacy in common area accessed by key inasmuch as other five tenants shared same entrance, "used the space and could admit as many guests as they pleased"); <u>United States v. Barrios-Moriera</u>, 872 F.2d 12, 14 (2nd Cir. 1989) (no expectation of privacy in locked common hallway of multi-dwelling apartment complex), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u>, <u>Horton v. California</u>, 496 U.S. 128 (1990); <u>United States v. McGrane</u>, 746 F.2d 632, 634 (8th Cir. 1984) (no expectation of privacy in unlocked common area in basement by tenant who occupied one of

---

[25] In 1996, the Supreme Court vacated and remanded the <u>Clark</u> decision on other grounds for consideration of a 1996 decision, <u>Bailey v. United States</u>, 516 U.S. 137 (1996) (holding "that § 924(c)(1) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense"). <u>See</u> <u>United States v. Clark</u>, 67 F.3d at 1161 ("'use' for purposes of the firearms count "does not require proof of actual use but simply that the weapons could have facilitated the drug offense").

four apartments in the two story building);[26] United States v.
Dickens, 695 F.2d 765, 778 (3rd Cir. 1983) (occupant lacked
reasonable expectation of "privacy in a building staircase
accessible to other tenants and the general public"); United
States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (no
reasonable expectation of privacy in apartment hallway that was
accessed by key or by tenant "'buzzing' to release the lock");[27]
United States v. Anderson, 533 F.2d 1210, 1214 (D.C.Cir. 1976)
(resident of rooming house had no protected privacy interest in
common corridors of the rooming house which "were available to
residents of the rooming house, their guests, people making
deliveries, and others who had a legitimate reason to be on the
premises").

Only the Sixth Circuit takes a different position.  See
United States v. Carriger, 541 F.2d 545, 551-552 (6th Cir. 1976)
(warrantless entry into locked common area of apartment complex
violated tenant's Fourth Amendment rights); see also United
States v. Miravalles, 280 F.3d at 1332 ("Sixth Circuit stands
alone in taking the position that it is reasonable for tenants to

---

[26]   Notably, the building in McGrane is similar to the
building at 36 Wrentham Street, albeit containing two apartments
on each floor as opposed to one apartment on each of the two
floors.

[27]   The federal agent in Eisler obtained entry into the
locked, common area of the building "by surreptitiously following
a tenant who opened the secured door with a key."  United States
v. McGrane, 746 F.2d at 634.

expect privacy in the common areas of their apartment building, at least when the building is locked").

The defendant submits that this court should focus upon the intimate nature of a two family home as opposed to the attributes of a larger apartment complex.  This court agrees insofar as the focus is upon the reasonableness of the expectation of privacy in the vestibule of the two unit building as opposed to the vestibule or common hallway of a larger apartment complex. Admittedly, there is perhaps a greater expectation of privacy in the less traveled and more secluded area of a common hallway in a two unit apartment building as opposed to a ten, 20 or 30 unit apartment building.  That said, however, the general reasoning employed by the cases involving common areas in larger apartment buildings also applies to the common area at 36 Wrentham Street. This court therefore turns to the reasoning employed by the majority view as a basis to support the conclusion that the defendantlacks a reasonable expectation of privacy in the vestibule or common hallway at 36 Wrentham Street.

First, as reasoned by the Eighth Circuit, "locks on the doors to the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways." United States v. Eisler, 567 F.2d at 816.  Likewise, the locks, as well as the sensor light and metal bars, used on the exterior door at 36 Wrentham Street provided needed and necessary security

in an area of high crime.  The purpose for their use was to provide security as opposed to privacy in the common hallway.[28] Minter herself testified to having a sense of security as a result of keeping the exterior front door locked.

Furthermore, the fact that Minter and the upstairs tenant kept the exterior front door locked most of the time does not automatically mandate a determination that there was a reasonable expectation of privacy.  United States v. Barrios-Moriera, 872 F.2d at 14-15 ("warrantless arrest is permissible even though the area was guarded by a locked door;" citing United States v. Santana, 427 U.S. 38, 42 (1976)); see United States v. Conti, 361 F.2d 153, 157 (2nd Cir. 1966) ("This court has recently held that a lobby of an apartment house, guarded by a door usually kept locked, is not within the curtilage of a tenant's apartment, and so is not a protected area within which the individual tenants have Fourth Amendment rights"); see also United States v. Miravalles, 280 F.3d at 1331 (noting that in four of the five circuit court decisions that conclude that tenants do not have a reasonable expectation of privacy in the common areas of apartment buildings "it does not matter whether the door to the

_____

[28]  Excluding police from such common areas would decrease, not increase, that security.  See United States v. Holland, 755 F.2d 253, 256 (2nd Cir. 1985) (rule making it constitutionally permissible for police to enter common hallway in the two unit, two story apartment building "gives tenants the benefit of much-needed police protection in common hallways").

34

apartment building is locked or unlocked").[29]  Where, as here,

the exterior front door was not locked at the time the officers

gained entrance, the reasonableness of the defendant's

expectation of privacy is diminished.[30]  See United States v.

Thornley, 707 F.2d at 624.

Second, the hallway or vestibule was a common area that

workmen, guests, deliverymen or a landlord would have had to

enter in order to access either of the two apartments.  Such an

area contrasts from the locked area behind the door to the actual

apartment where the tenant resides.  As reasoned by the Seventh

Circuit:

> [I]t is odd to think of an expectation of "privacy" in the
> entrances to a building.  The vestibule and other common
> areas are used by postal carriers, custodians, and peddlers.
> The area outside one's door lacks anything like the privacy
> of the area inside.  We think the district court on solid
> ground in holding that a tenant has no reasonable
> expectation of privacy in the common areas of an apartment
> building.

United States v. Concepcion, 942 F.2d at 1172; accord United

States v. Anderson, 533 F.2d at 1214 ("When the police officers

---

[29]  As additionally noted in Miravalles, it was "not clear
which position . . . the First Circuit[] would take on locked
door facts."  United States v. Miravalles, 280 F.3d at 1331-1332.
Whether the outer door was locked is, of course, a relevant
factor to consider in assessing the existence of a reasonable
expectation of privacy.  See United States v. Thornley, 707 F.2d
622, 624 (1st Cir. 1983) (listing factors, including that "[t]he
door to the storage area was not kept locked," as "weigh[ing]
against an objective expectation of privacy").

[30]  That said, this court would reach the same result even if
the exterior front door was locked at the time Officer Colon and
Detective Terestre entered the vestibule.

entered the rooming house they did not enter appellant's private dwelling; instead they merely entered the common corridors of the building, which were available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises").[31]  Similarly, the defendant, an invited guest of one of the tenants, had no ability to exclude the landlord, workmen, deliverymen or guests of the upstairs tenant from the vestibule area.

Third, under similar facts, the Second Circuit in United States v. Holland, 755 F.2d at 253 (2nd Cir. 1985), rejected the notion that the tenant in a two story, two apartment building had a reasonable expectation of privacy in the locked common hallway or vestibule.[32]  The court therefore upheld the warrantless felony arrest of Holland in the common hallway or vestibule area. In so doing, the court analogized the cases involving the common

---

[31]  Using similar reasoning, the Second Circuit in United States v. Fields, 113 F.3d 313 (2nd Cir. 1997), rejected the argument that the defendants had a legitimate expectation of privacy in the side yard of a three family dwelling on the evening of the search.  United States v. Fields, 113 F.3d at 321-322.  As noted by the court in Fields, the multi-family dwelling "in which [the defendants] conducted their operations contained other apartments whose tenants were entitled to use the side yard without giving notice or having the defendants' permission." United States v. Fields, 113 F.3d at 322.

[32]  The well respected Judge Jon O. Newman wrote a dissenting opinion in Holland.  Unlike the two judge majority opinion, the dissenting opinion distinguishes multi-tenant buildings from small two family houses like Holland's.  United States v. Holland, 755 F.2d at 259.  A majority opinion, however, constitutes more forceful precedent than a dissenting opinion.

areas of larger apartment complexes to the more intimate hallway
in <u>Holland</u>.[33]

This court agrees with the reasoning and the result reached
by the majority in <u>Holland</u> as applicable to the case at bar.  In
addition to recognizing and adhering to the decisions applicable
to multi-tenant buildings, the majority in <u>Holland</u> reasoned that
the rule "lays down a clearly-defined boundary line for
constitutionally permissible police action, which is readily
apparent to an officer in the field, without a need for counting
apartments, analyzing common-hallway traffic patterns or
interpreting the mental processes of a suspect relating to an
area used in common with others."  <u>United States v. Holland</u>, 755
F.2d at 256.  Further, such a "rule gives tenants the benefit of
much-needed police protection in common hallways while it
preserves for them the privacy of their actual places of abode,
their apartments."[34]  <u>United States v. Holland</u>, 755 F.2d at 256
(citation omitted).  The majority also explained that the
defendant had no right to exclude from the common hallway
"occupants of the first floor apartment, deliverymen, tradesmen,

---

[33]  Again, the Sixth Circuit takes a contrary view insofar as
the court in <u>United States v. King</u>, 227 F.3d 732, 748-750 (6th
Cir. 2000), held that a rent paying tenant of a basement
apartment in a two unit duplex where the occupants, consisting of
the defendant, his brother, his mother and siblings who "'all
lived there as one family,'" had a reasonable expectation of
privacy in the basement area.

[34]  See footnote 28.

or one or more visitors to the first floor apartment" and "there is no indication that he ever tried to do so." United States v. Holland, 755 F.2d at 256.

Fourth, this court recognizes, as argued by the defendant, that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313 (1972). A common hallway, however, is not a home or an abode. See United States v. Holland, 755 F.2d at 255 (Supreme Court and Congress recognize the common sense distinction between a place of abode, a home or an apartment and an adjoining common hallway); see also United States v. Conti, 361 F.2d at 157 ("lobby of an apartment house, guarded by a door usually kept locked, is not within the curtilage of a tenant's apartment, and so is not a protected area within which the individual tenants have Fourth Amendment rights"); United States v. Cruz Pagan, 537 F.2d at 558 (noting that in urban multifamily apartment house, area within curtilage "'is much more limited'" and "'tenant's "dwelling" cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control'").

Although it is an open question regarding locked common areas in an intimate two family building, First Circuit law largely adheres to the majority view. The First Circuit in United States v. Thornley, 707 F.2d at 622, held that Thornley

38

had no reasonable or objective expectation of privacy in an
unlocked basement in a three story residence rented to eight
tenants.  The factors the First Circuit considered relevant as
weighing against an expectation of privacy in Thornley are
illuminating.  Those factors are as follows:

> The door to the storage area was not kept locked.  Ready
> access could be had to that area through a hole in the
> partition which had been there for several years.  The
> storage area was being used by Mrs. LeBlanc before Thornley
> began using it.  She was never told, either before or after
> Thornley began using that area, that such use was
> prohibited.  Access to the basement was not restricted to
> any of the tenants.  In fact, it was regularly used by the
> LeBlanc children as a play area.  There was no credible
> evidence that Thornley had a lease for the storage area.
> Moreover, it is uncontroverted that he was not a tenant at
> the residence.

United States v. Thornley, 707 F.2d at 624-625.  Analogized to
the case at bar, like the door to the basement storage area, the
exterior front door to the vestibule area was unlocked at the
time of entry.[35]  The defendant was not a tenant or lessee of an
apartment in the building.  He had no possessory interest in the
common area.  Access to the common area was available to the
landlord, the upstairs tenant, her children, and anyone who the
upstairs tenant chose to admit.

Prior to Thornley, the First Circuit in United States v.
Cruz Pagan, 537 F.2d at 554, rejected the existence of a

---

[35]  Unlike Thornley, however, the outer door at 36 Wrentham
Street was otherwise usually locked.  Cf. United States v.
Thornley, 707 F.2d at 624 ("door to the storage area was never
locked").

reasonable expectation of privacy on the part of a tenant of a multi-unit apartment complex to the underground parking garage and basement.   In rejecting Fourth Amendment protection, the court agreed "that a person cannot have a reasonable expectation of privacy in such a well traveled common area of an apartment house or condominium."   United States v. Cruz Pagan, 537 F.2d at 558 (internal parenthetical omitted).

Citing Cruz Pagan, the First Circuit in Hawkins broadly stated that, "It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building."   United States v. Hawkins, 139 F.3d at 32; accord United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999) (same, quoting Hawkins); see United States v. Garner, 338 F.3d 78, 80 (1st Cir. 2003) (Garner "had no authority to refuse consent to a search of the basement, since it was a common area of the apartment building in which he had no privacy interest"), cert. denied, 540 U.S. 1084 (2003).   The court in Hawkins thereby summarily rejected the assertion of a reasonable expectation of privacy on the part of a tenant to the common basement area in the apartment complex.[36]   Indeed, the First Circuit in Hawkins did not even afford the argument an extended

---

[36]   The basement contained 12 open and locked storage areas surrounded by chicken wire that were assigned to each apartment. In other words, these locked areas were not shared, common or accessible to the other tenants.   As such, they differ from the vestibule area at 36 Wrentham that was accessible to the tenants and their guests.

discussion preferring, instead, to dismiss it in three sentences. Although the number of apartment units in the building is not entirely clear, it is reasonable to assume there were only 12 inasmuch as the "*twelve* open storage areas" in the basement were "assigned to *each* apartment." <u>United States v. Hawkins</u>, 139 F.3d at 31 (emphasis added).  The First Circuit in <u>Brown</u> likewise summarily dismissed, again in three sentences, the argument that Brown had a reasonable expectation of privacy in the lobby area of an apartment complex.  <u>United States v. Brown</u>, 169 F.3d at 92.

Finally and significantly, in a First Circuit case not addressed by the parties in their briefs, the First Circuit addressed the expectation of privacy in the back porch of an apartment in "*a multi-family building*." <u>United States v. Paradis</u>, 351 F.3d 21, 31 (1ˢᵗ Cir. 2003) (emphasis added).  The First Circuit in <u>Paradis</u> stated, in no uncertain terms, that the defendant "had no expectation of privacy in the common areas of a multi-family dwelling." <u>United States v. Paradis</u>, 351 F.3d at 31 (additionally noting that the defendant lacked a protectible privacy interest because he had left the evidence recovered from the back porch with a neighbor).  The court explained that the defendant lacked a reasonable expectation of privacy "both because he had given the ammunition to another person, who was free to do with it what she wanted and because it was seized from a place in which he had no privacy interest." <u>United States v.</u>

_Paradis_, 351 F.3d at 31.  Consequently, even though the effect of _Paradis_ diminishes because it involved a common area different from a common hallway, i.e., a back porch, and the defendant had given the seized evidence to a neighbor, the decision nonetheless confirms that the First Circuit would more than likely conclude that the defendantlacks a protectible privacy interest in the vestibule or common hallway at the two family or multi-family dwelling at 36 Wrentham Street.

In sum, as an invited albeit regular guest in a two unit apartment building, the defendanthad little control over the vestibule area which was available for use by the other tenant, her children, their guests, the landlord, deliverymen and workmen.  The defendant had no right to exclude these individuals from the common vestibule area.  Although the vestibule area was not heavily or "well traveled" like the garage in _Cruz Pagan_, there is no evidence that the defendant leased the apartment on the first floor.  See _United States v. Thornley_, 707 F.2d at 625 (noting, as a factor, that Thornley "was not a tenant at the residence" and did not lease the storage area); cf. _United States v. Cruz Pagan_, 537 F.2d at 557 (noting that Cruz Pagan lived in apartment 311 at the condominium complex).  The unlocked door at the time of the entry further diminishes the reasonableness of the expectation of privacy.  See _United States v. Thornley_, 707 F.2d at 624.  Adhering to the majority view as well as the

42

foregoing First Circuit decisions including <u>Paradis</u> and for the above reasons, this court concludes that there was no reasonable expectation of privacy in the vestibule or common hallway on the first floor.  The police were therefore legally on the premises outside the door of Minter's unit when they knocked and announced their presence.  <u>See</u> <u>United States v. Hawkins</u>, 139 F.3d at 33 ("Once legally inside [the basement] area, the police had a right to perceive whatever was available").

The defendant's reliance on <u>Fixel v. Wainwright</u>, 492 F.2d 480, 483 (5th Cir. 1974), is misplaced.  First, the decision involves an expectation of privacy in a back yard as opposed to a common vestibule or hallway.  Second, the decision is distinguishable on the same basis that the Eleventh Circuit in <u>Miravalles</u> distinguished the decision.  <u>See</u> <u>United States v. Miravalles</u>, 280 F.3d at 1332 (noting that the fenced in yard in <u>Fixel</u> "was 'not a common passageway normally used by the building's tenant's for gaining access to the apartments'").

The defendant additionally relies upon <u>McDonald v. United States</u>, 335 U.S. 451 (1948) (warrantless entry into locked common area in rooming house in mid-afternoon).  Not only has Fourth Amendment Supreme Court jurisprudence changed since 1948, <u>United States v. Concepcion</u>, 942 F.2d at 1172 (distinguishing prior cases providing more expansive Fourth Amendment protection as not "surviv[ing] changes in the Supreme Court's definition of

protected privacy interests"), but the entry and invasion in
McDonald involved the police climbing through a landlady's window
as opposed to the police in the case at bar who repeatedly
knocked and announced their presence before having the door
opened for them.  See United States v. Conti, 361 F.2d at 157
(distinguishing McDonald on this basis).  In addition and unlike
the case at bar at the time of the entry, the common area in
McDonald was locked and the entry was made in the mid-afternoon
after keeping McDonald "under surveillance for two months."
McDonald v. United States, 335 U.S. at 454; United States v.
Shima, 545 F.2d 1026, 1028 (5th Cir. 1977) (distinguishing
McDonald as involving an enclosed and locked area).

Finally, Commonwealth v. Hall, 323 N.E.2d 319 (Mass. 1975),
also cited by defendant, is distinguishable on its facts.  The
unlocked door to the three unit apartment building in Hall
entered into a vestibule which itself had two interior doors.
Access to the the defendant's second floor apartment was through
one of those doors with either a key or buzzer mechanism and the
third floor apartment was vacant.  Thus, unlike the vestibule
area on the first floor of 36 Wrentham Street which both the
downstairs and the upstairs tenants shared, in Hall "only the
defendant lived behind the downstairs vestibule door and off the
stairway to the second and third floors."  Commonwealth v. Hall,
323 N.E.2d at 322.

44

III.  <u>Warrantless Arrest Justified by Exigent Circumstances</u>

A.  <u>Probable Cause and Exigent Circumstances</u>

It is well settled that the Fourth Amendment prohibits a warrantless entry into a private residence for a routine felony arrest absent consent or exigent circumstances.  <u>Payton v. New York</u>, 445 U.S. 573, 576 (1980) (Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest").  Stated otherwise, "the Fourth Amendment bars warrantless, nonconsensual entries of private residences."  <u>United States v. Tibolt</u>, 72 F.3d 965, 969 (1st Cir. 1995).  Indeed, "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  <u>Payton v. New York</u>, 445 U.S. at 589-590 (internal brackets and quotation marks omitted); <u>accord</u> <u>United States v. Martins</u>, 413 F.3d 139, 146 (1st Cir. 2005) ("Fourth Amendment is at its zenith with respect to an individual's home").

As the defendant correctly points out, "[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."  <u>Kirk v. Louisiana</u>, 536 U.S. 635, 638 (2002); <u>accord</u> <u>United States v. Mikell</u>, 102 F.3d 470, 475 (11th Cir. 1996) ("warrantless search is allowed, however, when both probable cause and exigent

circumstances exist"). Thus, to cross the threshold into Minter's apartment, the police needed both probable cause and "exigent circumstances justifying an exception to the warrant requirement." United States v. Wilson, 36 F.3d 205, 208 (1st Cir. 1994) ("To cross the apartment's threshold, Agent Gonzalez needed (1) probable cause to believe that contraband or evidence would be found inside, and (2) exigent circumstances"). Furthermore, this rule extends to searches in temporary homes such as a motel room, United States v. Beaudoin, 362 F.3d 60, 65 (1st Cir. 2004), or homes wherein the the defendantresides as an overnight guest. See Minnesota v. Olson, 495 U.S. 91, 96-100 (1990).

Probable cause exists "if the officers at the scene collectively possessed reasonably trustworthy information sufficient to warrant a prudent policeman in believing that a criminal offense had been or was being committed." United States v. Tibolt, 72 F.3d at 969. Having seen what appeared to be a narcotics transaction and apprehending Court who supplied additional information, the officers had probable cause to believe that the defendant had committed a drug offense as well as an assault upon a police officer. They then traced the defendant to the 36 Wrentham Street building with a canine and a computer search of the identification found in the defendant's jacket. Upon entering the common hallway and observing the

lights out, they proceeded to the second floor apartment after receiving no response from knocking and announcing themselves at the door to the first floor apartment.  The woman in the second floor apartment indicated the defendant's presence in the downstairs apartment and was asked a series of questions regarding seeing anyone entering the apartment.  Thus, there was probable cause to believe that the defendant had committed a felony drug offense and was inside the first floor apartment. See, e.g., United States v. Jones, 204 F.3d 541, 543 (4th Cir. 2000) (circumstances wherein prior to entering home, officer observed suspect take part in apparent drug transaction, walk away while companion swallowed small bag, and run into residence "clearly" established "probable cause to arrest [suspect] at the time the officer entered [suspect's] home"); United States v. Wilson, 36 F.3d at 209 n. 3 (citing Archibald v. Mosel, 677 F.2d 5 (1st Cir. 1982),[37] as justifying police having reasonable belief that suspect was inside apartment); United States v. Moore, 790 F.2d 13, 15 (1st Cir. 1986) (affirming sufficiency of agents' belief that the drug supplier was inside the apartment and that evidence would be found there); United States v. Martinez-Gonzalez, 686 F.2d 93, 99-100 (2nd Cir. 1982) (suspect's flight from officers transformed reasonable suspicion into probable

---

[37]  The circumstances at issue in Archibald are similar to those in the case at bar and discussed in greater detail infra.

cause to arrest for suspected possession of narcotics).[38]

Turning to the issue of exigent circumstances, such circumstances encompass situations wherein a compelling reason or necessity "for immediate action excuses law enforcement officers from pausing to obtain a warrant." United States v. Martins, 413 F.3d at 146; United States v. Wilson, 36 F.3d at 209 ("test" for exigent circumstances "is 'whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant'"). Common scenarios of exigent circumstances "include: (1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected;[39] or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant." United States v. Tibolt, 72 F.3d at 969 (internal quotation marks and brackets omitted). The inquiry is an objective one based upon "the objective facts reasonably known to, or discoverable by, the officers at the time

---

[38] Alternatively, the government correctly notes the existence of probable cause that the defendant committed the crime of assaulting a police officer. See, e.g., United States v. Brown, 169 F.3d at 92 (officer had probable cause to arrest the defendant, who was charged with being felon in possession, for assault and battery on a police officer inasmuch as the the defendant pushed the officer).

[39] In making the finding infra that the hot pursuit doctrine justifies the entrance into Minter's first floor apartment, this court has fully considered the defendant's argument that the building was surrounded.

of the search." United States v. Tibolt, 72 F.3d at 969.

Summarily stated, the exigent circumstance in the case at bar involved the pursuit of the defendant, who had proved dangerous and evasive to Officer O'Sullivan, through the high crime area and thereafter tracking him to the area in the vicinity of 36 Wrentham Street.  Such circumstances provide the necessary exigency allowing the officers to enter the apartment and arrest the defendant who was, at the time, again in the process of evading the police by attempting to run towards the back of the apartment.  Because the doctrine provides a basis for the entrance over the threshold, it bears a further exploration and explanation particularly as interpreted by the First Circuit.

The hot pursuit doctrine emanates from a 1976 Supreme Court case, United States v. Santana, 427 U.S. 38 (1976).  Santana involved a fleeing drug suspect who retreated into her home to avoid arrest.  As reasoned in Santana, a fleeing suspect cannot avoid an otherwise proper arrest by the simple expediency of retreating into her home.  United States v. Santana, 427 U.S. at 42.  The hot pursuit doctrine is a "consistently recognized example of exigent circumstances" and, generally speaking, "encompasses the 'hot pursuit' of a suspect the police reasonably believe to be a felon."  United States v. Soto-Beniquez, 356 F.3d 1, 36 (1st Cir. 2003).  "In such cases, the police are permitted

49

to pursue the fleeing felon into a private residence in order to effect an arrest." United States v. Soto-Beniquez, 356 F.3d at 36. As its name implies, however, a "hot pursuit" involves "some sort of chase." United States v. Santana, 427 U.S. at 43 n. 3 & 44.

In tracing the defendant to 36 Wrentham Street and not taking the time to seek a warrant, the police were justified in believing that further delay would lead to his escape and possibly arming himself[40] thereby making any subsequent arrest that much more dangerous. Indeed, the defendant had already assaulted a police officer and fled in order to avoid Officer O'Sullivan. See United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993) (suspect's flight in response to police order to halt justified hot pursuit entry into multi-tenant structure); see also United States v. Weems, 322 F.3d 18, 23 (1st Cir.) (justifying initial police entry inasmuch as suspect "was known to be armed with a dangerous weapon and to have a history of assault," was "seen at premises and was evidently trying to escape" and "had the opportunity to destroy or hide drugs or the gun"), cert. denied, 540 U.S. 892 (2003); Hegarty v. Somerset County, 53 F.3d 1367, 1379 (1st Cir. 1995) (recognizing that officers could not maintain vulnerable positions outside cabin indefinitely); 3 W. LaFave Search and Seizure § 6.1(f)(2004)

---

[40] The criminal history check included a charge of possessing a firearm without a permit.

50

(delay in arrest of felon reasonably believed to be armed "may well increase the danger . . . to the officers at time of arrest").  The need to act quickly before the defendant permanently left the area, as was his apparent intention upon fleeing Officer O'Sullivan, was objectively evident.  See generally United States v. Santana, 427 U.S. at 42 (noting that "need to act quickly" was "even greater" than in Warden v. Hayden, 387 U.S. 294 (1967)).  It became even more evident when, upon Minter opening the door to the first floor apartment, the police observed the defendant begin to flee towards the rear of the apartment after making eye contact with one of the officers.  See United States v. Fields, 113 F.3d at 321 (noting, in context of approving police observation from common area of the side yard of multi-family dwelling, that "the police are free to observe whatever may be seen from a place where they are entitled to be").

In addition, the time line and other circumstances are similar to those at issue in Archibald v. Mosel, 677 F.2d 5 (1st Cir. 1982).[41]  Like the circumstances in Archibald, the police arrived at 36 Wrentham Street a short time after Officer Colon observed the apparent narcotics transaction and after the

_____

[41] Although Archibald was a civil rights suit for damages, the First Circuit has repeatedly cited the decision in cases involving criminal searches and seizures.  See United States v. Tibolt, 72 F.3d at 969; United States v. Wilson, 36 F.3d at 209 n. 3.

defendant fled from Officer O'Sullivan.   See <u>Archibald v. Mosel</u>, 677 F.2d at 7 (upholding hot pursuit entry into apartment when police arrived 20 to 25 minutes after theft).   Throughout this period, the officers continuously attempted to track and locate the defendant.   Moreover, the approximately one hour time period from the time the defendantfled from Officer O'Sullivan to the time the police arrived at 36 Wrentham Street is significantly less than the delays in two cases cited with approval by the court in <u>Archibald</u>.[42]   <u>See</u> <u>Archibald v. Mosel</u>, 677 F.2d at 7 (citing <u>United States v. Mitchell</u>, 457 F.2d 513 (6th Cir. 1972), as involving arrest two hours after robbery, and <u>United States v. Scott</u>, 520 F.2d 697 (9th Cir. 1975), as involving arrest one hour and 45 minutes after robbery).

Although the police officers in <u>Archibald</u> had not identified the robber and his residence, the court in <u>Archibald</u> cited with approval, albeit for the principle of not requiring a sighting by police, <u>United States v. Mitchell</u>, 457 F.2d 513 (6th Cir. 1972), a case wherein the police had registration information of the truck involved in the bank robbery and traced it to an address where they saw it parked outside after the robbery.   <u>See</u>

---

[42]   Pursuit was ongoing from the time Officer O'Sullivan broadcast the description of the defendant at 5:58 p.m. over channel six to the time the officers arrived at 36 Wrentham Street one hour later.   During that one hour period, the canine unit was tracking the defendant.   Various officers assisted Officer O'Sullivan searching the area.   Possible suspects were considered and rejected.

<u>Archibald v. Mosel</u>, 677 F.2d at 7.  Accordingly, the fact that
the officers had reason to believe that the defendant resided at
36 Wrentham Street or at an address in Brockton does not preclude
the existence of exigent circumstances.  That said, however, it
does not weigh in their favor.

On the other hand, the police had objective knowledge that
the defendant was prone to escape and had used whatever means
necessary to avoid the police.  In fleeing from Officer
O'Sullivan, the defendant had pretended to reach down for an item
and then swiftly swung and hit the officer before fleeing down
the street.  The defendant had already proven to be dangerous in
assaulting Officer O'Sullivan.  The defendant had also lied about
not having a weapon, the pocket knife.  In light of such guile
and propensity to flee, it was uncertain whether police would be
able to locate the defendant at either the 36 Wrentham Street or
the Brockton address if they delayed their pursuit.

Also somewhat like the circumstances in <u>Archibald</u>, the
upstairs tenant confirmed the presence on the first floor of the
defendant who was attempting to avoid detection with the lights
turned off.  The occupants inside also refused the officers'
initial knock and announcement.  <u>See</u> <u>Archibald v. Mosel</u>, 677 F.2d
at 7 (officers' "suspicions were corroborated by the noise inside
the apartment, which showed that someone was there, and by the
refusal of the occupant to respond to their announcements").

Once Minter voluntarily opened the door, the defendant made eye
contact with one of the officers and then again attempted to flee
by running towards the back.  Given the foregoing, there was a
compelling necessity for immediate action.  See, e.g., United
States v. Jones, 204 F.3d at 543 (finding "no difficulty" in
concluding exigent circumstances existed given hot pursuit).

In sum, the arrest was not illegal.  Rather, there was
probable cause as well as exigent circumstances.[43]


B.  Protective Sweep

In the course of entering the first floor apartment and

_____

[43]  The defendant's supporting memorandum briefly states
that:

> Any statements made by defendant are inadmissible since they
> occurred during confinement following the unlawful arrest.
> Brown v. Illinois, 422 U.S. 590, 603 (1975) (a confession
> "obtained by exploitation of an illegal arrest" may not be
> used against a criminal defendant.).

(Docket Entry # 21).  The motion also refers to "admissions made
by defendant" as "impermissible fruits of the unlawful
intrusions."  (Docket Entry # 20).  This court's finding of
probable cause and exigent circumstances dispenses with the
argument that the defendant's admissions should be suppressed
because of "the unlawful arrest" (Docket Entry # 21, p. 24).
This finding, however, does not preclude the defendant from
raising another argument relative to suppressing the statements
made during confinement.  The statements or admissions made by
the defendant were not the focal point of the suppression hearing
or the supporting papers.  Thus, this court simply finds,
consistent with the foregoing reasoning, that the statements were
not the product of an illegal entry into the first floor
apartment and arrest therein based upon probable cause and
exigent circumstances and, accordingly, should not be suppressed
on that basis.

subduing and arresting the defendant, the officers conducted a
protective sweep of the area.  The government urges that the
officers' right to conduct the protective sweep, including the
closet, justifies admission at trial of the body armor found
within the closet.  This court agrees.

Having lawfully entered the apartment, the police have "the
same right to conduct a protective sweep whether an arrest
warrant, a search warrant, or the existence of exigent
circumstances prompts their entry."  United States v. Martins,
413 F.3d at 150.  "The baseline rule is that police officers, in
conjunction with an arrest on residential premises, may undertake
a protective sweep so long as they can point to 'articulable
facts which, taken together with the rational inferences from
those facts,' would warrant a reasonably prudent officer in
believing 'that the area harbor[s] an individual posing a
danger.'"  United States v. Martins, 413 F.3d at 149 (citing
Maryland v. Buie, 494 U.S. 325, 327 (1990)); cf. United States v.
Barnett, 989 F.2d 546, 555 & n. 10 (1st Cir. 1993) (dicta quoting
Buie's alternative holding allowing sweep "'narrowly confined to
a cursory visual inspection of those places in which a person
might be hiding'" inasmuch as "officers are permitted to take
reasonable steps to ensure their safety, and may, 'without
probable cause or reasonable suspicion, look in closets and other
spaces immediately adjoining the place of arrest from which an

attack could be immediately launched'"). The scope of the sweep "allows only a 'cursory inspection of those spaces where a person may be found.'" <u>United States v. Martins</u>, 413 F.3d at 151.

The articulable facts weighing in the government's favor include that the defendant was armed with the pocket knife and that he denied being armed to Officer O'Sullivan. <u>See</u> <u>United States v. Martins</u>, 413 F.3d at 150-151 ("seeming attempt to misinform" supports reasonable suspicion as does "evasive behavior and flight") (paraphrasing <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000)). The police knew that the defendant had at least one confederate, Court. Although she had been taken into custody by the time the officers arrived at 36 Wrentham Street, the defendant's criminal history revealed five prior arrests for various drug offenses. (Ex. 6). Charges included possession with an intent to distribute various Class B controlled substances, historical facts that reasonably support the assumption that in dealing drugs the defendant did not work alone. <u>See</u> <u>Crooker v. Metallo</u>, 5 F.3d 583, 584 (1st Cir. 1993) (paraphrasing <u>United States v. Lopez</u>, 989 F.2d 24 (1st Cir. 1993), that "the defendant might not be acting alone"); <u>United States v. Lopez</u>, 989 F.2d at 26 (even though Lopez had been handcuffed, "police had no assurance that Lopez was acting alone").

Bolstering this fact is the circumstance that when the

police arrived at 36 Wrentham Street, they knocked on the first floor apartment, received no answer, went and spoke with the upstairs tenant who indicated the defendant's presence inside the darkened apartment where he was attempting to avoid detection. There was also the possibility of more than one adult male inside the apartment inasmuch as Officer Colon could not "say for sure" that the male voice belonged to the defendant.  See United States v. Martins, 413 F.3d at 150 ("the officer knew that there was a distinct possibility that a man was hiding inside the apartment" and "[t]hat possibility, in itself, elevated the level of suspicion"); see also United States v. Gerry, 845 F.2d 34, 35 (1st Cir. 1988) ("noises emanating from the rear of the house" justified further search in closets, under beds, shower, vestibule and basement).  Not only was it reasonable to believe that more than one person was inside the apartment but it was also reasonable to believe that the persons inside the apartment were actively and jointly[44] engaged in an attempt to hide and avoid the police.  See United States v. Martins, 413 F.3d at 151 (recognizing "evasive action" as part of the mix).  The lights were off initially and there was a significant delay in answering the second series of knocks and announcements.

The record convincingly depicts the defendant's

---

[44]  The criminal history check showed that the defendant had resided at the Wrentham Street address and, thus, was a welcome visitor.

dangerousness.   The criminal history check revealed charges of
assault and battery, assault and battery with a dangerous weapon
and unarmed robbery.   He had a lengthy criminal history.
Moreover, the defendant's propensity for violence was readily and
recently evidenced by the altercation with Officer O'Sullivan.
See United States v. Weems, 322 F.3d at 21 (upholding protective
sweep and noting that officers "knew that Weems had a lengthy
criminal record, that there were two state arrest warrants for
him, and that Weems had been seen carrying the gun earlier that
day").   Although once subdued the defendantwas no longer a danger
to the officers on the scene,[45] the officers had a reasonable
belief that others on the scene had engaged in "evasive action,"
United States v. Martins, 413 F.3d at 151, and had knowingly
harbored the defendantin an attempt to avoid the police locating,
questioning and/or taking the defendantinto custody.   It would be
logical to surmise that such individual[s] might attempt to hide

---

[45]   In arriving at the conclusion that the protective sweep
into the closet was justified, this court has carefully
considered the foregoing fact that the defendant was subdued on
the floor by the time or around the time the police entered the
closet.   This fact admittedly and undeniably weighs in the
defendant's favor as not justifying a protective sweep into the
closet.   See United States v. Henry, 48 F.3d 1282, 1284 (D.C.Cir.
1995) (noting "that the officers' awareness that Henry had a
previous weapons conviction and could be dangerous did not itself
directly justify the sweep" inasmuch as "[o]nce Henry was in
custody, he no longer posed a threat to the police").   On
balance, however, the officers still held a reasonable fear for
their safety and a reasonable belief that the area swept,
including the closet, harbored another individual posing a danger
to the officers.

in a closet and launch an attack to prevent the officers from further questioning the defendant and taking him into custody. See generally United States v. Lawlor, 406 F.3d 37, 41-42 & n. 6 (1st Cir. 2005) (distinguishing cases where "'the only person known to have posed a danger to anyone's safety had been removed [from the residence] prior to the search'" and "[h]ere, by contrast, even after Lawlor and Tomah had been immobilized, Fiske had reasons to believe that the residence still harbored at least one individual who posed a danger to those at the scene").

The closet, which was within the immediate vicinity of the arrest, was undoubtedly large enough to harbor a person who might launch an unexpected attack against the officers. See, e.g., Maryland v. Buie, 494 U.S. at 334 (including closets as area adjoining place of arrest from which attack could immediately be launched). Unlike the circumstances in Paradis, the police had not engaged in previous protective sweeps of the area. See United States v. Paradis, 351 F.3d at 29 (noting that at time police found the gun, "the police had already been through the entire apartment"). To the contrary, the police were in an unfamiliar interior apartment in an area of high crime.[46] See generally Maryland v. Buie, 494 U.S. at 333 (noting that in-home

---

[46] It is, of course, true that mere presence in a high crime area is insufficient to justify the sweep. See United States v. Martins, 413 F.3d at 150 ("mere presence in a high-crime area, without more, is insufficient to meet the reasonable suspicion benchmark").

arrest puts officer at disadvantage of being "on his adversary's 'turf'" and "in a confined setting of unknown configuration"). The digital scale, the defendant's criminal history check and the events that day evidenced an ongoing drug operation involving more than one person.  Finally, the search was brief, cursory and not an aimless rummage in areas too small to harbor an individual.  See Crooker v. Metallo, 5 F.3d at 585 (noting that "nothing in the record suggests that the officers were rummaging aimlessly about").

On balance, at the time the officers conducted the protective sweep of the apartment and having considered the totality of circumstances known to the officers at the time of the search, they had a reasonable belief, based upon articulable facts and rational inferences therefrom, that the area, including the closet, harbored an individual who posed a danger to the officers at the time.[47]

The initial discovery of the protective vest is the result of the constitutional protective sweep into the closet.  As such, the evidence need not be suppressed.

C.  Consent

---

[47]  As an alternative basis to uphold the sweep into the closet, there was a high probability that the area harbored individuals who "'may destroy evidence.'"  United States v. Gerry, 845 F.2d at 36.

Absent consent or exigent circumstances, the Fourth
Amendment prohibits a warrantless search of the home. United
States v. Weidul, 325 F.3d at 53; accord United States v. Meada,
408 F.3d 14, 20 (1st Cir. 2005) ("police need not seek a warrant
where 'voluntary consent has been obtained, either from the
individual whose property is searched, or from a third party who
possesses common authority over the premises'").
Stated conversely, a search undertaken in accordance with "a
valid consent is constitutionally permissible." Schneckloth v.
Bustamonte, 412 U.S. 218, 222 (1973); accord United States v.
Goodridge, 945 F.Supp. 359, 368 (D.Mass. 1996) (consensual search
is an established, well-delineated exception to "the warrant and
probable cause requirements").

The government "bears the burden of demonstrating that
consent was validly obtained." United States v. Romain, 393 F.3d
at 69.  Consent must be voluntary. See Schneckloth v.
Bustamonte, 412 U.S. at 224-225 (discussing the term
"voluntariness" and characterizing a voluntary decision as "free
and unconstrained" where the will of the consenting individual
has not been overborne or "his capacity for self-determination
critically impaired").  Where, as here, the consenting party is
not in custody and the government attempts to justify a
warrantless search on the basis of consent, the Fourth and
Fourteenth Amendments of the Constitution require that the

consent be freely given and not be the result of duress or coercion, either express or implied.  United States v. Twomey, 884 F.2d 46, 50 (1st Cir. 1989).

"[W]hether consent was '"voluntary" or was the product of duress or coercion is a question of fact to be determined from the totality of all the circumstances.'"  United States v. Patrone, 948 F.2d 813, 815-816 (1st Cir. 1991); accord United States v. Weidul, 325 F.3d at 53 ("[c]onsent must be voluntary to be valid" under the totality of the circumstances).  Factors to consider in assessing the voluntary nature of the consent include:  the consenting individual's age, lack of education, low intelligence, Schneckloth v. Bustamonte, 412 U.S. at 222, "possibly vulnerable state of mind," United States v. Twomey, 884 F.2d at 51, experience and "knowledge of the right to withhold consent."  United States v. Barnett, 989 F.2d at 555; United States v. Reith, 66 F.Supp.2d 52, 56 (D.Me. 1999) (identifying factors "such as 'age, education, experience, intelligence, and knowledge of the right to withhold consent'") (quoting United States v. Barnett, 989 F.2d at 555).  "More general considerations" encompass whether the consenting individual was advised of his "constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances."  United States v. Barnett, 989 F.2d at 555; accord United States v. Twomey, 884 F.2d at 51 (court should

62

consider "evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place").

During the process of subduing and removing the defendant from the apartment, Detective Terestre spoke with Minter in the bedroom in a nonthreatening manner and obtained her consent to conduct the search.  Signing the consent form as "owner," she had actual as well as apparent authority over the premises.  Knowing that she had the ability to refuse consent, she voluntarily agreed to have the premises searched.  See United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (noting that officers "repeatedly informed" individual "of her right to refuse consent").  She gave consent both verbally and in writing. Minter's uncoerced, knowing and voluntary consent thereby authorized the officers to search the premises including the closet.

In addition to the overall premises, the officers opened one of the two small safes inside the closet.  See generally United States v. Robinson, 999 F.Supp. 155, 161-162 (D.Mass. 1998) (discussing consenting authority and ability to search containers inside home).  Although "[w]arrantless searches may not exceed the scope of the consent given," Minter freely provided the officers with keys to the safe containing the two firearms.  See United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994) (freely

surrendering keys to doors and trunk evidenced express consent
and consent inferable from conduct).  Under the totality of the
circumstances, she consented to the search of that particular
locked safe.  See United States v. Genao, 281 F.3d 305, 310 (1st
Cir. 2002) (executing consent form and "volunteering the fact
that he had a key to the third-floor apartment and showing the
police how the key worked both indicate willing cooperation with
the police"); United States v. Patrone, 948 F.2d at 816 (finding
sufficient evidence of voluntary consent where officers asked
individual if they could search the trunk, the individual "said
'alright' and handed over the keys"); United States v. Reith, 66
F.Supp.2d at 56 (noting inter alia that the defendant gave police
combination to briefcase).  The initial discovery of the firearms
was the product of a consensual search and should not be
suppressed as illegal fruit on that basis.

In summary, the police made a valid Terry stop.  The
defendant lacked a reasonable expectation of privacy in the
vestibule, a common area to both the upstairs and downstairs
apartments.  The police crossed the threshold and made a valid
arrest based upon probable cause and exigent circumstances.  The
protective sweep of the first floor apartment was justifiably
based upon the reasonable belief that the area swept harbored an
individual who posed a danger to the officers or, alternatively,
an individual who might be destroying evidence.  Minter also gave

64

her voluntary and uncoerced consent to a search of the premises, including one of the safes inside the closet.

Accordingly, given these lawful as opposed to unlawful intrusions, this court declines the defendant's request to "suppress all evidence seized, obtained or derived from his illegal stop and subsequent illegal arrest." (Docket Entry # 20). Likewise, this court rejects the defendant's assertion that, "The search of the premises, any admissions made by defendant, any alleged consent to search, and a subsequent search warrant were the direct and impermissible fruits of the unlawful intrusions." (Docket Entry # 20). Hence, even though the defendant raises a serious, intelligent and thorough argument and made an eloquent presentation in court, the motion to suppress (Docket Entry # 20) lacks merit.

D.   Items Seized as Result of Consent as Fruits of Illegality

The government argues that items found as a result of the consent search do not constitute illegal fruits because of an intervening cause, to wit, Minter's voluntary consent. (Docket Entry # 25, n. 2). The government also submits it would have sought to search the location irrespective of the defendant's arrest. (Docket Entry # 25, n. 2). The government's argument encompasses the firearms and statements made by the defendant albeit not the protective vest which was uncovered during the

protective sweep.[48]

This court's finding that the entry into the vestibule and the first floor apartment, the arrest, the protective sweep and the consent were not unconstitutional obviates the need to address whether items seized as a result of the consent were so-called illegal fruits.  Nonetheless, out of an abundance of caution, this court will assume, for purposes of argument only, that the protective sweep into the closet was not justifiably based upon a reasonable belief that the area harbored a dangerous individual or an individual who may be destroying evidence.  Based upon this assumption, this court turns to the government's argument.[49]

Under the inevitable discovery doctrine, the government bears the burden of showing that the evidence would have been discovered by lawful means.  United States v. Procopio, 88 F.3d 21, 27 (1st Cir. 1996) (citing the Supreme Court's influential case involving the doctrine, Nix v. Williams, 467 U.S. 431, 444 (1984)).  "The inevitable discovery doctrine permits the introduction of evidence obtained in an illegal search if such

---

[48]  The government applies the argument only to "any of the other evidence" other than "the body armor."  (Docket Entry # 25, p. 19 & n. 2).

[49]  Broadly speaking, the government argues both attenuating circumstances and inevitable discovery would have led them to the items seized in the apartment.  Bypassing the attenuation argument, this court addressees, on an alternative basis, the inevitable discovery argument.

evidence would inevitably have been discovered through an
independent legal search." United States v. Meada, 408 F.3d at
24 n. 4.  "Evidence which comes to light by unlawful means
nonetheless can be used at trial if it ineluctably would have
been revealed in some other (lawful) way so long as (i) the
lawful means of its discovery are independent and would
necessarily have been employed, (ii) discovery by that means is
in fact inevitable, and (iii) application of the doctrine in a
particular case will not sully the prophylaxis of the Fourth
Amendment." United States v. Zapata, 18 F.3d at 978; United
States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986).  In
general, the government must "show by a preponderance of the
evidence that the government would have discovered the challenged
evidence even had the constitutional violation to which the
defendant objects never occurred." United States v. Scott, 270
F.3d 30, 42 (1st Cir. 2001).

The legal means, consisting of the consent, was independent
and would necessarily have been employed.  As explained above,
the government validly and properly obtained Minter's consent.
Detective Terestre's independent questioning of Minter did not
rely on any illegal entry into the closet or upon any observation
of the safes therein.  To the contrary, the questioning of Minter
and the obtaining of consent was independent of the entry into
the closet and inevitable under the circumstances.  See generally

United States v. Scott, 270 F.3d at 43 (alternate avenue of questioning Stephens was independent and did not rely upon information obtained from Scott).  It is highly probable that the police would have obtained Minter's voluntary consent and discovered the safes in the closet even if they had never extended the protective sweep into the closet.  See United States v. Rogers, 102 F.3d 641, 646 (1st Cir. 1996) (discussing Supreme Court's application of inevitable discovery doctrine in Nix v. Williams, 467 U.S. at 431).  Indeed, the sweep into the closet had little, if any, effect upon and was truly independent of the questioning and the giving by Minter of consent.

More specifically, she believed at the time there was nothing to hide.  As confirmed by the defendant's parting words, Minter would have consented even if the police had not entered the closet.  See Murray v. United States, 487 U.S. 533, 543 n. 3 (1988) ("To determine whether the warrant was independent of the illegal entry one must ask whether it would have been sought even if what actually happened had not occurred").  First, Minter believed at the time that the safe harbored benign documents.  Second, having been led to the 36 Wrentham Street address from the criminal history check performed using the driver's license in the defendant's jacket as well as the canine tracking, the officers would have questioned Minter and logically asked for her consent to search the premises.  There is little, if any, reason

to believe she would not have consented to a search.

Probable cause to conduct the search of the closet was also present at the time of entry.  See United States v. Silvestri, 787 F.2d at 746;  United States v. Ford, 22 F.3d 374, 378 (1st Cir. 1994).  Officer Colon had witnessed a likely drug transaction.  After observing the transaction between Court and defendant, the officers stopped Court who advised the officers that she had paid $1,600 for the crack cocaine that they recovered.  Meanwhile, the defendant had fled from Officer O'Sullivan when stopped and questioned about the transaction. The criminal history check had revealed the 36 Wrentham Street address, the area where the canine had lost the scent. Consequently, in addition to other circumstances, the officers had probable cause to search the premises including the closet.

It is also beyond dispute that the safes in the closet would have been discovered following the authorized and legal search resulting from Minter's consent.  See United States v. Ford, 22 F.3d at 378 ("It is beyond dispute that the seized evidence [from Ford's home] would have been (and was) discovered following the authorized search").  The items in the closet would have (and were) discovered upon obtaining Minter's voluntary consent to search the premises.  Indeed, she voluntarily provided the officers with a key to open one of the safes.  Police obtained the information about the contents of one of the safes

because of legally obtaining Minter's voluntary consent to open the safe and not directly because of the illegal sweep into the closet.  Upon opening the safe and viewing its contents, Detective Terestre decided to obtain and did obtain a search warrant.  See generally United States v. Silvestri, 787 F.2d at 744-745 (discussing distinctions between warrantless searches never followed by search warrant and warrantless searches followed by search warrant).

Finally, application of the doctrine does not provide "'an incentive for police misconduct or significantly weaken fourth amendment protection.'"  United States v. Scott, 270 F.3d at 42 (quoting United States v. Silvestri, 787 F.2d at 744, with internal brackets omitted).  The purpose of the judicially created exclusionary rule "is to deter police misconduct by eliminating the incentive for police officers to disregard constitutional requirements on the chance that they may turn up evidence which would incriminate a defendant."  United States v. Aiudi, 835 F.2d 943, 945 (1st Cir. 1987); accord United States v. Williams, 622 F.2d 830, 842 (5th Cir. 1980) (the exclusionary rule is "judge-made" and "justified . . . only by its deterrence of future police misconduct").  That purpose is not served by not applying the inevitable discovery doctrine to the case at bar.

First, the sweep into the closet falls far short of an egregious violation of the defendant's Fourth Amendment rights.

70

See <u>United States v. Scott</u>, 270 F.3d at 45 (taking "into account that neither constitutional violation was truly egregious" in applying inevitable discovery doctrine).  The brief and momentary sweep into the closet was cursory in scope and in time.

Second, the sweep into the closet was motivated by an understandable concern for the officers' safety.  <u>See</u> <u>United States v. Scott</u>, 270 F.3d at 45 (noting that "police might have reasonably believed they had undertaken only a justified investigatory stop").  Indeed, the officers had no incentive to violate the defendant's constitutional rights through an illegal sweep into the closet.  Instead, they were motivated by a fear for their safety.  The area of the closet was a large enough area to harbor a dangerous individual and the police were at a disadvantage in the sense of being in an unfamiliar, confined and interior area on the defendant's turf.  <u>See</u> <u>United States v. Ford</u>, 22 F.3d at 380 (paraphrasing holding in a district court case "that there was no incentive for police misconduct when the search of the premises took place out of a concern for the safety of the police officers involved").  Bearing "in mind the social costs of the exclusionary rule," <u>United States v. Scott</u>, 270 F.3d at 45, application of the inevitable discovery doctrine in the case at bar does not provide an incentive for future police misconduct.

Accordingly, the exclusionary rule does not bar the

introduction of the items seen inside one of the safes by virtue of Minter's consent.  In addition, the connection between the statements made by the defendant during confinement at a different place and different time were sufficiently attenuated from and independent of any initial illegal sweep into the closet.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[50] that the motion to suppress (Docket Entry # 20) be **DENIED**.

           <u>/s/ Marianne B. Bowler</u>
           **MARIANNE B. BOWLER**
           United States Magistrate Judge

---

[50]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  <u>United States v. Escoboza Vega</u>, 678 F.2d 376, 378-379 (1st Cir. 1982); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).