UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10133-RCL |
| | ) | |
| DERONE BREWINGTON | ) | |

DEFENDANT'S OBJECTIONS TO REPORT AND
RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant submits these objections to the Report and Recommendation Re: Defendant's
Motion to Suppress. Defendant's motion, which had been referred by this Court to the
Magistrate Judge for consideration, raised significant legal issues, among them, the validity of a
street stop, whether police officers could make a warrantless entry into a home relying on a claim
of exigency where they had ample time and opportunity to obtain a warrant, and whether officers
could make a warrantless intrusion into the common area of the small two-family home.
Defendant seeks a further hearing before this Court to address the motion, and details his reasons
and objections below.

1. Why this Court Should Conduct its Own Suppression Hearing

The motion, challenging a street stop of defendant and his later arrest in the home he
shared with his girlfriend, arises in the aftermath of several cases in this circuit in which judges
have expressed concerns about the heavy hand of police actions within the inner city. Judge
Lynch, in her dissent from the denial of en banc review in United States v. Woodrum, 208 F.3d
8, 10 (1st Cir. 2000), addressed the "extension of police discretion" in urban neighborhoods and
"its societal consequences": "When one sector of the community feels the brunt of discretionary

police action more than others, that sector may be less likely to accept that the purpose of the law is to protect them." This same concern animated Judge Woodlock's opinion in <u>United States v. Omar Sharif McKoy</u>, 2004 U.S. Dist. LEXIS 24945, 2004 WL 2851950, (D. Mass. Dec. 9, 2004), <u>aff'd</u>, 428 F.3d 38 (1st Cir. 2005).

The present case involved the street stop of a young black male, first seen by police waiting for someone at a busy intersection at Ashmont Station in Dorchester. Shortly thereafter the male met a white female on a nearby residential street and the two walked away in different directions. Suspecting a drug transaction, one of the officers followed the female (charged in a separate proceeding), who had entered a nearby tavern. Learning that she had entered the female restroom, the male officer entered the women's lavatory and forced open her stall. Surprised, the woman rose from her seated position. A subsequent search found drugs. At the hearing below, the police officer first lied about the incident, claiming he first knocked at the exterior door of the restroom and that the female came out with "some hesitation." Tr.1.14. This version, belied by the officer's testimony on cross examination, was adopted by the court below. Yet the officer also testified that he could not remember how he breached the stall door to confront the indisposed woman (or, indeed, whether her pants were down at her ankles). These memory lapses presaged others as officers could not remember how, when later they massed at the exterior door of house where defendant stayed with his girlfriend, they breached the door.

The harsh reality of the police encounter with the female, an incident unlikely if the geography had been a western or northern suburb, is nowhere described in the ruling below. Nor is its probative force acknowledged, in assessing memory failures regarding whether doors were breached and areas of privacy invaded. Nor did the ruling below acknowledge that the female,

after being arrested, pointed out the person who sold her the drugs, a man (not defendant) who was at the scene.  Police did not arrest the man; indeed, they did not even record his name.  Nor, for that matter, did the police disclose this information to the court, or to the prosecutor.  The female's identification of the drug seller at the scene came to light only due to defense counsel's review of police radio transmissions and examination of the officers at the hearing. Notwithstanding the female's identification of another person as the source of the drugs found on her person, the court below stated only that the woman, when apprehended, "supplied additional information."  Report at 46.  Indeed, she did, but not in the manner described by the court.

Unless the Fourth Amendment is honored, and its sanctions invoked, in criminal cases, its constitutional assurances are empty.  Civil actions to vindicate the Fourth Amendment are infrequent and procedurally difficult.  Thus, it falls to judges in criminal cases, where much is at stake for a defendant who faces staggering sentencing consequences, to give vitality to the Fourth Amendment's proscription of warrantless entries of the home and of unreasonable seizures. Charged with such responsibility, a judicial officer cannot refrain from evaluating police testimony because by-the-book police work is hard or because the remedy for violation is suppression of evidence.

Courts often speak of the "messages" sent in their rulings.  The ruling below sends a message that police may in the nighttime gather outside a suspect's home, breach a common area door (and then fail to recall how they got in), and invade a home, confident (even in federal court) that a judge will invoke exigency and a bad neighborhood to laud the police action.

A further hearing by this Court is necessary.

2.  <u>Specific Objections</u>

    a.  <u>The Police Observation of Defendant</u>

Officer Colon testified that he saw a black male, standing just up the street from

Dorchester's busy Ashmont T station, "waiting for someone."  Tr.1.19.  Officer Colon estimated

that he observed the man at "probably about ten minutes before six."  A computerized printout of

Boston Police radio transmissions recorded that defendant fled from a police officer at 5:58 p.m.

Tr.1.34; Ex. F.  Despite the police document, which narrowed the time of police observation to

approximately five minutes, the court below says that police observed defendant for 20-30

minutes before he was seen walking to another location.  Report at 4.  Defendant objects to the

finding.

Defendant's conduct was typical of that seen one block from a busy transit hub: he

appeared to be waiting for a person and he used a cell phone.  Defendant objects to the court's

reliance on the statement of an officer that this conduct was "odd" behavior, and to the

characterization that the conduct of "pacing back and forth and looking around as if 'he was

looking for someone'" was "unusual conduct."  Report at 3-4.

    b.  <u>"High Crime" Area</u>

 One officer testified that the Ashmont Station area was one where "there are a number of

drug sales that [the officer] observed or [been] aware of."  Tr.1.9.  This testimony, spare to say

the least, was the basis for the court's ruling that the area was "high crime."  Report at 4.

One notes that the immediate area is the Ashmont T station, the terminal point for the

Red Line and a bus hub for suburban commuters to Milton, Sharon and points south.  It is a high

use area, but the fact that <u>some</u> arrests occur there (as they do, for instance, at Park Street station)

does not make it Intervale Street.  Conspicuously, there was <u>no</u> evidence whatever of the character of the street where defendant was ultimately stopped, Dracut Street, although pictures offered at the hearing show a street of well tended homes (Exhibit B), or of Wrentham Street, where defendant was arrested, which similarly show well-maintained homes (Exhibit C).

As regards Ashmont station, the government did not offer any evidence to show the frequency of drug arrests there; after all, it is the frequency of arrests, and not the mere fact that arrests occur, which is telling.

The First Circuit has stated that, "[w]hile police are permitted to take the character of a neighborhood into account when assessing whether a stop is appropriate, [cite omitted], it is only one factor that must be looked at alongside all the other circumstances ...."  <u>McKoy</u>, 428 F.3d at 40.  The court below cited the "high crime" character nine times, offering this as justification for the stop of defendant (Report at 26), his frisk (Report at 27), the exigent circumstances which overrode the warrant requirement of the Fourth Amendment (Report at 49), as well as the sweep of his apartment (Report at 59).  Thus, "high crime" was invoked, <u>ipse</u> <u>dixit</u>, as an all-purpose justification to deny traction to defendant's assertion of constitutional infringement.

Defendant objects that there was no support in the record that these were "high crime" areas.

c.  <u>Police Observation of Defendant Meeting the White Female</u>

Defendant walked up Dorchester Avenue, and, at the intersection of Dracut Street, met a white female.  The two walked approximately 30 feet up Dracut Street.  Report at 5.  The court found that, although Officer Colon "allowed the defendant 'some room' of about 15 seconds to avoid being conspicuous," <u>id</u>., the officer had a "clear view up Dracut Street from inside his

vehicle, which was located approximately 30 feet from the defendant and [the female] at the corner of Dorchester Avenue and Dracut Street." Id.  At the hearing, the officer had testified to a longer period where he held back from the intersection to remain unobserved, "[a]nywhere from 15 to 30, 40 seconds," and that he only then pulled his van forward into the small Dracut intersection to see up the street. Tr.1.43-44, 46.  The court below said that Officer Colon observed the two persons get "in tight" and that they acted "consistent with something being passed off." Id. at 6.  The court also found that Officer O'Sullivan, turning onto Dracut Street from Dorchester Avenue, "witnessed the end of the transaction and, more specifically, saw 'the female] turn away from defendant." Id.  Defendant objects to these and related findings.

The findings below were undermined by the testimony of Officer Colon who said that his van was "pull[ed] up into the intersection" of the small street. Tr.1.43, 46.  He further testified that, "as I was at the corner and they were meeting, Officer O'Sullivan turned onto Dracut Street." Tr.1.12 [emphasis added].  But O'Sullivan, turning onto Dracut, did not see Colon's van at the corner. Tr.2.28-30.  He conceded that he knew Colon's van, Tr.2.29, and that it "would [] be important to know where [Colon] was." Tr.2.30.  A glance at the intersection, shown in photographs in Exhibit B, makes obvious that O'Sullivan, turning onto Dracut, could not have missed Colon's van with its nose pulled into the slender intersection, if it had, in fact, been situated there.

Second, the court below credited O'Sullivan's testimony that he was in radio contact with Colon, on an unrecorded frequency, and heard Colon say words to the effect that the deal was done.  But moments later Colon's voice can be heard on a recorded channel trying to summon O'Sullivan on the radio.  Tr.1.51-54, 55-6.  O'Sullivan himself claimed to have made an

observation, that, "[a]s I drove on Dracut, I saw – observed a white female turn away from Mr. Brewington with a right hand clinched and go into her pocket."  Tr.2.6.  He did not, however, transmit this observation back to Colon, Tr.1.52, as he would surely have done if they had been, as the court below found, in radio contact (<u>and</u> if it had been true).  Nor did O'Sullivan testify in the grand jury during his March 2004 testimony that he saw Ms. Court's hand "clinched" or closed, Tr.2.31-34, or that Colon had told him that the deal was done. Tr.2.31.

Third, O'Sullivan, if he had witnessed an exchange, or if had heard Colon claim to have witnessed one, would have made the decision to stop defendant at that instant.  But O'Sullivan testified that only as he approached Brewington on foot and after he had parked his vehicle up the street did he decide to stop him.  Tr.2.34-5. This acknowledgment should have given the court below considerable pause, suggesting that the testimony of both officers about an apparent hand-to-hand transaction observed seconds earlier was suspect.

d.  <u>The Stop and Frisk</u>

O'Sullivan walked up to Brewington and asked: "[d]id you meet with a girl down the street?"  As he did so, he put his hand to Brewington's chest to, as he explained, test his heart rate.  He did not immediately frisk him:

> Q:     Is it your testimony that he [Brewington] simply stood there and permitted you to test his heart rate as you waited to see whether it was beating quickly; is that what happened?
>
> A: [O'Sullivan]:  Yes, sir.
>
> Q:     During that time, did he lift his arms up to hit you?
>
> A: [O'Sullivan]:  No, sir.

Q:    Did he do anything with his arms to try to defend himself from you while you did that?

A: [O'Sullivan]:  No, sir.

Tr.2.37.  O'Sullivan said that he detected that Brewington's heart was "beating at a rapid pace," Tr.2.11, and decided to frisk him.  Tr.2.18.  The court below apparently did not think it odd that an officer, concerned for his safety, would first hold his hand to defendant's chest long enough to detect the heart rate.  One wonders: if defendant's heart rate did not elevate after the police hand was put to his chest, would a frisk be unjustified?

Officer O'Sullivan testified that he frisked Brewington because "I was, you know, basically being very cautious."  Tr.2.18.  But officers are not entitled to frisk anyone they briefly detain.  United States v. McKoy, supra, 2004 U.S. Dist. LEXIS 24945.  The evidence showed that the officer was scarcely frightened by Brewington.  According to O'Sullivan's own testimony, he removed his right hand from Brewington's chest and, with the same hand, reached around to his rear pocket which held a closed pocketknife.  O'Sullivan's other hand held a flash light.  O'Sullivan acknowledged that, as he reached around Brewington, he left himself unguarded.  Tr.2.37-8.  If the hallmark of a Terry frisk is the officer's concern for his safety, one puzzles here, as the officer acknowledged that he left himself unprotected as he frisked defendant.  Yet the court below found that the officer was alone, in a "high crime area," which sufficiently justified the frisk.  That the officer had not even decided to stop Brewington until he was feet away, and did not immediately frisk him, was, apparently, of no consequence to the ruling below.

To the degree candor is in order, it is perfectly plain what the officer was doing here.  He

-8-

was demonstrating his physical dominance with a stiff arm to the defendant's chest, not doing a cardiac check. The aggressive move hardly suggests that the officer was worried for his safety. That Brewington was nervous does not justify a frisk; as the First Circuit held in <u>McKoy</u>, also in the context of a <u>Terry</u> frisk, "[n]ervousness is a common and entirely natural reaction to police presence." 428 F.3d at 40. Yet the court below ruled that an officer may hold his hand to a person's heart "to further gauge" whether a frisk was necessary. Report at 28. The ruling below treats an aggressive police move as if it were a textbook procedure, conferring upon it a judicial imprimatur.

Defendant objects to the finding that the frisk of defendant was justified.

e. <u>Defendant's Flight</u>

Brewington told Officer O'Sullivan that he had identification, and, as he reached for it, he fled from O'Sullivan. O'Sullivan grabbed his jacket, but defendant "pulled out of his jacket." Tr.2.13. O'Sullivan transmitted a radio report, but did not claim that defendant had assaulted him, only that the man had run out of his jacket. Tr.2.40. The court below, in a footnote, acknowledges that O'Sullivan "did not describe the assault" over the radio. Perhaps more to the point, O'Sullivan did not even mention an assault. Moreover, in his testimony, O'Sullivan even described how Brewington "began backing away from me" after the officer pressed his hand to Brewington's chest. Tr.2.18. It makes narrative sense that Brewington would have backed away from the aggressive officer; what makes less sense is O'Sullivan's claim that Brewington then struck him, an action unnecessary unless O'Sullivan had him in his grasp (which O'Sullivan denied). Even less likely is the finding that Brewington struck O'Sullivan "with his forearm," suggesting very close quarters and, again, that O'Sullivan had Brewington in his grasp (which

O'Sullivan denied).  Despite these issues, throughout the rulings below, the court stated that

defendant "assaulted" O'Sullivan.  The "assault" became the lynchpin for the ruling that

defendant was "dangerous," which in turn was used by the court to justify the headlong pursuit of

Brewington into a dwelling house.  In ratifying the police conduct, the court below was not

dissuaded by O'Sullivan's acknowledgment that he did not make a contemporaneous claim of

assault, nor did it find inconsistent the police assertion that, as they later approached the door of

defendant's dwelling, their guns were holstered (most unlikely if they thought their prey

dangerous).

Defendant objects to the finding that he assaulted Officer O'Sullivan.

f.  The Arrest of the Female

Officer Colon did not immediately follow the female.  Instead, he "repositioned" his van,

Tr.1.13, and then went into the Peabody Tavern to see where Ms. Court went.  Learning that she

had gone into the ladies room, Colon first testified that he "went to the restroom, knocked on the

door, didn't get a response, opened the door, knocked on the second door and ordered

Ms. Court out of the bathroom,"  Tr.1.14, and that she came out "with some hesitation, but she

did [come out]."  Tr1.14.  Asked on cross examination if he had barged into her stall, Tr1.58, he

disavowed the conduct.  However, confronted with Ms. Court's grand jury testimony, Colon

admitted that he had "barge[]" into the bathroom and had opened her stall door.  Tr.1.59.  He

could not recall if the stall was locked: "I believe it wasn't locked. I was able to open it."  Id.  He

said "when I first encountered [Ms. Court], it looked like she was coming from the seated

position;" he was standing "[v]ery close" to her, but didn't "recall" if her pants were down.

Tr1.60.  Presumably, if her pants were down, she was indisposed and not anticipating police

intrusion, a point conspicuously evaded by Colon's failure of memory.  Yet the court below

found, ignoring Colon's admission, that the officer knocked at the door and the female came out,

voluntarily but reluctantly.  Report at 10.

The female at the scene identified the man (not Brewington) she bought drugs from.  The

police did not record the man's name and kept no record of the stop.  Tr.3.38-41.  The court

below noted in its findings that "a number of BPD units reported individuals who might fit the

defendant's description, but after looking at a number of those individuals, Officer O'Sullivan

concluded that they were not the defendant."  Report at 10-11.  The Report did not acknowledge

that one of the identifications was made by the female, and she said that her drug source was <u>not</u>

defendant.

The admission by the police that the female had identified another as her drug source

vitiated probable cause that defendant engaged in a drug transaction with defendant.  Yet the

court below ruled that, "[h]aving seen what appeared to be a narcotics transaction and [having]

apprehended [the female] who supplied additional information, the officers had probable cause."

Report at 46.  Defendant objects to the findings.

g.  <u>The Police Decision to Dispense with the Warrant</u>

Officers O'Sullivan and Terrestre both returned to the station.  Tr.3.47-8.  Both radioed

they would be seeking a warrant for Brewington ("We have him I.D.'d, we'll be getting warrants

for him." Tr.3.45; 2.2).  Sgt. Terrestre obtained a Board of Probation report on Brewington, with

an address of 36 Wrentham Street.  Having a local address, Sgt. Terrestre resolved to go there

"without benefit of warrant to make entry at 36 Wrentham Street."  Tr.3.45.  This

acknowledgment -- that police intended "to make entry" without a warrant -- makes other police

testimony (such as that an exterior door was possibly open and that defendant fled to the rear as they entered) appear contrived and altogether too convenient.

One pauses: if police had consulted a department lawyer or a district attorney as to whether a warrant might be needed, the answer predictably would have been: certainly. Competent counsel would have said that police could charge, at most, a possible hand-to-hand transaction, a not-infrequent charge in state court but surely insufficient to excuse a warrant (leaving aside for the moment that the female said that her drugs came from another), and could also charge simple assault (leaving aside for the moment that O'Sullivan never made a contemporaneous claim of assault, nor did the police radio transmissions disclose such a claim), also a garden-variety state court charge.  Competent department counsel would have asked officers, if they pressed further: how is this case different from many others, so as to justify entering a residential building, which you know nothing about, to effect an arrest?  And, the counsel would surely have asked, what will you do if defendant does not come out; you surely wouldn't just barge in?  But, to fast forward, as acknowledged by Sgt. Terrestre, police <u>did</u> intend "without benefit of warrant to make entry at 36 Wrentham Street," Tr.3.45, and, so far as we know, no advise was sought from counsel.  Yet the court below, untroubled that the police massed outside the home in the night with the clear intent to enter without a warrant, saved the police action on the ground of a manufactured exigency.  Defendant objects.

h.  <u>No Exigency Existed to Enter the Common Area of 36 Wrentham Street</u>

Officers made no attempt to learn if 36 Wrentham Street was a one or two family. Tr.3.51-2.  They conducted no surveillance of the property to find who lived there.  Since police did not testify that they saw Brewington place anything in his pocket during the alleged exchange

with the female, there was no probable cause to believe that he had carried anything away, and no probable cause to believe that he used 36 Wrentham for any criminal activity. Thus, there was no basis to seek a search warrant for 36 Wrentham, which perhaps explains the police failure to do so before massing there in the night hours of February 28, 2004.

Sgt. Terrestre did not disclose how many officers arrived at the property ("I can only guess, there was my squad, there was some uniformed presence, and there was some anti-crime units which are additional units." Tr.3.48.). Police surrounded the building. Tr.3.49. The police presence, even if testifying officers would not acknowledge at the hearing the raw number of officers present, was formidable.

The court found that "the officers arrived only 'a few minutes' after the defendant entered the downstairs apartment. Report at 13. Defendant objects.

Thirty-six Wrentham is a well-maintained, two and one-half story residential property with a porch. Ex. C. There is a single entrance at the front, with an exterior screen door and an exterior locked wooden door with a small glass window covered by a curtain. Sgt. Terrestre could not recall if an interior light was on in the entry area. Tr.3.51. Sgt. Terrestre "believed" the screen door was closed, but did not recall which officer opened it. Tr.3.51. Although Terrestre had the keys taken from the jacket wrested away from Brewington, Tr.2.45, he did not remember if he used them. According to Ebony Minter, defendant's girlfriend, the exterior door "automatically locked" and was locked at the time. Tr.4.10, 15. Terrestre testified: "My testimony is we went through there [the exterior door]," without knocking, but could not remember how. Tr.3.49, 63. O'Sullivan, for his part, admitted that in his grand jury testimony he had said that 'the keys opened that outside hallway door," but insisted he was not on the porch

with Terreste, Tr.2.45, a claim which contradicted his own grand jury testimony.  Tr.2.46.

Terrestre, in turn, contradicted O'Sullivan, testifying that he had a "specific memory of Mr.

O'Sullivan being on the porch...."  Tr.3.52.  The conclusion is irresistible that police, using

Brewington's key, had let themselves into the locked building but were not prepared to admit it.

Yet the court below found, "on balance," that the door was open, Report at 15, ignoring that the

police were reluctant to say so under oath, and ignoring a similar failure of memory regarding the

door to the bathroom stall.  Defendant objects to this finding.

The court below held that there was no privacy right in a common area of the building,

notwithstanding its small size.  Report at 43.  Defendant objects to this ruling.  In his Preliminary

Memorandum in Support of Motion to Suppress, defendant detailed numerous cases

demonstrating not only that there is a decided difference of judicial opinion on the subject of

whether a right of privacy exists in the common area of a small building, but that there is a

distinguished array of judges who think that the reasoning disfavoring privacy in common areas

of large buildings does not apply to small, two or three family homes, where the expectations of

the occupants is far different.  The court below dispensed with these cases, finding that little

distinguishes the common area of the large building with its many occupants and greater activity

level from that of the small building with fewer occupants where visitors are few and far between

and where quiet generally reigns.  Revealingly, the court below referred to the dwelling as a "two

unit apartment building," ignoring that in common usage, persons never refer to a row house as

an "apartment building." Report at 42.

The First Circuit has not addressed the issue, but several circuits, including the Fifth,

Sixth and Ninth, and the District of Columbia district court have held that occupants in small

houses have a greater expectation of privacy in common areas than occupants of large apartment

buildings.  See Fixel v. Wainwright, 492 F.2d 480, 483 (5th Cir. 1974) (a four-unit apartment

building); United States v. King, 227 F.3d 732, 746 (6th Cir. 2000) (a two-family dwelling: "the

nature of the living arrangements of a duplex, as opposed to a multi-unit apartment building,

affords the tenant of the duplex a greater expectation of privacy in areas the tenant of the multi-

unit apartment building would not enjoy, because in the case of a duplex, access to such areas is

limited to the duplex's tenants and landlord."  Id. at 750); United States v. Fluker, 543 F.2d 709

(9th Cir. 1976) (a three unit building); United States v. Drummond, 98 F.Supp.2d 44 (D.D.C.

2000) (a two-apartment dwelling).  See also United States v. Holland, 755 F.2d 253 (2d Cir.

1985) (Newman, J., dissenting ("I have no doubt that a tenant in a multi-apartment building

must accept the risk that someone else will admit a police officer into the common areas of the

building and, if the defendant is present in those areas, he may be arrested there upon probable

cause. But following Katz (temporally and substantively), I believe a tenant has a legitimate

expectation of privacy in a hallway when he is using it to admit someone to his home; at least,

this should be so in a small two-family house like (defendant's).")

Defendant objects to the ruling of the court below on this significant issue of law, and

seeks further hearing before this Court.

i.  No Exigency Existed to Enter the Apartment

The police announced themselves at the inside door, saying Boston Police.  Tr.3.54.  A

male voice (Brewington's) shouted out, she's going to open the door.  Tr.1.22; 4.17.  Defendant's

girlfriend Ebony Minter opened the door.  According to Terrestre, Brewington was "behind her

in the living room."  Tr.3.15.  "He was just standing there at the moment I made eye contact with

him." Id. Approximately seven officers immediately entered the apartment and arrested

Brewington. Tr.4.17. At the time, Brewington was in the living room, Tr.4.17, or, as Sgt.

Terrestre described it, "in the front foyer leading out from the living room towards the front

door." Tr.3.64. Sgt. Terreste took Minter aside into the bedroom to speak with her, "apart from

where Mr. Brewington was." Tr.3.65. Terreste, as he spoke with Minter, could hear

Brewington's voice, "pretty close to the front door..., [r]ight around the front door." Tr.3.65.

Ebony Minter corroborated Sgt. Terrestre, saying that Brewington was arrested where he stood,

in the living room adjoining the front door. Tr.4.18-20.

The court below found that Brewington fled to the rear of the apartment, although at an

implausible time, only after the door was opened (although he had spoken to the police before

opening the door and was standing still as the door was opened). Report at 17. The finding that

Brewington fled to the rear bedroom ignored core elements of Sgt. Terrestre's testimony, both

that he arrested Brewington "in the front foyer leading out from the living room towards the front

door," and that he spoke with Minter in the bedroom, "apart from where Mr. Brewington was."

Tr.3.65. On this police testimony, Brewington was arrested where he stood; there had been no

flight. Even if the court below ignored the testimony of defendant's girlfriend, it yet had to

confront Sgt. Terrestre's corroborating testimony. It did not do so. Defendant objects to the

finding that he fled to the rear of the apartment.

Further, police testified that they did not draw their weapons at the door. The court

credited this testimony, Report at 17, but did not acknowledge that it undermined the basis for an

earlier frisk. Defendant objects.

The court's finding that defendant ran to the rear bedroom, apart from being implausible

on the facts and unsupportable in view of Sgt. Terrestre's testimony, did not justify police entry into the apartment.  Defendant had full right to withdraw deeper into the apartment, which did not permit police to intrude.  The court below found that the building was surrounded, Report at 48, n.39, so no escape was possible.  And, since there had been no testimony that defendant was seen pocketing anything from the female, he could not be postulated as concealing or destroying evidence.  Thus, the entry was not within one of the few, carefully delineated exceptions to the warrant requirement.

The court below described the "exigency" as follows: "...the exigent circumstance in the case at bar involved the pursuit of the defendant who had proved dangerous and evasive to Officer O'Sullivan, through the high crime area and tracking him to the area in the vicinity of 36 Wrentham Street."  Report at 49.  The court added that defendant "had already proven to be dangerous in assaulting Officer O'Sullivan" and that defendant had "used whatever means necessary to avoid the police."  The invocation of the phrase "whatever means necessary" appears a bit much; so too was the court's speculation that by "not taking the time to seek a warrant, the police were justified in believing that further delay would lead to [defendant's] escape and possibly arming himself thereby making any subsequent arrest that much more dangerous."  Report at 50.  There is nothing in the record to suggest defendant would arm himself to resist the police.  Indeed, police stated at the hearing that they had approached the door unarmed, suggesting an absence of fear of defendant.  The court noted in a footnote that defendant in the past had been charged with possessing a firearm without a permit, but did not note that the charge had been dismissed.  Otherwise, defendant's criminal record, in material part, consisted of an assault charge involving a basketball, and two drug distribution charges

involving small amounts of drugs, with committed sentences totaling one year and six months in the house of correction.  This record, rather common in the district courts of the Commonwealth, does not support the profile of defendant as a person who would, by "whatever means necessary," arm himself to take on the police.

"This is simply not a case where there was compelling need for official action and no time to secure a warrant," United States v. Adams, 621 F.2d 41, 45 (1st Cir. 1980), citing Michigan v. Tyler, 436 U.S. 499, 509 (1978), particularly where officers had resolved to obtain a warrant when they returned to the station.  It is unlike United States v. Scott, 570 F.2d 697 (9th Cir. 1975), where officers chased four robbery suspects wielding sawed off shotguns, or United States v. Santana, 427 U.S. 38 (1976), where a suspect stepped back through a doorway to frustrate a police arrest.   In Welsh v. Wisconsin, 466 U.S. 740, 753 (1984), the Supreme Court ruled that, under circumstances where policemen traced suspect to his home, "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime."  The Court noted that "exceptions to the warrant requirement are "few in number and carefully delineated," [cite omitted], and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  In reaching its ruling, the Court quoted Justice Jackson, writing in concurrence in McDonald v. United States, 335 U.S. 451 (1948):

> When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

Id. at 460.

No such "real immediate and serious consequences" existed here.  Rather than being

-18-

"hot," the pursuit here had broken off.  Police had returned to the station.  The identity of the

suspect was known.  At the station, a local address was found.  Instead of proceeding to obtain a

warrant as the officers first said they would, the officers decided to forego a warrant, a decision

fueled more by pique that defendant ran from their grasp than anything else.  Police mobilized

outside 36 Wrentham Street, delaying entry until they had overwhelming force, which also

undermines a claim that the pursuit was "hot."  In United States v. Curzi, 867 F.2d 36, 43 n.6 (1st

Cir. 1989), the First Circuit warned that police may not manipulate events to create an "exigency"

justifying warrantless entry.  "Circumstances deliberately created by the police themselves cannot

justify a warrantless search."  Id. at 43, n.6.

The cases cited by the court below are entirely inapposite.  For example, in United States

v. Lopez, 989 F.2d 24 (1st Cir. 1993), a man told police that he had been threatened with a

sawed-off shotgun in connection with a drug transaction.  Police saw one of the suspects with an

object in his hand.  The suspect immediately fled into the adjoining building, and police

followed.  The First Circuit affirmed the police entry into the building, noting that "the police

had ample basis for believing that an extremely dangerous weapon was lodged close at hand and

should be recovered as promptly as possible."  The same concern about an imminent public

safety threat motivated the ruling in Hegarty v. Somerset County, 53 F.3d 1367 (1st Cir. 1995).

There, the First Circuit, reviewing a claim of immunity by police for the shooting death of a

woman, found that police did not exceed their authority when they entered a Maine cabin on a

report of a woman firing a weapon at campers where, as they approached the cabin, police saw

her raise a firearm.  These cases have the flavor of exigency about them, where the use and

brandishing of firearms posed an imminent threat to the public.

At most, this was a police stop of a drug suspect, who fled the police grasp. This occurs not infrequently in Boston, and in other places in Massachusetts. Such instances do not justify police pursuit into a home, unless the suspect, as happened in <u>Santana</u>, was seen ducked behind a door. However, unless this Court corrects the ruling below, police will have precedent in this district that they may proceed from street to station house and back, foregoing a warrant, to pursue a suspect into his house, so long as the investigation has some pulse. Applying the narrowly conceived "hot pursuit" doctrine to such circumstances would take it to the point of no return, subsuming the warrant requirement. If the ruling is left standing, these same police officers, whose memories turned cloudy when asked how they breached the outer door of the home (or of the bathroom stall), would no longer have to feign memory loss; they could forthrightly say that they had identified an address of a suspect and would not allow themselves to be detained by the time-consuming task of submitting to a magistrate their claim to probable cause.

Defendant objects.

j. <u>Protective Sweep</u>

The court below found that the police were justified in conducting a "protective sweep" despite already having defendant in custody. Report at 55. Defendant objects. The court below found that the sweep was "brief and cursory," Report at 18, although the search extended to finding a protective vest on a closet hangar, an intrusion hard to characterize as "cursory." Report at 54. The court invoked the specter that the apartment might harbor another person. The reality is that the police knew nothing about the property, having made no effort to learn who lived there. Defendant objects that police had no basis to infer that someone else in the

apartment might pose a risk to the officers; nor had the police any basis to infer that evidence

might be destroyed when they never claimed to have witnessed defendant pocket anything from

the female.  See Report at 58, n.45, 60.

Finally, the court below ruled that a consent obtained from defendant's girlfriend,

obtained at the end of a long series of events, as well as a post-arrest statement by defendant,

were independent of earlier events.  Report at 67.  Defendant objects that the court's finding of

independence, in view of the sequence of events detailed above, is little short of stunning, and

cites Brown v. Illinois, 422 U.S. 590, 603 (1975) and the line of cases under Wong Sun v. United

States, 371 U.S. 471 (1963).  See United States v. Lopez, supra ("If the original entry was

unlawful, the seizure of the cocaine in the bedroom might be suppressed as the fruit of the

poisonous tree, see generally Wong Sun v. United States, 371 U.S. 471, 484 (1963), and the ban

might extend as well (we need not decide the point) to the evidence found in the bathroom and a

volunteered statement at the police station.")

DERONE BREWINGTON
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
  B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue
Boston, MA  02110
Tel: 617-223-8061

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 23, 2006.

/s/ Charles P. McGinty

Charles P. McGinty