UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 04-cr-10133-RCL |
| ) | |
| DERONE BREWINGTON ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTION TO REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant objects to Magistrate Judge Bowler's thorough, detailed, 72-page recommendation to deny defendant's Motion to Suppress. Judge Bowler's recommendation, written after she had heard from four witnesses over four days of testimony, and after she reviewed exhaustive briefing by the parties both before and after the evidentiary hearing, made extensive and detailed findings of fact and rulings of law. Defendant seeks to undermine the Court's confidence in Judge Bowler's ruling by citing, out-of-context, a few isolated and arguably contradictory sentences of testimony regarding each factual conclusion with which the defendant disagrees. Defendant thereby attempts to leave the Court with the impression that Judge Bowler chose simply to ignore these allegedly crucial pieces of evidence, apparently in a single-minded effort to rule in favor of the government. As Judge Bowler's lengthy recommendation makes clear, she gave careful consideration to all of the evidence, including the isolated, arguably contradictory statements that the defendant raises, and determined that the police officers acted reasonably.

Defendant's objections to Judge Bowler's legal conclusions are similarly flawed. The defendant's objections to Judge Bowler's legal conclusions rest on first seeking to undermine her factual conclusions. In other words, the defendant does not argue that even if the Court were to accept Judge Bowler's facts, her recommendation is legally inaccurate. Instead, he seeks to

undermine the legal conclusions by attacking the factual underpinnings and then asserting that the legal standards are not met.

For the reasons detailed below, defendant's request for a new hearing is groundless. The Court should instead adopt Judge Bowler's thorough, detailed and considered recommendation.

I.  Response to Specific Objections:

   a.  The Police Observation of Defendant:

Defendant's objection grossly misrepresents the extensive testimony concerning the observations of two police officers regarding defendant's behavior prior to the initial stop and frisk. Defendant reduces to two lines in his motion the more than thirty pages of transcript testimony regarding the officers' observation of the defendant prior to the initial stop. He completely ignores Judge Bowler's five page discussion of this evidence. This presents the Court with a distorted view of the evidence and wrongly leaves the impression that the evidence was flimsy.

In fact, the initial stop and frisk of the defendant was based on the observations of two experienced police officers, Sergeant (then Officer) Felipe Colon and Officer David O'Sullivan. Sergeant Colon had been in the drug control unit for seven years prior to the events that led to the defendant's arrest, during which time he had been involved in well over 500 arrests and had seen thousands of drug transactions. Colon Tr. at 5. He knew the area in which the defendant was first observed to be a high crime area where drug sales commonly occur. Colon Tr. at 9. Officer O'Sullivan had been in the drug control unit for ten years and had participated in over 1000 drug surveillances and arrests. O'Sullivan Tr. at 4-5.

Sergeant Colon observed the defendant for a significant period of time prior to his

observation of the drug transaction that led to the defendant's being stopped.  Sergeant Colon variously estimated this time period that he observed the defendant as between 8 and 30 minutes.  Colon Tr. at 16 and 34.  During this time period, he observed the defendant pacing back and forth, looking around and into motor vehicles.  Colon Tr. at 8.  He saw the defendant approach a bus as it pulled up to the bus stop near where he was standing, but then refrain from getting on the bus.  Colon Tr. at 9.  Then, Sergeant Colon observed the defendant talk on his mobile phone for a brief moment and walk away from the area.  Colon Tr. at 10.  Shortly thereafter, Sergeant Colon observed the defendant meet a white female, later identified as Darlene Court.  Colon Tr. at 10.  During this entire time period, Sergeant Colon was within 30 to 50 feet of the defendant and had a clear view of him.  Colon Tr. at 11.  Sergeant Colon then observed the defendant and Ms. Court walk to the front of 9 Dracut Street, where they turned around, stood close together, and made an exchange of unknown objects.  Colon Tr. at 11.  Sergeant Colon testified that he was able to see their hands meet in a manner that he described as not a greeting, but consistent with something being passed from one to the other.  Colon Tr. at 11 and 47-48.  He then observed Ms. Court place her right hand, the hand she had used to exchange objects, into her right pocket.  Colon Tr. at 12 and 47.  Based on these observations, Sergeant Colon determined that a drug deal had taken place.  Colon Tr. at 12 and 48.  Sergeant Colon shared his observations with Officer O'Sullivan, gave Officer O'Sullivan a description of the suspects, and told him that the deal had been done.  Colon Tr. at 12 and 55-56.  O'Sullivan Tr. at 7-9.

Officer O'Sullivan himself observed the defendant and Darlene Court immediately after the exchange had occurred.  He observed the two suspects beginning to separate and observed Ms. Court place a clench fist into her pocket.  O'Sullivan Tr. at 8-9.  He testified that based on

his observations and experience, drug dealers are often armed and dangerous. For this reason, he was afraid for his safety when he first approached the defendant. O'Sullivan Tr. at 17-18.

These observations clearly created an articulable suspicion that criminal activity was afoot, as required by Terry v. Ohio, 392 U.S. 1 (1968), before a stop can be initiated. See also United States v. Cook, 277 F.3d 82 (1st Cir. 2002) (finding a Terry stop and frisk justified based on observations of a furtive exchange in a high crime neighborhood); United States v. Gilliard, 847 F.2d 21 (1st Cir. 1988) (same); United States v. Trullo, 809 F.2d 108 (1st Cir. 1987) (same). Judge Bowler's recommendation appropriately recognized the officer's expertise in recognizing suspicious activity. As the First Circuit has ruled, a Court should grant "deference" to the judgements of experienced law enforcement officers about the meaning of suspicious behavior. Trullo, 809 F.2d at 112 and Cook, 277 F.3d at 85.

  B. "High Crime" Area:

Defendant objects to Judge Bowler's finding that the area in which defendant was arrested was a high crime neighborhood. Defendant falsely implies that this conclusion was based solely on a single sentence of testimony that there had been "a number of drug sales" that Sergeant Colon was aware of in that area. In fact, Sergeant Colon's testimony was much more detailed on this point:

> A: I noticed [the defendant] in between where the fire fighters park their motor vehicles, that area there ... where we made arrests before where defendants, or I should say drug buyers, would meet their drug dealers, so that was an area that I was well aware of, and that's what kind of drew my attention from his activities pacing back and forth, looking around. It appeared that he was waiting for

>someone.
>
>Q: Is that an area you would consider in your experience to be an area of high crime?
>
>A: Yes, in that area, yes.

Defendant also distorts Judge Bowler's appropriate use of this information in her decision. In fact, the First Circuit has ruled on numerous occasions that a police officer may take into account the fact that a neighborhood is a high crime neighborhood in his interactions with potential targets. See, Cook 277 F.3d 82 (1st Cir. 2002) (finding a Terry stop and frisk justified based on observations of a furtive exchange in a high crime neighborhood); Gilliard, 847 F.2d 21 (1st Cir. 1988) (same); and Trullo, 809 F.2d 108 (1st Cir. 1987) (same).

Contrary to defendant's assertion, Judge Bowler did not invoke the high crime neighborhood as an "all purpose justification to deny traction to defendant's assertion of constitutional infringement." Instead, she quite properly alluded to this fact as part of a detailed analysis of the relevant legal standards, in exactly the manner mandated by the First Circuit.

C. Police Observation of Defendant Meeting with White Female:

Defendant's objection distorts the record regarding the extensive testimony from two officers of their observations of the defendant and Darlene Court prior to the initial stop of defendant Brewington. Defendant attempts to undermine Judge Bowler's finding by pointing to a few isolated comments from the record that are arguably inconsistent with other detailed testimony by each of the officers. As discussed more fully above, Judge Bowler heard the full testimony of each of these officers, which included well over twenty pages of testimony concerning this interaction. Based on all the evidence, the demeanor of the witnesses, and after hearing the defendant raise these same arguments, she reasonably concluded that the observation

made by the officers was sufficient to create an articulable suspicion that criminal activity was afoot, as required by Terry v. Ohio, 392 U.S. 1 (1968). In doing so, she appropriately recognized the officer's expertise in recognizing suspicious activity. See Trullo, 809 F.2d at 112 (finding that "deference" should be granted to the judgements of experienced law enforcement officers about the meaning of suspicious behavior), and Cook, 277 F.3d at 85 (same).

      D.      The Stop and Frisk:

Defendant contends that the stop and frisk of the defendant was unjustified because Officer O'Sullivan's decision to feel the defendant's chest to gauge the defendant's heartbeat (and therefore how nervous he was) was really an attempt to "demonstrat[e] his physical dominance with a stiff arm to the defendant's chest." Defendant's Objections at 9. This assertion is entirely unsupported in the record. It is nothing more than speculation on the defendant's part. Moreover, it is completely irrelevant to a determination whether the frisk of the defendant was proper. As Judge Bowler's factual findings make clear, Officer O'Sullivan was justified in frisking the defendant at the moment he was stopped, based on Officer O'Sullivan's articulable suspicion that 1) the defendant had just sold drugs; 2) drug dealers are often armed; and 3) the encounter occurred in a high crime neighborhood. Thus, defendant's speculation that the heartbeat check was really an effort to establish dominance is as irrelevant as it is unfounded. See, Cook, 277 F.3d 82 (1st Cir. 2002) (finding a Terry stop and frisk justified based on observations of a furtive exchange in a high crime neighborhood); Gilliard, 847 F.2d 21 (1st Cir. 1988) (same); and Trullo, 809 F.2d 108 (1st Cir. 1987) (same).

Because Officer O'Sullivan was justified in frisking the defendant before he determined that the defendant had a rapid heartbeat, he was clearly justified in frisking him after this

6

discovery. Indeed, because the defendant's rapid heartbeat contributed to Officer O'Sullivan's fear for his personal safety, he was further justified in frisking the defendant after he took this additional, minimally invasive step.

Moreover, defendant fails to note that it is not clear what significance there would be to a determination that a frisk was unjustified. The only item that was discovered as a result of the frisk was a knife in the defendant's pocket. Defendant has not been charged with possessing this knife. The other items recovered from the defendant's person were found in the defendant's jacket after the defendant assaulted Officer O'Sullivan, wiggled out of and abandoned his jacket, and fled from the police. At most, an illegal frisk would result in the suppression of the knife, not any of the property found later.

E.     Defendant's Flight:

Defendant disbelieves Officer O'Sullivan's testimony that the defendant assaulted him and objects to Judge Bowler's crediting this uncontradicted testimony. Defendant cites two things to attempt to undermine Judge Bowler's conclusion. The first is O'Sullivan's radio request for help in which he stated that the defendant fled, but did not mention that he had assaulted him. This request for backup, which defendant curiously refers to as a "radio report," occurred after the assault had been completed, and while the officer was chasing the defendant. Colon Tr. at 53-54. This was hardly a "report" of his encounter with the defendant; it was a plea for help. Defendant's attempts to make this on-the-run request into evidence that the assault did not occur was rejected by Judge Bowler and is without merit. So too is defendant's speculation it would not have made sense for the defendant to have struck Officer O'Sullivan "unless O'Sullivan had him in his grasp." Defendant's Objections at 9. On the contrary, defendant's

assault of Officer O'Sullivan was a necessary precondition of his flight. Judge Bowler rejected defendant's attempt to distract from the uncontradicted testimony of Officer O'Sullivan and make the defendant's assault and flight into evidence of police misconduct. This Court should not disturb that finding.

      F.    <u>The Arrest of the Female</u>:

Defendant mentions twice in his objections the activities that resulted in the stop of Darlene Court, who had purchased drugs from the defendant. In one of the opening paragraphs, defendant notes that the "harsh reality of the police encounter with the female, an incident unlikely if the geography had been a western or northern suburb, is nowhere described in the ruling below." Defendant's Objections at 2. This inflammatory comment is both contradicted by the record and irrelevant. As discussed below, defendant ignores the detailed description of the stop provided by Sergeant Colon and credited by Judge Bowler, a description which bears only a slight resemblance to the "harsh reality" that defendant strains to find. More importantly, defendant neglects to mention that the stop of the female was never an issue before the court. Indeed, defendant does not have standing to raise, and did not raise, any legal objection to the evidence obtained from the female. Defendant Court did not file a motion to suppress. Thus, the relevance of this alleged police misconduct is hard to fathom.

In any event, defendant's attempt to disparage Judge Bowler's recommendation based on the encounter between Sergeant Colon and defendant Court misrepresents the record. First, Sergeant Colon did not admit the he had "barged" into the bathroom. Defendant's Objections at 10. He only admitted that he opened the door of the stall. Defendant's understanding of this "admission" is a misreading of the record. Defendant's counsel asked Sergeant Colon a

compound question: "Now, did you open the door and barge into that bathroom." The answer, however, only addressed the second part of the question. "Subsequently, I did. Yes, I did, I opened the door." Colon Tr. at 59. This does not constitute an "admission" that the officer "barged" into the stall. Moreover, regardless of whether the officer opened the door, or even "barged into the bathroom," this testimony does not contradict Sergeant Colon's earlier testimony that Court eventually came out of the bathroom, gave the drugs to the officers, and admitted that she had just purchased them in the manner observed by the police. Only this later finding was relevant to the issue before Judge Bowler (and this Court): whether the police had probable cause to believe that defendant Brewington had just engaged in an illegal drug transaction.

     Defendant next claims that Darlene Court told the officers that her drug source was not the defendant. This is totally unsupported by the record. Once again, defendant attempts to undermine the central findings of Judge Bowler by pointing to, and greatly exaggerating the significance of, an arguable discrepancy in the testimony. Defendant Court admitted that she had just purchased drugs and apparently agreed that this was the transaction that the officers observed. Colon Tr. at 14-16. Defendant, without citation, instead suggests that Ms. Court told the agents that her drug source was <u>not</u> the defendant. No such statement is in the record. Defendant appears to be referring to a brief statement on a radio call from an officer who did not testify that seemed to suggest that the "other suspect" made a "false ID," apparently of someone who looked like the defendant, but was not him. Terestre Tr. at 38-40. None of the officers who testified at the hearing knew anything about this alleged identification. The one thing that is clear about this identification is that everyone knew it was false virtually the moment it was

made. Defendant concludes this must mean that defendant Court stated that Brewington did not sell her the drugs. A more likely explanation is that, during the search for the defendant after his flight, defendant Court pointed to a person who was far away and said that person was the person who sold her drugs. Upon closer examination of the person, she then realized that it was someone who looked like the defendant, but was not him. This explanation, apparently credited by Judge Bowler, makes more sense than the defendant's because the report that the ID had been made came virtually simultaneously with the report that it was incorrect. Thus, the officers standing with Court somehow knew immediately that the person that she apparently pointed out was not the defendant. This suggests that it was Darlene Court herself who identified her initial identification as a mistake. This statement is bolstered by the sworn testimony of Darlene Court in another forum (which was not part of the hearing), in which she stated that Brewington (and not someone else) sold her the drugs.[1]

Moreover, even assuming for the moment that Darlene Court had in fact stated that Brewington had not sold her drugs (an assertion for which there is no support in the record), this would not have "vitiated probable cause that the defendant engaged in a drug transaction with defendant." Defendant's Objections at 11. Defendant is ignoring the fact that the police officers had probable cause to arrest the defendant, with or without Darlene Court's cooperation, and based on their own observations would have been perfectly justified in assuming that such a statement by Darlene Court (if it had been made) would have been a lie. At that point in the interaction, the officers had probable cause to believe a drug transaction had taken place because

---

[1] Defendant did not seek to have Darlene Court or the officers she was with during the alleged "false ID" testify at the hearing.

1) they had observed the transaction, Colon Tr. at 7-12, 42-48, O'Sullivan Tr. at 17-18; 2) they recovered drugs from Darlene Court; Colon Tr. at 14-15; 3) they heard from Darlene Court that she had just purchased the drugs in the manner that they observed, Colon Tr. at 14-16; 4) they knew that the defendant had fled when he was confronted by the police; O'Sullivan Tr. at 11-13; and 5) they knew that he had assaulted a police officer. O'Sullivan Tr. at 11-13. Based on these facts, there can be no question that officers had probable cause to arrest the defendant, not only for the drug transaction they had seen, but for the assault on Officer O'Sullivan and the defendant's flight. Defendant's assertion that Darlene Court said or did something that "vitiated" probable cause is thus both unfounded and absurd.

    G.    <u>The Police Decision to Dispense with a Warrant</u>:

Defendant makes much of the fact that officers first radioed that they would seek a warrant for Brewington, but then resolved to arrest him without a warrant. Defendant's Objections at 11. Once again, this is taken completely out of context and ignores pages and pages of testimony supporting the officers decision and Judge Bowler's conclusion.

Sergeant Detective Terestre testified at the hearing that after the defendant had fled and left behind a photo identification with a Brockton address, Sergeant Detective Terestre believed that the defendant had eluded the police and the only way the defendant would be apprehended was at his Brockton address. Terestre Tr. at 62. It was for this reason that Sergeant Detective Terestre stated that he would get a warrant. What Sergeant Detective Terestre did not know at that time, but found out immediately afterwards, is that the defendant's Board of Probation report listed his address as 36 Wrentham Street. Terestre Tr. at 11-12. Unlike the photo identification, which implied that the defendant lived in another part of the state, the Board of

Probation report showed that the defendant lived about a block from the scene of the incident, near the place where Officer O'Sullivan had lost sight of him and very near to the place where moments before police dogs had lost his scent. O'Sullivan Tr. at 19, Colon Tr. at 18, Terestre Tr. at 10. Thus, immediately after wrongly concluding that Brewington had successfully escaped from the police, Sergeant Detective Terestre learned that the pursuit of the defendant was still hot. In other words, Sergeant Detective Terestre learned that the defendant was not lost; he was essentially cornered. Based on this new information, Sergeant Detective Terestre immediately (and properly) set out to arrest the defendant, rather than let him further flee or destroy evidence.

Defendant, leaving out all of the context in which the decision to seek a warrant was first made and then abandoned, posits a hypothetical discussion between Sergeant Detective Terestre and police department lawyers. This hypothetical is absurd. As Judge Bowler found, Sergeant Detective Terestre acted properly when he decided to arrest Brewington immediately, rather than give him a further opportunity to flee, destroy evidence, or commit further crimes. Thus, it seems likely that police department lawyers, like Judge Bowler, would have told Sergeant Detective Terestre that exigent circumstances permitted his continued pursuit of the defendant.

As Judge Bowler concluded, the officers' entry into 36 Wrentham Street was proper because they were in hot pursuit of the defendant. During the period between the crime and the defendant's arrest, a period of approximately one hour, the officers were in pursuit of the defendant.[2] Immediately after the defendant fled, Officer O'Sullivan recovered an identification

---

[2] The short time frame between the incident and the arrest is established by the recorded radio report of the defendant's flight from Officer O'Sullivan, which occurred at 5:58 pm, and the time that the defendant's criminal history was printed, 6:50 p.m., 52 minutes later.

card with the defendant's name and a Brockton address, as well as a set of keys from the jacket that the defendant abandoned after he assaulted Officer O'Sullivan. O'Sullivan Tr. at 15. They also knew that the defendant had fled in the direction of Wrentham Avenue and that a canine unit had traced the defendant's scent to a site adjacent to 36 Wrentham Street. O'Sullivan Tr. at 19, Colon Tr. at 18, Terestre Tr. at 10. At 6:50 pm, 52 minutes after the incident, they learned that the defendant's last known address was 36 Wrentham Street. Terestre Tr. at 11-12, O'Sullivan Tr. at 20-22. Upon learning this the officers immediately went to 36 Wrentham Street, arriving within five or ten minutes. Terestre Tr. at 13, Colon Tr. at 18, and O'Sullivan Tr. at 23. Indeed, even the defendant's girlfriend testified that the police arrived at the apartment "just a few minutes" after the defendant ran into the apartment and stated that he was running from the police. Minter Tr. at 23-25.

Based on all this information, the officers' entry into 36 Wrentham Street was proper, regardless of whether the front door was locked or unlocked.. See United States v. Santana, 427 U.S.38, 43 (1976) ("A suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place."); United States v. Moore, 790 F.2d 13, 15 (1st Cir. 1986) (same); United States v. Wilson, 36 F.3d 205 (1st Cir. 1994) (same). See also United States v. Scott, 520 F.2d 697 (9th Cir. 1975) (finding that 1.5 hour time period between crime and flight in public place justified a warrantless, hot pursuit arrest in defendant's home); United States v. Mitchell, 457 F2d 513 (6th Cir. 1972) (finding that 2 hour time period between crime and flight in public place justified a warrantless, hot pursuit arrest in defendant's home).

The officers' entry into 36 Wrentham Street was further justified by the fact that the defendant was suspected of dealing in narcotics, as narcotics are easily destroyed. See, e.g.,

13

United States v. Blount, 123 F.3d 831 (5th Cir. 1997) (officers may enter a private space without a warrant when they have probable cause to believe that narcotics are inside and the occupants know of the police presence); United States v. Mikell, 102 F.3d 470,475 (11th Cir. 1996) ("the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be quickly destroyed."); United States v. Jones, 204 F.3d 541 (4th Cir. 2000) (finding exigent circumstances to enter a house, arrest a defendant, and conduct a protective sweep that uncovered drugs after officers observed a suspect exchange an object for money and rapidly leave when he became aware of the police).

      H.      The Entry into the Vestibule of 36 Wrentham Street:

Defendant objects to a series of factual rulings related the officers entry into the vestibule of 36 Wrentham Street. The defendant also objects to the alternative legal finding that the vestibule was a "common area" that the officers had a right to enter. None of these objections to Judge Bowler's conclusions are warranted.

Defendant first objects to Judge Bowler's conclusion that "the officers arrived only a few minutes after the defendant entered the downstairs apartment" at 36 Wrentham Street. Defendant Objection at 13. Defendant does not state a basis for this objection. Judge Bowler's conclusion is amply supported by the record. Terestre Tr. at 11-13, O'Sullivan Tr. at 20-23. Indeed, as noted above, even the defendant's girlfriend testified that the police arrived at the apartment "just a few minutes" after the defendant ran into the apartment and stated that he was running from the police. Minter Tr. at 23-25.

Defendant also objects to Judge Bowler's factual finding that front door to 36 Wrentham Street (the entrance to the common area of the building) was unlocked when the police arrived.

Though no witness had a clear memory of whether the door was locked or unlocked, the record certainly supports Judge Bowler's factual finding that the door was not locked. Indeed, Sergeant Colon testified that he did not believe that the door was locked when the officers arrived at 36 Wrentham Street. He testified that he did not use the keys to enter the door, and he does not remember Sergeant Detective Terestre using the keys either. Colon Tr. at 62-64. Sergeant Detective Terestre testified that he did not have any memory of whether the door was locked and did not remember using the keys to open the door. Terestre Tr. at 49-52. Even the defendant's girlfriend and sole witness at the hearing conceded that she did not remember locking the door that day and is not sure it was locked. Minter Tr. at 24.

Defendant finally objects to Judge Bowler's legal conclusion, as an alternative ground to support the entry into the vestibule, that the defendant did not have a reasonable expectation of privacy in the vestibule. Defendant's argument is legally incorrect. Individuals do not have a reasonable expectation of privacy in the common areas of a multi-unit dwelling. United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("it is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building").

However, even if the door to the common area was locked, and even if under some circumstances a person may have a privacy interest in the common area of a dwelling, such a ruling would have no impact on the admissibility of any evidence in this case for two reasons. First, as noted above, the officers were in hot pursuit of the defendant and thus had the right to enter the vestibule of his apartment, and indeed his apartment itself to try to locate him. Second, no evidence was found inside the common area of the dwelling. The relevance of the vestibule in this case is only that the police had to physically cross it in order to knock on the doors of the

apartments inside, so that they could talk to the occupants. There is simply no case law to support the view that evidence obtained as a result of police knocking on doors that were opened by the occupants is suppressible as a fruit of the poisonous tree, even if the police had to cross a common area so that they could knock on the door.

    I.    <u>Exigency Existed to Enter the Apartment</u>:

For all the reasons noted above, Judge Bowler's conclusion that the police were in hot pursuit of the defendant and therefore were allowed to enter his apartment to arrest him was correct. Defendant objects to several factual findings tangentially related to this conclusion, in addition to the ones noted above.

Defendant first objects to the finding that Brewington fled towards the rear of the apartment after the door to the apartment was opened. Defendant takes several statements out of context and claims that these statements contradict Judge Bowler's conclusion that the defendant ran after he made eye contact with the police. For example, defendant quotes Sergeant Detective Terestre as testifying, "He was just standing there at the moment I made eye contact with him." Defendant conveniently ignored Sergeant Detective Terestre's very next sentence: "Q: Then what happened? A: He began to run towards the rear of the apartment." Terestre Tr. at 15. Defendant also ignores Sergeant Colon's testimony that the defendant "ran towards the back of the room." Colon Tr. at 23.

Defendant next objects to Judge Bowler's conclusion that the officers did not draw their weapons at the door. This conclusion is supported by the uncontradicted testimony of Sergeant Detective Terestre that his gun was not drawn. Terestre Tr. at 56. Defendant's assertion that the fact that Sergeant Detective Terestre's gun was not drawn "undermined the basis for [the] earlier

16

frisk" is nonsensical. Officer O'Sullivan's made a decision to frisk the defendant because he feared for his safety when was alone and on the street. The fact that Sergeant Detective Terestre, accompanied by several police officers, decided not to draw his gun in a different location tells us nothing about Officer O'Sullivan's state of mind in the earlier situation.

As noted above, defendant's objection to Judge Bowler's conclusion that the police entry into the apartment was justified by their hot pursuit of the defendant is both factually and legally groundless. The police action in this case was both proper and commendable. The few minutes between the defendant's flight from the police and his arrest inside 36 Wrentham Street, combined with the extensive and continuous efforts made by the police to track the defendant, is well within bounds of hot pursuit as defined by the case law. See Santana, 427 U.S. at 43 ("A suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place."); Moore, 790 F.2d at 15 (same); Wilson, 36 F.3d 205 (1st Cir. 1994) (same), Scott, 520 F.2d 697 (finding that 1.5 hour time period between crime and flight in public place justified a warrantless, hot pursuit arrest in defendant's home); Mitchell, 457 F2d 513 (finding that 2 hour time period between crime and flight in public place justified a warrantless, hot pursuit arrest in defendant's home).[3]

J.  Protective Sweep:

Defendant also objects to Judge Bowler's conclusion that the police were justified in conducting a "protective sweep" of the apartment, despite the fact that the defendant was in

---

[3] Defendant's citation to United States v. Curzi, 867 F.2d 36 43 n.6 (1st Cir. 1989) is odd. Curzi states, "Circumstances deliberately created by the police themselves cannot justify a warrantless search." It is entirely unclear what circumstances the defendant believes were "deliberately created by the police".

custody.  This conclusion is well supported by the case law.  <u>See</u>, e.g., <u>United States v. Martins</u>, 413 F.3d 139 (1st Cir. 2005)  and <u>United States v. Buie</u>, 494 U.S. 325 (1990).  As explained in Judge Bowler's recommendation, given the prior police interaction with the defendant, the fact that several people were present in the apartment, and the fact that the defendant appeared to be fleeing towards the closet, the officers had an articulable suspicion to believe that a person who could present a risk of attack could be hiding in the apartment.  In any event, it should be noted that the only evidence found as a result of the protective sweep of the apartment was the bullet resistant vest, and not the guns which were found only as a result of a subsequent consent search.

     Defendant's final objection regards Judge Bowler's alternate finding that the consent obtained from the defendant's girlfriend, as well as the defendant post-arrest statements, were independent of the earlier events.  Defendant mischaracterizes Judge Bowler's recommendation.  Judge Bowler found not that these items were discovered independently, but that their discovery was inevitable.  Given that even the defendant concedes that the officers knew where to find the defendant prior to the entry into 36 Wrentham Street, it was inevitable at that point that the police officers would go to the location, seek to find the defendant, and ask for a consent to search.  Judge Bowler correctly found that the consent to search, given by Ebonie Minter whose apartment the defendant had hidden in, would have been given anyway, especially because Ms. Minter testified that she believed that the defendant had removed the guns found in the apartment and expected that the police would find nothing illegal in the safe or elsewhere in the apartment.  Minter Tr. at 28.

## CONCLUSION

     Judge Bowler's recommendation was based on careful consideration of the four

witnesses' testimony and demeanor.  It was issued after she heard four days of testimony and allowed the parties extensive briefing of the legal and factual issues both before and after the hearing.  Judge Bowler's recommendation clearly delineated the proper legal standards and appropriately applied the facts to these standards.  Defendant's attempt now to cast doubt on Judge Bowler's recommendation by selectively quoting out-of-context passages from the witnesses' extensive testimony should not be allowed to undermine Judge Bowler's lengthy and detailed recommendation.

For these reasons, the United States asks this Court to adopt Judge Bowler's Recommendation and Report and deny Defendant's Motion to Suppress.

    Respectfully submitted,

    MICHAEL J. SULLIVAN
    United States Attorney

By:   /s/ Seth P. Berman
    SETH P. BERMAN
    Assistant U.S. Attorney

Dated: February 2, 2006